**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                                      CASE NO.:  09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,[1]      CHAPTER 11

    Debtor.

_____/

**TRUSTEE'S MOTION TO APPROVE SETTLEMENT WITH BERENFELD SPRITZER**
**SHECHTER & SHEER, LLP AND FOR ENTRY OF BAR ORDER**
(Evidentiary Hearing Requested)

Herbert Stettin ("Trustee"), the Chapter 11 Trustee of Rothstein Rosenfeldt Adler, P.A.

("RRA" or "Estate"), pursuant to Federal Rule of Bankruptcy Procedure 9019(a), files this

Motion to Approve the Trustee's Settlement With Berenfeld Spritzer Shechter & Sheer, LLP

("BSSS") and For Entry of Bar Order and states:

**Background**

This case was commenced by four petitioning creditors as an involuntary Chapter 11

proceeding on November 10, 2009 [ECF No. 1].  The Court entered an Order for Relief on

November 30, 2009 [ECF No. 66].  On November 20, 2009, this Court entered an order directing

the appointment of a trustee [ECF No. 30].  On November 20, 2009, the Office of the United

States Trustee office selected Herbert Stettin as the Trustee in this case. [ECF No. 35].  On

November 25, 2009, the Court ratified Mr. Stettin's appointment as Trustee. [ECF No. 55].

On August 4, 2010, the Trustee commenced an adversary proceeding, 10-03485-RBR

("Adversary") against the defendant BSSS, by filing an Adversary Complaint (Adversary ECF

No. 1; the "Complaint"), alleging various causes of action and objecting to the BSSS proof of

---

[1] The address and last four digits of the taxpayer identification number of the Debtor, Rothstein Rosenfeldt Adler, P.A., is 6600 NW 16th Street, Suite 11, Plantation, FL 33313 (TIN 7961).

claim [Claim # 38] or, alternatively, seeking to equitably subordinate such claim if the Trustee's objection thereto is not sustained, all as more particularly alleged in the Complaint.

**Terms Of The Settlement**

The Trustee and BSSS have reached a resolution of the outstanding issues raised in the Trustee's Complaint. The settlement was reached as part of a mediation process governed by a Confidential Mediation Agreement signed on behalf of the Trustee, BSSS and its insurer, Lexington Insurance Company ("Lexington"), Mediator Mark Buckstein, Esq., and various other parties interested in said insurance policy, including the plaintiffs in *Razorback, et al. v Rothstein, et al.,* CASE NO.: 09-062943 (Fla. 17th Cir. Ct 2009) all of whom are represented by William Scherer of Conrad & Scherer, LLP (collectively the "Scherer Clients"). As a result of the mediation described above a settlement agreement was reached, a copy of the Settlement Agreement is attached as Exhibit "A."

The Settlement reached amongst the mediation participants calls for Lexington to pay $10 million for the account of BSSS-- the full policy limits --to the Trustee for the benefit of the RRA bankruptcy estate, including, without limitation, the Scherer Clients, notwithstanding the existence of other claims asserted against BSSS. BSSS has provided the Trustee with an affidavit of its managing partner confirming that there are no other policies of insurance covering his claim and the claim of the Scherer Clients. Additionally, BSSS has represented that it does not have unencumbered assets from which it could provide any material additional payment in excess of the policy limits of its insurance.

Given these considerations and in the absence of any other resources to satisfy a judgment against BSSS, the Trustee has concluded, in an exercise of his business judgment, that

the Settlement with BSSS based upon the payment of its full insurance policy limits and entry of a bar order is warranted and in the best interests of the Estate and its creditors.

**The Trustee's Collaboration with Creditors in Settling with BSSS**

In addition to the claims asserted against BSSS by the Adversary Proceeding, BSSS is a defendant in litigation initiated by the Scherer Clients in Broward County, Florida Circuit Court. *Razorback, et al. v Rothstein, et al.,* CASE NO.: 09-062943 (Fla. 17th Cir. Ct. 2009). The Trustee and his undersigned counsel have collaborated closely with Mr. Scherer in jointly demanding that BSSS' insurance carrier, Lexington, pay the policy limits to facilitate settlement of the claims of both the Trustee and the Scherer Clients.

The Trustee and the Scherer Clients jointly demanded that Lexington pay the policy limits in exchange for settlement of all of their respective claims and the issuance of a bar order. *See Letter from William Scherer* dated July 16, 2010 attached as Exhibit "B" (the "Scherer Demand") and *Letter From Frank Scruggs*, dated August 9, 2010, attached as Exhibit "C" (the "Trustee Demand"). By design and after collaboration with each other, the Scherer Demand and the Trustee Demand present mirror image demands. In the Scherer Demand, Mr. Scherer states, "We understand the bankruptcy trustee has also demanded policy limits. We are willing to accept a joint tender to us and the trustee who would also issue a bar order thereby ensuring finality to any litigation whether pending or contemplated." *See* Exhibit B.

In the Trustee Demand, the Trustee literally echoed the demand of the Scherer Clients for payment of the Lexington policy limits in return for a complete resolution of the litigation, including a bar order, in his demand letter of August 9, 2010. *See* Exhibit C. The Settlement reflects the bargain that both the Trustee and the Scherer Clients offered in their respective demand letters. The Settlement Agreement attached hereto as Exhibit A evidences that BSSS

and Lexington accepted the settlement offers made by the Scherer Clients and the Trustee in their respective demand letters (Exhibits B and C, respectively).

After having joined the Trustee in seeking and successfully obtaining the policy limit settlement, the Scherer Clients, through their counsel, have advised the Trustee and his counsel of the existence of certain preconditions to their consent to any settlement with BSSS that would include entry of a bar order.  In the interest of effecting the Settlement and receiving the Settlement proceeds for the benefit of the Estate and all creditors, the Trustee seeks the Court's approval, even if over the objections of the Scherer Clients based upon new terms and conditions not included in the Scherer Demand or the Trustee Demand.

To the extent that the Scherer Clients contend that they or their counsel deserve or are entitled to receive some portion of the proceeds of the Settlement, the Trustee has advised the Scherer Clients that he will support their filing a motion seeking compensation for making a substantial contribution to the Settlement under 11 U.S.C. §503(b)(3)(D).[2]  Regardless of what process the Scherer Clients elect to utilize to recover some portion of the Settlement proceeds for themselves or their counsel, the Trustee believes that it is imperative to obtain and not further imperil the bankruptcy estate's receipt of the policy limits settlement with BSSS.  No dispute or controversy between the Trustee and the Scherer Clients should put this very significant settlement in jeopardy; that result would be patently inconsistent with the interests of all creditors of this bankruptcy estate.

---

[2]  At the September 28, 2010 status conference before this Court, Mr. Singerman represented to this Court that should a settlement with BSSS be reached "the Conrad Scherer, [sic] Mr. Silver's firm, would apply to the Court, with the trustee's support, for a substantial contribution claim, for its work in bringing the settlement about." Transcript, *September 28, 2010,* at pg. 51 lines 18-22. This position is consistent with the understanding of the Trustee and his counsel of the mechanism to resolve any issue of fees and costs due to Conrad & Scherer, LPP, or the Scherer Clients.

**Legal Argument to Support Settlement**

Bankruptcy Rule 9019(a) provides that after notice and a hearing, a court may approve a proposed settlement of a claim.  The decision of whether or not to approve a compromise is within the sound discretion of the court.  *Chira v. Saal (In re Chira)*, 367 B.R. 888, 896 (S.D. Fla. 2007); In *re Air Safety Intern., L.C.,* 335 B.R. 843, 852 (S.D. Fla. 2005).

In order to fulfill its duty to scrutinize any potential settlement, the bankruptcy court must determine whether a proposed settlement is "fair and equitable".  *Chira v. Saal (In re Chira)*, 367 B.R. at 896; *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 852 (S.D. Fla. 2005).   In *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990), the Eleventh Circuit provided additional guidance as to whether a compromise should be approved.  *Justice Oaks* established a four-part test for approval:

> (a)     The probability of success in litigation;
>
> (b)     The difficulties, if any, to be encountered in the matter of collection;
>
> (c)     The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and
>
> (d)     The paramount interest of the creditors and a proper deference to their reasonable views in the premises. Id.

The Settlement overwhelmingly satisfies the *Justice Oaks* standard.  The Trustee believes his complaint sets forth sound claims, as illustrated not only by the text of the complaint but also by his memorandum of law in opposition to the BSSS motion to dismiss [Adversary ECF No. 21].  In contrast, BSSS believes it has sound defenses as more fully set forth in its Motion to Dismiss [ECF No. 7].  The Trustee recognizes, that all litigation involves

5

a measure of uncertainty and risk. Accordingly, he seeks approval of the Settlement to eliminate this measure of uncertainty and risk and to benefit all creditors.

BSSS has been a successful professional services firm. Yet, its assets, including available insurance coverage, are negligible in relation to the extensive damages sought by the Trustee in the Adversary and the Scherer Clients in the Broward County Circuit Court action. And the current assets of BSSS are subject of a prior lien in favor of its working capital lender. The largest asset which can be used to satisfy the demands against BSSS is the $10 million Lexington insurance policy, the limits of which have been tendered by Lexington, upon the request of BSSS to fund the Settlement.

As in any accounting malpractice litigation, if not settled, this proceeding could and likely would become complex, document intensive, and protracted. Litigation of this case will inevitably involve delay above and beyond that provided for by the current pretrial order. Even if the case were to be litigated by the Trustee to a successful conclusion, an appeal likely would follow, thus further delaying the Estate's receipt of any recovery. By that time, the insurance policy proceeds may not be available.

This Court is required to consider the "paramount interest of creditors," the Trustee has considered the Settlement with a view to the benefit of all creditors. As explained above, the Scherer Clients, through their counsel, have been intimately involved in the design and execution of the settlement strategy. Additionally, the Committee has been kept fully aware of the developments in the BSSS adversary proceeding. It is evident that BSSS' most significant asset is the Lexington insurance policy, which has already been tendered to effect the Settlement. The request for a bar order from BSSS in return for the entire amount of the

insurance proceeds was clearly and expressly contemplated by the Scherer Demand and the Trustee Demand.

### Bar Order

The terms of the Settlement include the issuance of a bar order in favor of BSSS and its employees.  This Court has the inherent power under the Bankruptcy Code, including section 105(a), to issue any order necessary or appropriate to carry out the provisions of Title 11. *Munford v. Munford, Inc., (In re Munford)*, 97 F.3d 449, 454 (11th Cir. 1996)(finding bankruptcy court had authority under section 105(a) to enter order barring claims against certain defendants).  The Eleventh Circuit concluded that (i) public policy favors settlements, (ii) the cost of litigation can be burdensome on a bankruptcy Estate, and (iii) "bar orders pay an integral role in facilitating settlements."  *Munford* 97 F.3d at 455; *accord In re S&I Investments*, 421 B.R. 569, 583-586 (Bankr. S.D. Fla. 2009)(J. Ray) (approving a bar order as part of a settlement with the estate); *In re Certified HR Serv. Co.,* No. 05-22912-RBR, *Order Granting Motion of Liquidating Trustee James S. Feltman To Approve Settlement and Compromise* [ECF No. 2200] (Bankr. S.D. Fla. June 8, 2008)(J. Ray); *In re First NLC Financial Serv. LLC.*, 2009 Bankr. LEXIS 1083 (Bankr. S.D. Fla. March 12, 2009)(J. Hyman). In fact, this Court has already approved bar orders in this case under similar facts. *See In re Rothstein Rosenfeldt Adler, P.A.*, 2010 Bankr. LEXIS 3001, at *17 (Bankr. S.D. Fla. Sept. 16, 2010) (approving a bar order as part of the Szafranski settlement); *In re Rothstein Rosenfeldt Adler, P.A.*, 09-34791-RBR [ECF No. 910] (approving a bar order as part of the Lippman settlement).

The proposed bar order is an essential and critical element of the Settlement.  The approval of the Settlement and the issuance of the bar order will result in a payment of $10

million to the estate and will save the estate the cost of litigating this case both at the trial and appellate levels and any risk of an adverse ruling were the case to be tried to verdict.

## Conclusion

The Settlement is in the best interest of the estate and all of its creditors. It will provide the Estate with $10 million. The Settlement will also save the estate considerable expenses by avoiding the delays and uncertainties of trial and in recovering upon any judgment.

**WHEREFORE,** the Trustee respectfully requests the entry of an Order in substantially the same form as is attached as Exhibit D, granting this Motion, approving the Settlement, and granting such other relief as is just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Regular U.S. Mail, postage prepaid, fax, email and/or overnight delivery, as indicated, upon all parties on the attached Service List this 3rd day of November, 2010.

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Attorneys for Trustee Herbert Stettin*
200 S. Biscayne Blvd, Ste 1000
Miami, Florida 33131
Phone: (305)-755-9500
Facsimile: (305)-714-4340

By:    /s/ Paul Steven Singerman
     Paul Steven Singerman, Esq.
     Fla. Bar No. 378860
     singerman@bergersingerman.com
     Frank Scruggs, Esq.
     Florida Bar No. 251488
     fscruggs@bergersingerman.com
     Isaac Marcushamer, Esq.
     Florida Bar No. 0060373
     imarcushamer@bergersingerman.com

3184184

8

# MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Marianella Morales, Esquire
Authorized Agent For Joining Creditors
Avenida Francisco de Miranda
Torre Provincial "A"
Piso 8
Caracas, Venezuela
**(VIA CM/ECF and EMAIL)**

John H. Genovese, Esq.
Robert F. Elgidely, Esq.
Theresa M.B. Van Vliet, Esq.
Genovese Joblove & Battista, PA
Bank Of America Tower at International
Place
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
**(VIA CM/ECF and EMAIL)**

Kendall Coffey, Esq.
Coffey Burlington,
Office in the Grove
Penthouse
2699 South Bayshore Drive
Miami, Florida 33133
kcoffey@coffeyburlington.com
**(VIA CM/ECF and EMAIL)**

The Honorable Herbert M. Stettin
One Biscayne Tower
Suite 3700
Two South Biscayne Boulevard
Miami, Florida 33131
**(VIA U.S. MAIL and EMAIL)**

John G. Bianco, Esq.
John M. Mulli, Esquire
Tripp Scott
110 Southeast Sixth Street
Fifteenth Floor
Fort Lauderdale, Fl.  33301
jgb@trippscott.com
**(VIA CM/ECF and EMAIL)**

Alison W. Lehr, Esq.
Grisel Alonso, Esq.
Assistant United States Attorney
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132
Alison.Lehr@usdoj.gov
Grisel.alonso@usdoj.gov
**(VIA CM/ECF and EMAIL)**

Jeffrey R. Sonn, Esq.
Sonn & Erez, PLC
Broward Financial Center
500 E. Broward Boulevard
Suite 1600
Fort Lauderdale, Florida  33394
jsonn@sonnerez.com
**(VIA CM/ECF and EMAIL)**

Office of the US Trustee
51 Southwest First Avenue
Suite 1204
Miami, Florida  33130
**(VIA CM/ECF and EMAIL)**

Thomas Tew, Esq.
Tew-Cardenas, LLP
Four Seasons Tower
15th Floor
1441 Brickell Avenue
Miami, Florida 33131-3407
tt@tewlaw.com
 **(VIA CM/ECF and EMAIL)**

Conrad & Scherer, LLP
633 South Federal Highway
Fort Lauderdale, FL 33301
bs@conradscherer.com
JSilver@conradscherer.com
**(VIA CM/ECF and EMAIL)**

2441794-1

## MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Michael D. Seese, Esq.
Hinshaw & Culbertson, LLP
1 E Broward Blvd Ste 1010
Ft Lauderdale, Florida 33301
mseese@hinshawlaw.com
**(VIA CM/ECF and EMAIL)**

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA 19114
**(Via U.S. Mail)**

Internal Revenue Service
Special Procedures - Insolvency
7850 SW 6th Court
Plantation, FL  33324
**(Via U.S. Mail)**

Special Asst. U.S. Attorney
P.O. Box 9, Stop 8000
51 SW 1st Avenue, #1114
Miami, Fl  33130
**(Via U.S. Mail)**

United Healthcare
Dept. CH 10151
Palatine, IL 60055
**(Via US Mail)**

Special Asst. U.S. Attorney
IRS District Counsel
1000 S. Pine Island Rd., Ste 340
Plantation, FL 33324-3906
**(Via U.S. Mail)**

The Honorable Eric H. Holder, Jr.
Attorney General of the U.S.
950 Pennsylvania Avenue, NW Room 4400
Washington, DC  20530-0001
**(Via U.S. Mail)**

Honorable Jeffrey H. Sloman,
Acting U.S. Attorney
99 NE 4th Street
Miami, Fl  33132
**(Via U.S. Mail)**

Daniel Mink
Ovadia Levy
c/o Renato Watches, Inc
14051 NW 14th Street
Sunrise, Florida 33323
**(Via U.S. Mail)**

William George Salim, Jr.
Moskowitz Mandell & Salim
800 Corporate Dr Ste 510
Fort Lauderdale, Florida 33334
wsalim@mmsslaw.com
**(VIA CM/ECF and EMAIL)**

USI
Attn: Anthony Gruppo
200 West Cypress Creek Road
Suite 500
Fort Lauderdale, FL 33309
Anthony.gruppo@usi.biz
**(VIA EMAIL)**

Marc Nurik, Esq.
1 East Broward Blvd
Suite 700
Fort Lauderdale, FL 33301
marc@nuriklaw.com
**(VIA EMAIL)**

BAST AMRON LLP
SunTrust International Center
One Southeast Third Avenue
Suite 1440
Miami, Florida 33131
bamron@bastamron.com
jbast@bastamron.com
**(VIA CM/ECF and EMAIL)**

# MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Mark Bloom, Esq.
John B. Hutton, Esq.
Greenberg Traurig, LLP
1221 Brickell Avenue
Miami, FL 33131
bloomm@gtlaw.com
huttonj@gtlaw.com
**(VIA CM/ECF and EMAIL)**

Robert D. Critton, Esq.
Burman, Critton, Luttier & Coleman
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
rcrit@bclclaw.com
**(VIA CM/ECF and EMAIL)**

Roth & Scholl
Attn: Jeffrey C. Roth, Esq.
Attorneys For Creditor Blue
Capital Us East Coast Properties, L.P.
866 South Dixie Highway
Coral Gables, Fl 33146
jeff@rothandscholl.com
**(VIA CM/ECF and EMAIL)**

Rogers, Morris & Ziegler, LLP
1401 East Broward Blvd
Suite 300
Fort Lauderdale, FL 33301
mfbooth@rmzlaw.com
**(VIA CM/ECF and EMAIL)**

Arthur C. Neiwirth, Esq.
One E. Broward Blvd., Suite 1400
Ft. Lauderdale, FL 33301
aneiwirth@qpwblaw.com
**(VIA CM/ECF and EMAIL)**

The Florida Bar
Adria E. Quintela, Esq.
Alan Anthony Pascal, Esq.
Lake Shore Plaza II
1300 Concord Terrace, Suite 130
Sunrise, FL 33323
aquintel@flabar.org
apascal@flabar.org
**(VIA CM/ECF and EMAIL)**

Micheal W. Moskowitz, Esq.
800 Corporate Drive, Suite 500
Ft. Lauderdale, FL 33234
mmoskowitz@mmsslaw.com
**(VIA CM/ECF and EMAIL)**

Francis L. Carter, Esq.
Katz Barron Squitero Faust
2699 S. Bayshore Drive, 7th Floor
Miami, Florida 33133
flc@katzbarron.com
**(VIA CM/ECF and EMAIL)**

Bradley S. Shraiberg, Esq.
2385 NW Executive Drive
Suite 300
Boca Raton, Florida 33431
bshraiberg@sfl-pa.com
**(VIA CM/ECF and EMAIL)**

Henry S. Wulf, Esq.
CARLTON FIELDS, P.A.
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401
E-Mail: hwulf@carltonfields.com
**(VIA CM/ECF and EMAIL)**

EMESS Capital, LLC
c/o Bruce A. Katzen, Esq.
201 S. Biscayne Blvd., 17th Floor
Miami, Florida 33131
E-Mail: bkatzen@klugerkaplan.com
jberman@klugerkaplan.com
**(VIA CM/ECF and EMAIL)**

2441794-1
3

# MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Ira Sochet, Trustee
Revocable Intervivos Trust of Ira Sochet
c/o Phil Hudson, Esq.
200 South Biscayne Blvd, Suite 3600
Miami, Florida 33130
E-Mail: pmhudson@arnstein.com
**(VIA CM/ECF and EMAIL)**

Coquina Investments
c/o Patricia A. Redmond, Esq.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
E-Mail: predmond@stearnsweaver.com
**(VIA CM/ECF and EMAIL)**

Michael I. Goldberg, Esq.
Las Olas Centre - Suite 1600
350 East Las Olas Blvd
Fort Lauderdale, FL 33301
E-Mail: Michael.goldberg@akerman.com
Eyal.berger@akerman.com
**(VIA CM/ECF and EMAIL)**

LMB Funding Group
c/o Robert C. Furr, Esq.
2255 Glades Road, Suite 337W
Boca Raton, Florida 33431
E-Mail: rfurr@furrcohen.com
**(VIA CM/ECF and EMAIL)**

Lawrence A. Gordich, Esq.
Melissa Alagna, Esq.
SEGALL/GORDICH P.A.
801 Brickell Avenue, Suite 900
Miami, Florida 33131
Email: lag@segallgordich.com
Email: mma@segallgordich.com
**(VIA CM/ECF and EMAIL)**

Broward County
Attn: Hollie N. Hawn, Esq.
Government Center
115 South Andrews Avenue
Fort Lauderdale, FL 33301
E-Mail: hhawn@broward.org
**(VIA CM/ECF and EMAIL)**

Steven J. Solomon, Esq.
Gray Robinson, P.A.
1221 Brickell Ave, Suite 1600
Miami, Florida 33131
E-Mail – steven.solomon@gray-robinson.com
**(VIA CM/ECF and EMAIL)**

Peter F. Valori, Esq.
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
E-mail: pvalori@dvllp.com
**(VIA CM/ECF and EMAIL)**

Canon Financial Services, Inc.
158 Gaither Drive, #200
Mount Laurel, NJ 08054
**(Via US Mail)**

CIT Technology Financing Services I, LLC
10201 Centurion Parkway North
Jacksonville, FL 32256
**(Via US Mail)**

Gibraltar Private Bank & Trust Company
220 Alhambra Circle, Suite 500
Coral Gables, FL 33134
**(Via US Mail)**

Inter-Tel Leasing, Inc.
1140 West Loop North
Houston, TX 77055
**(Via US Mail)**

Florida Department of Revenue
501 S. Calhoun Street
Room 201
Carlton Building
Tallahassee, FL 32399
**(Via US Mail)**

2441794-1      4

# MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Leon County Tax Collector
315 S. Calhoun Street
Suite 210
Tallahassee, FL 32301
**(Via US Mail)**

Miami-Dade County Tax Collectors
140 West Flagler Street, 14th Floor
Miami, FL 33130
**(Via US Mail)**

Palm Beach County Tax Collector
P.O. Box 3715
West Palm Beach, FL 33402-3715
**(Via US Mail)**

THE LAW OFFICES OF
GEOFFREY D. ITTLEMAN, P.A.
440 North Andrews Avenue
Fort Lauderdale, Florida 33301
**(Via US Mail)**

Carpenter & Berger, PL
6400 N. Andrew Ave, suite 370
Fort Lauderdale, FL 33309
**(Via US Mail)**

Frank F. McGinn, Esq.
Bartlett Hackett Feinberg, P.C.
155 Federal Street, 9th Floor
Boston, MA 02110
ffm@bostonbusinesslaw.com
**(VIA CM/ECF and EMAIL)**

Darol H. M. Carr, Esq.
99 Nesbit Street
Punta Gorda, FL 33950
dcarr@farr.com
**(VIA CM/ECF and EMAIL)**

Jane A. Bee, Esq.
Blank Rome LLP
130 North 18th Street
Philadelphia, PA 19103-6998
bee@blankrome.com
**(VIA EMAIL)**

Roderick F. Coleman, Esq.
400 South Dixie Highway, Suite 121
Boca Raton, FL 33432
rfc@colemanattorneys.com
**(VIA CM/ECF and EMAIL)**

Mark S. Haltzman, Esq.
Lamm Rubenstone, LLC
3600 Horizon Blvd, Suite 200
Trevose, PA 19053
mhaltzman@lammrubenstone.com
**(VIA CM/ECF and EMAIL)**

Robert C. Buschel, Esq.
100 S.E. Third Ave, Suite 1300
Fort Lauderdale, FL 33394
**buschel@bglaw-pa.com**
**(VIA CM/ECF and EMAIL)**

Berkowitz Dick Pollack & Brant
Certified Public Accountants & Consultants,
LLP
200 S Biscayne Boulevard, Sixth Floor
Miami, FL  33131-2310
Attn: Richard Pollack
**(Via Email and U.S. Mail)**

MELAND RUSSIN & BUDWICK, P.A.
3000 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Attn: James C. Moon, Esq.
jmoon@melandrussin.com
Attn: Peter D. Russin, Esq.
prussin@melandrussin.com
Attn: Michael S. Budwick, Esq.
mbudwick@melandrussin.com
**(VIA CM/ECF and EMAIL)**

Gary S. Blake, Esq.
1499 W. Palmetto Park Rd
Suite 300
Boca Raton, FL 33486
gblake@lglaw.net
**(VIA CM/ECF and EMAIL)**

# MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Melinda S. Thornton, Esq.
Assistant County Attorney
County Attorney's Office
2810 Stephen P. Clark Center
111 N.W. First Street
Miami, Fl 33128-1993
Email: cao.bkc@miamidade.gov
**(VIA CM/ECF and EMAIL)**

SLATKIN & REYNOLDS, P.A.
Attorneys for Russell Adler and Katie Adler
One East Broward Boulevard, Suite 609
Fort Lauderdale, Florida 33301
Telephone 954.745.5880
Facsimile 954.745.5890
jslatkin@slatkinreynolds.com
**(VIA CM/ECF and EMAIL)**

ASSOULINE & BERLOWE, P.A.
213 East Sheridan Street, Ste. 3
Dania Beach, FL 33004
Attn: Eric N. Assouline, Esq.
ena@assoulineberlowe.com
**(VIA CM/ECF and EMAIL)**

Steven J. Reisman, Esq.
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
E-mail: sreisman@curtis.com
**(Via Email and U.S. Mail)**

Turner P. Smith, Esq.
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
E-mail: tsmith@curtis.com
**(Via Email and U.S. Mail)**

Maryann Gallagher, Esq.
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue

New York, NY 10178-0061
E-mail: mgallagher@curtis.com
**(Via Email and U.S. Mail)**

ILEANA CRUZ BONGINI, ESQ.
icruz@stearnsweaver.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON,
P.A.
Coquina Investments
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
**(VIA CM/ECF and EMAIL)**

Lynn Maynard Gollin
lgollin@gordonrees.com
Gordon & Rees LLP
Four Seasons Tower
15th Floor
1441 Brickell Avenue
Miami, FL 33131
**(VIA CM/ECF and EMAIL)**

Paul J. McMahon, Esq.
Paul Joseph McMahon, P.A.
2840 S.W. Third Ave
Miami, Florida 33129
pjm@pjmlawmiami.com
**(VIA CM/ECF and EMAIL)**

Robert P. Avolio, Esq.
Crossroads Corporate Center
3150 Brunswick Pike, Ste. 120
Lawrenceville, NJ 08648
ravolio@avoliohanlon.com
**(Via Email and U.S. Mail)**

Mark S. Shipman, Esq.
20 Batterson Park Road, Suite 120
Farmington, CT 06032
mark@shipso.com
**(Via Email and U.S. Mail)**

# MASTER SERVICE LIST
CASE NO.: 09-34791-BKC-RBR

Heather L. Ries, Esq.
Fox Rothschild, LLP
222 Lakeview Ave, Suite 700
West Palm Beach, Fl 33401
hries@foxrothschild.com
**(VIA CM/ECF and EMAIL)**

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

In re

ROTHSTEIN ROSENFELDT ADLER, P.A.,

    Debtor.

_____/

HERBERT STETTIN, not individually but as
Chapter 11 Trustee of the estate of the Debtor,
Rothstein Rosenfeldt Adler, P.A.,

    Plaintiff,

v.

BERENFELD SPRITZER SHECHTER & SHEER, LLP

    Defendant.

_____/

CASE NO. 09-34791-BKC-RBR
CHAPTER 11

ADV. NO. 10-03485-RBR-A

## <u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement dated this 3rd day of November 2010 (the "Agreement") is executed by and amongst : (i) Herbert Stettin ("Stettin" or the "Trustee"), not individually but as Chapter 11 Trustee of the above-styled bankruptcy estate of the Debtor, Rothstein Rosenfeldt Adler, P.A. ("RRA"); and (ii) the Defendant in the above-styled adversary proceeding, Berenfeld Spritzer Shechter & Sheer LLP ("Berenfeld") and (iii) Lexington Insurance Company, "Lexington"), Berenfeld's liability insurer.

3203121-5

## RECITALS

A.      On November 10, 2009 (the "Petition Date"), a group of petitioning creditors filed an involuntary petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") the United States Bankruptcy Court for the Southern District of Florida (the "Court"), Case No. 09-347 91-BKC-RBR (the "Chapter 11 Case").

B.      On November 2, 2009, Stettin was appointed RRA's state court receiver.  By Order dated November 20, 2009, Stettin was appointed Chapter 11 Trustee of RRA.

C.      By notice filed November 25, 2009, RRA, by and through the Trustee, consented to the entry of an Order for Relief under Chapter 11 of the Bankruptcy Code.  As such, the Trustee is the duly authorized fiduciary on behalf of the Debtor.

D.      On August 4, 2010, the Trustee filed a complaint (the "Complaint") [Adv Proc. No. 10-03485-RBR-A, D.E. 1] against defendant Berenfeld alleging various causes of action against Berenfeld arising from Berenfeld's tax preparation and other accounting services performed by Berenfeld for RRA (the "Adversary Proceeding").

E.      The signatories to this Agreement have the authority to bind the entity for which they are signing to the terms of this Agreement, subject to the entry of the Approval Order, as defined below.

F.      The Trustee, Berenfeld, and Lexington have been engaged in settlement discussions to attempt to settle the issues raised in the Adversary Proceeding.

G.      As a result of such negotiations, the parties hereto have agreed to enter into this Agreement and to consummate the settlement and compromise contained herein.

H.      The parties hereto each agree and acknowledge that they have each received reasonably equivalent value in exchange for agreeing to the obligations under, and the terms and conditions of, this Agreement and the settlement and compromise contained herein.

NOW THEREFORE, in consideration of the terms and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      For purposes of this Agreement and the settlement contained herein, the parties agree and acknowledge that the foregoing recitals are true and correct and are hereby incorporated into and made a part of this Agreement.

2.      Upon the order approving this Settlement Agreement (the "Approval Order") becoming a Final, Non-Appealable order[1], and the Bar Order as defined in paragraph 3,

---

[1]      A "Final Non-Appealable" order shall mean an order that is: (i) not subject to any motion pursuant to Fed. R. Bankr. P. 9023; and (ii) no notice of appeal has been filed within the time period specified by Fed. R. Bankr. P. 8002; or (iii) if any appeals are filed in any court, they are dismissed or the Approval Order and the Bar Order have been affirmed and are no longer subject to further appellate review.

3203121-5                                                  2

becoming a Final, Non-Appealable order, which orders shall be in form and substance reasonably satisfactory to Lexington and Berenfeld and in substantially the form of the orders attached hereto as Exhibit "1" and Exhibit "2," Lexington, for the benefit of Berenfeld, shall deliver to the Trustee the sum of **$10,000,000.00 US** in immediately available funds (the "Settlement Payment"), to be tendered jointly to the Trustee and Conrad & Scherer LLP as payees or as the court may otherwise order, which is the total face value of the insurance policy held by Berenfeld. For the avoidance of doubt, the Settlement Payment shall not be made to the Trustee until each of the Bar Order and Approval Order is a Final, Non-Appealable Order. Additionally, Berenfeld stipulates to entry of an order in which the Court denies its Proof of Claim [Claim #38].

3.    The Trustee agrees and acknowledges that this Agreement is intended to resolve and satisfy any and all claims by the Trustee, the Debtor and the estate of the Debtor against Berenfeld, including, Tracy D. Weintraub, Gary Berkowitz, Brian Leitstein, its employees, its partners and any successors and their partners, and employees (the "Settling Parties"). The Trustee further agrees and acknowledges that this Agreement is contingent upon (the "Settlement Contingencies): (a) the entry of the Approval Order and the Bar Order[2] by December 15, 2010; and (b) the entry of the Bar Order containing an injunction and a permanent bar of the prosecution of any and all claims (the "Barred Claims"), of any kind and nature, including all direct, indirect or derivative claims against the Settling Parties in regard to any and all matters arising out of the Settling Parties' involvement whatsoever in transactions, acts or events in any manner related to Scott W. Rothstein and/or RRA, including but not limited to accounting and tax preparation services provided to RRA and Scott W. Rothstein and auditing services provided to Banyon 1030-32 LLC and its predecessors, affiliates, successors, and related entities (the "Bar Order") . The form of the Bar Order is attached hereto as Exhibit "2", and incorporated herein by reference.[3]

4.    Should the litigation involving the Barred Claims be permitted to proceed during the pendency of any appeal on the Bar Order, including as a result of a stay pending appeal of this Agreement, this Agreement shall be voidable by either party giving written notice to the other of its election to void this Settlement Agreement.

5.    The Trustee shall serve notice of the Settlement Motion and the notice of hearing in accordance with the Order Limiting Notice as amended [ECF No.206 & 272], which requires that notice be provided to all creditors. In addition the Trustee agrees to serve any additional party requested by the Settling Parties, provided that such requests are received no later than 5 PM Eastern 14 days prior to the hearing on the Settlement Motion.

6.    The parties shall jointly cooperate to enforce the terms of the Bar Order if challenged by any person and/or entity. The parties further agree that the Bankruptcy Court shall retain jurisdiction to enforce the terms of this Agreement and the Bar Order.

---

[2] The parties acknowledge that the Court may enter more than one order approving this settlement and that such an event shall not be a violation of this Settlement Agreement.

[3] The parties acknowledge that the Court may enter a Bar Order substantially similar in form and content, but not identical. Such an event shall not be a violation of the Settlement Contingencies.

For the avoidance of doubt, the Parties agree that if the Settlement Contingencies described above are not satisfied, then Berenfeld shall have the right to withdraw from this Settlement Agreement in which case all the terms and conditions thereof will be null and void and the parties will be restored to their rights as they existed prior to the signing of this Settlement Agreement.

7.     Upon entry of the Approval Order and the Bar Order and the Trustee's receipt of the Settlement Payment: (a) the Trustee, the Debtor and the Debtor's estate hereby forever release and discharge the Settling Parties and Lexington, its agents, employees, servants, and reinsurers of and from any and all claims, causes of action (including but not limited to statutory and common law claims of bad faith relating to the policy of insurance issued by Lexington to Berenfeld), damages, losses, debts, obligations, agreements, liabilities, attorney's fees, costs and expenses, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, and whether arising under state law, federal law, common law or otherwise, which arise directly or indirectly out of any facts, events, or transactions that occurred from the beginning of time through the effective date of this Agreement, including without limitation, the Barred Claims; (These are general releases of all known and unknown claims, including, without limitation, all claims, obligations, liabilities, and/or rights to payment.) and (b) the parties shall have no further obligations or liabilities between them, except as provided herein.

8.     Upon entry of the Approval Order and the Bar Order and the Trustee's receipt of the Settlement Payment: (a) the Settling Parties and Lexington hereby forever release and discharge the Trustee and the Debtor and each of their subsidiaries, affiliates, divisions, shareholders, former shareholders, directors, officers, employees, former employees, managers, agents, representatives, independent contractors, consultants, attorneys, accountants, trustees, spouses, heirs, predecessors, successors and assigns, and all persons or entities acting by, through or on behalf of any of them, of and from any and all claims, causes of action, damages, losses, debts, obligations, agreements, liabilities, attorneys' fees, costs and expenses, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, and whether arising under state law, federal law, common law or otherwise, which arise directly or indirectly out of any facts, events, or transactions that occurred from the beginning of time through the effective date of this Agreement, including without limitation, the Barred Claims;  (These are general releases of all known and unknown claims, including, without limitation, all claims, obligations, liabilities, and/or rights to payment.) and (b) the parties shall have no further obligations or liabilities between them, except as provided herein, and the Settling Parties and Lexington waive filing or asserting any claims against the Debtor's estate and agree to withdraw any such claims filed of record.

9.     The parties hereto agree to use their collective best efforts to obtain the Approval Order for which time is of the essence.

10.     The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to enforce the terms and conditions of this Agreement and to otherwise resolve any disputes under or pertaining to this Agreement and all parties hereto consent and submit to the jurisdiction of the Bankruptcy Court for all such matters.

11.     The parties agree not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame or disparage the personal or business reputation, practices, or conduct of the Settling Parties or the Trustee and his professionals and agents.  The parties acknowledge and agree that this prohibition extends to such statements, written or verbal, made to anyone, including but not limited to, the news media, creditors and other claimants in the bankruptcy, and other litigants.

12.     Any notices or other communications required or permitted hereunder shall be in writing and shall be considered to have been duly given, when received, if delivered by hand, telegram, overnight courier, telex or telecopy, and, when deposited, if placed in the mails for delivery by air mail, postage prepaid, addressed to the appropriate party at his or its address provided in writing to the parties to this Agreement at any time prior to the entry of the Approval Order and as set forth below (however, any such notice shall not be effective, if mailed, until three (3) working days after depositing in the mails or when actually received, whichever occurs first:

> (a)     If to the Trustee, to:
> Charles Lichtman, Esq.
> Berger Singerman, P.A.
> 350 East Las Olas Boulevard
> Suite 1000
> Fort Lauderdale, FL 33301
>
> (b)     If to a Settling Party, to:
> Jane W. Moscowitz, Esq.
> 1111 Brickell Avenue, Suite 2050
> Miami FL 33131

13.     Each of the parties hereto hereby agrees and acknowledges that the rights and benefits granted to each of them, subject to their respective obligations hereunder, constitute full and adequate consideration to each such party to enter into this Agreement and the ancillary documents contemplated to be delivered by each such party hereunder, and each such party has expressly bargained for and agreed that the rights afforded them constitute a material inducement to agree to settle these matters in accordance with the terms and conditions of this Agreement.

14.     This Agreement may be executed in one or more counterparts and by different parties in separate counterparts.  All such counterparts shall constitute one and the same agreement and shall become effective when one or more of the counterparts of this Agreement have been signed by each of the signatories. The parties may execute this Agreement in any number of actual, faxed, telecopied and/or pdf scanned counterparts and by the different parties on separate counterparts, each of which when so executed shall be an original.

15.     The parties hereto have had the full opportunity to consult with legal counsel and have reached this Agreement to resolve the matters set forth herein so as to avoid the

3203121-5                                    5

cost, risk and delay of litigation and agree to enter into this Agreement as evidence of that resolution.

16.     The foregoing Agreement constitutes the entire agreement of the parties to this Agreement with respect to the matters stated herein and there are no other oral or written agreements between the parties which are supplementary or contrary to this Agreement.  There are no contemporaneous oral promises, representations or agreements not set forth herein inducing this Agreement and all prior negotiations, discussions, statements and representations are merged herein.  This Agreement may only be modified by a written modification signed by each party hereto.  Reliance by any party on oral communications accordingly is unwarranted.

17.     The terms and provisions of this Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, personal representatives, successors and permitted assigns.

18.     The parties each represent and warrant that they are represented by legal counsel of their choice, are fully aware of the terms contained in this Agreement and have voluntarily and without coercion or duress of any kind entered into this Agreement and the documents executed in connection with this Agreement to which they are a party.  No party to this Agreement, nor any third party, shall be permitted to assert that any provision of this Agreement, shall be construed in favor of or against such party to this Agreement as a result of such party(s) participation in the drafting of this Agreement.

19.     Each of the parties hereto represents and warrants to the others that:  (a) all necessary corporate action on the part of such party to be taken in connection with the execution, delivery and performance of this Agreement and ancillary documents required hereunder has been duly taken; and (b) the execution, delivery and performance by such party of this Agreement does not constitute a violation or breach of such party's organizational documents or other agreements or laws by which such party is bound.

20.     At any time and from time to time before and after the closing, the parties hereto shall promptly execute and deliver such further documents and instruments, and take such other actions as may be reasonable to carry out the purpose and intent of this Agreement.

IN WITNESS WHEREOF, the parties have executed and deliver this Agreement as of the date first written above.

For the Plaintiff,

HERBERT STETTIN, Chapter 11 Trustee
for RRA

3203121-5                                                    6

For the Plaintiff

HERBERT STETTIN, Chapter 11 Trustee
for RRA

For the Settling Parties

| BERENFELD SPRITZER SHECHTER & SHEER, LLP   By: _____ Managing Ptr. | LEXINGTON INSURANCE COMPANY   By: _____ VP Claims |
|---|---|
| Tracy D. Weintraub | Gary Berkowitz |
| Brian Leitstein | |

3184126-4

7

For the Plaintiff

_____
HERBERT STETTIN, Chapter 11 Trustee
for RRA

For the Settling Parties

| BERENFELD SPRITZER SHECHTER & SHEER, LLP | LEXINGTON INSURANCE COMPANY |
|---|---|
| By:_____ | By:_____ |
| _____ Tracy D. Weintraub | _____ Gary Berkowitz |
| _____ Brian Leitstein | |

3184126-4

7

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                            CASE NO.:  09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,           CHAPTER 11

        Debtor.
_____/

**ORDER GRANTING MOTION TO APPROVE COMPROMISE AND SETTLEMENT**
**BETWEEN THE CHAPTER 11 TRUSTEE AND BERENFELD SPRITZER SHECHTER**
**& SHEER, LLP AND FOR ENTRY BAR ORDER**

**THIS CAUSE** came before the Court upon the Trustee's *Motion to Approve Compromise and Settlement Between The Chapter 11 Trustee and Berenfeld Spritzer Shechter & Sheer, LLP  And For Entry of Bar Order* [ECF No. ___] (the "Motion") filed by the Trustee on November 3, 2010.  The Court has reviewed the Motion, and has considered the entire record in this case and the arguments of counsel at the hearing on the Motion and evidence adduced in support of the Motion (including any evidence offered by proffer and accepted by the Court without objection of any party).  The Court finds that notice of the Motion and the hearing

3179473-1

thereon is sufficient (*See* ECF No., ___ for the Certificate of Service of the notice of hearing on the Motion).  Based on the foregoing, it is

ORDERED as follows:

1.      The Motion is **GRANTED**, any and all Objections [ECF No. _____] are **OVERRULED**. The request for a bar order shall be dealt with by separate order.

2.      The terms of the Settlement Agreement attached to the Motion as Exhibit "A" are approved and incorporated herein in their entirety. The Trustee is further authorized to take any action necessary to effectuate the Settlement.

3.      The Court reserves jurisdiction regarding the interpretation, effectuation, and enforcement of the terms of the Settlement Agreement and this Order.

# # #

Submitted by:

**BERGER SINGERMAN, P.A.**
Paul Steven Singerman, Esq.
200 S. Biscayne Blvd, Suite 1000
Miami, Florida 33131
Main Line: (305) 755-9500
Facsimile: (305) 714-4340

Copies to:
(*Attorney Singerman shall serve this order on all interested parties and file a certificate of service within 3 days of entry of this Order*).

3179473-1

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                                         CASE NO.:  09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,          CHAPTER 11

     Debtor.

_____/

## BAR ORDER PURSUANT TO SETTLEMENT AGREEMENT BETWEEN TRUSTEE HERBERT STETTIN AND BERENFELD SPRITZER SHECHTER & SHEER, LLP

**THIS MATTER** came before the Court upon the Trustee's *Motion to Approve Compromise and Settlement Between The Chapter 11 Trustee and Berenfeld Spritzer Shechter & Sheer, LLP And Request For Bar Order* [ECF No. ___] (the "Motion") filed by Herbert Stettin the Chapter 11 Trustee ("Stettin" or "Trustee") of Rothstein Rosenfeldt Adler P.A. ("RRA") on November 3, 2010.  The Court has reviewed the Motion, and has considered the entire record in this case and the arguments of counsel at the hearing on the Motion and evidence adduced in support of the Motion (including any evidence offered by proffer and accepted by the Court without objection of any party).  The Court finds that notice of the Motion and the hearing thereon is sufficient (*See* ECF No. ___for the Certificate of Service of the notice of hearing on the Motion).  Based on the foregoing, it is

**ORDERED** as follows:

1. The court has approved the Settlement Agreement[1] between the Trustee and Berenfeld Spritzer Shechter & Sheer LLP in a separate order.

2. For the reasons stated on the record, which are incorporated herein by reference, the request for a bar order is **GRANTED** to the extent set forth below.

3. This Order shall act as an injunction against any person or entity in favor of Berenfeld Spritzer Shechter & Sheer LLP, its employees, and its partners, including, Tracy D. Weintraub, Gary Berkowitz, Brian Leitstein, and any successors and their partners, and employees (collectively, "Berenfeld") in regard to any and all matters arising out of any involvement of Berenfeld whatsoever in transactions, acts, or events in any manner related to Scott W. Rothstein ("Rothstein"), RRA, and/or Banyon 1030-32 LLC and its predecessors, affiliates, successors, and related entities (collectively, "Banyon") as follows:

    a. Against the filing, commencing, conducting, or continuing in any manner directly, indirectly, or derivatively, any suit, action, or other proceeding (including, without limitation, any proceeding in any judicial, arbitral, administrative, or other forum) against Berenfeld with regard to all matters arising out of any involvement of Berenfeld whatsoever in transactions, acts, or events in any manner related to Rothstein, RRA, and/or Banyon;

    b. Against enforcing, levying employing legal process, whether pre- or post-judgment; attaching, garnishing, sequestering (including without limitation, any prejudgment attachment, garnishment or sequestration), bringing

---

[1] Unless otherwise noted, all capitalized terms herein shall have the same meaning ascribed to them in the Motion and the Settlement Agreement.

proceedings supplementary to execution, collecting or otherwise recovering by any means or in any manner, any claims against Berenfeld with regard to all matters arising out of any involvement of Berenfeld whatsoever in transactions, acts or events in any manner related to Rothstein, RRA, and/or Banyon;

c. Against any action brought by any person or entity seeking recovery, contribution and/or indemnity from Berenfeld with regard to all matters arising out of the Berenfeld's involvement whatsoever in transactions, acts or events in any manner related to Rothstein, RRA, and/or Banyon. Notwithstanding any of the foregoing, nothing contained in this Order shall prevent a defendant in any pending or threatened litigation in any court from claiming, to the extent applicable in such litigation, that the damages sustained by plaintiff should be subject to setoff or other reduction in accordance with applicable non-bankruptcy law. Further, entry of this Order shall be without prejudice to the right of any such plaintiff to challenge the applicability of a setoff or reduction, and to the right of any plaintiff or defendant to challenge or assert the manner of calculating any such setoff or reduction in accordance with applicable non-bankruptcy law; and

d. Against proceeding in any manner and any place with regard to making or liquidating any claim or bringing any action of any kind or nature against Berenfeld in any forum other than the U.S. Bankruptcy Court for the Southern District of Florida.

4. The scope of the bar order set forth in paragraph 3 above is limited to those claims against Berenfeld arising from, in connection with, and/or involvement in Rothstein, RRA, and/or Banyon. The bar order set forth in paragraph 3 is not intended to bar third party claims against Berenfeld arising out of matters completely unrelated to Berenfeld's involvement with Rothstein, RRA, and/or Banyon.

5. Subject to paragraph 3C above, but otherwise notwithstanding anything else to the contrary contained herein or in the Settlement Agreement, neither the Court's entry of this Bar Order, the Order Approving the Settlement [ECF No.___], or the entry of an order dismissing the Adversary Proceeding shall operate as a release, discharge, or otherwise affect, diminish or impair in any way the claims, rights and remedies of any creditors, party in interest or other person or entity against any person or entity other than Berenfeld. Without limiting the foregoing, nothing in this Order, the Settlement Agreement, any order dismissing the Adversary Proceeding, or anything related to the approval or implementation of the Settlement Agreement shall affect, impair, or diminish in any way the claims, rights, remedies being asserted, or which may hereafter be asserted in any action or proceeding against any person or entity (including, without limitation, any current or future defendants or other parties in any current or future actions or proceedings), other than Berenfeld, including without limitation, in those certain cases styled (i) *Labonte et al v. Levine et al*, Case No. 10-CV-00853-MRK (D. Conn. June 2, 2010); and (ii)*Razorback Funding, LLC, et al v. Rothstein et al.*, Case No. 09-062943 (Fla. 17th Cir. Ct 2009).

6. Nothing in this Order, any order dismissing the Adversary Proceeding, or any other order implementing the Settlement and Bar Order approved herein is a determination

of any issue other than the reasonableness of the Settlement and Bar Order under applicable law, and the Court makes no determination of adjudication on the merits of the claims asserted. Moreover, the Trustee's release contained in paragraph 5 of the Settlement Agreement being given to Berenfeld shall be limited solely to claims, which the Trustee has exclusive standing to prosecute on behalf of the estate.

7. Nothing in the Settlement Agreement, this Order or the approval of the Settlement Agreement shall preclude any person or entity from taking discovery from and setting depositions of Berenfeld, as otherwise allowed by applicable law.

8. The bar order set forth in paragraph 3 above shall not apply to agencies or departments of the United States of America or of any state or local governments.

9. The Court reserves jurisdiction regarding the interpretation, effectuation, and enforcement of this Order.

10. Any and all objections [ECF No.____] to the entry of the bar order have either been withdrawn or are hereby **OVERRULED**.

# # #

Submitted by:

**BERGER SINGERMAN, P.A.**
Paul Steven Singerman, Esq.
200 S. Biscayne Blvd, Suite 1000
Miami, Florida 33131
Main Line: (305) 755-9500
Facsimile: (305) 714-4340

Copies to:
(*Attorney Singerman shall serve this order on all interested parties and file a certificate of service within 3 days of entry of this Order*).

3184190-5

# EXHIBIT "B"



**Conrad & Scherer**
Attorneys at Law

Ft. Lauderdale, Florida • Washington, DC • Quito, Ecuador

Rac

July 16, 2010

Jane Moscowitz, Esq.
Moscowitz & Moscowitz
Mellon Financial Center
1111 Brickell Ave., Suite 2050
Miami, FL 33131

Pam Perry, Esq.
Dresnick & Rodriguez, P.A.
9100 S. Dadeland Blvd., Ste 1610
Miami, FL 33156

Dear Jane and Pam,

On behalf of the plaintiffs in the case styled *Razorback, et al. v Rothstein, et al.;* CASE NO.: 09-062943 (19), demand is hereby made for the Berenfeld policy limits under the Lexington policy of insurance and any other policies providing coverage for the acts alleged in our complaint. We represent investors who lost approximately $160 million in the Rothstein Ponzi scheme. As you are aware and as we have been advised, the Lexington policy limits are only $10 million. The policy limits represent only a fraction of the damages in this case even without possible punitive damage exposure. As such, tender of the policy limits is demanded within 30 days. Failure to tender the policy limits promptly in light of the exorbitant exposure facing Berenfeld and its employees shall constitute bad faith and subject Lexington Insurance Company to a verdict in excess of the policy limits..

Liability is clear as evidenced in part by the testimony of Gary Berkowitz. Mr. Berkowitz made several damning admissions during his 2004 examination conducted on 3-17-10 and 3-18-10. In part, Mr. Berkowitz prepared a Statement of Assets, Liabilities and Stockholders' Equity for RRA to provide to its malpractice carrier. Mr. Berkowitz admitted the statement did not conform to generally accepted accounting principles nor was the statement accompanied by a compilation report which would have explained the basis of accounting utilized. Gary Berkowitz admitted he should have provided the compilation report and further admitted that his delivery of the financial statement to Irene Stay without a compilation report was inconsistent with the practice of Berenfeld regarding the delivery of financial statements. Mr. Berkowitz further testified that it didn't look to him like there was enough law business to justify having all these

Established 1974
Rex Conrad 1935-1999 • William Scherer

Conrad & Scherer, LLP • 633 South Federal Highway, Fort Lauderdale, Florida 33301
Mailing address • P.O. Box 14723, Fort Lauderdale, FL 33302
Phone 954.462.5500 • Fax 954.463.9244
www.conradscherer.com

lawyers in the office. He also testified that he did observe that RRA was taking money from trust accounts and transferring it into its operating account and payroll account. In June 2009 Mr. Berkowitz prepared a letter to John Harris of Gibraltar Bank at the request of Scott Rothstein. He believed Gibraltar was questioning a deposit by Rothstein to determine if the deposit represented income earned by the firm. Rothstein told him it was income and Berkowitz reported to Gibraltar that it was income without any verification. Tracy Weintraub further edited the "nebulous letter" to Gibraltar Bank at Rothstein's request by removing "we provide no proof of accuracy" and removing the word "verified" from the sentence "this information was not audited or verified by our firm."

It should have been readily apparent to Berkowitz, Leitstein and Weintraub that something was amiss at RRA. No one questioned a $20 million increase in firm income from 2006 to 2007. No one questioned gifts of new cars by Rothstein to his niece, nephew, Bill Brock, Debra Villegas, Les Stracher, Rothstein's parents and Kim Rothstein's parents. Similarly, no one questioned the gift of a $479,000 Weston house to Villegas in exchange for $100. This knowledge is against a backdrop of a negative balance $472,800.69 in the RRA operating account at Gibraltar Bank and a negative cash balance of $160,088.63 in the payroll account at Colonial bank as of 12-31-06.. Many more examples of blatant misconduct are contained within the deposition transcript with awareness by you.

All of the acts described above occurred prior to October 2009 when most of the plaintiffs made their investments. Had Berenfeld and its employees done their job, the Ponzi scheme would have been exposed earlier and imploded long before my clients made their investments. Over $160 million in losses could have been avoided. We further believe that the Court upon motion will grant leave to plead punitive damages thereby subjecting the insureds to unfathomable exposure not to mention negative publicity that could gravely impact the business of Berenfeld.

In closing, demand is made for the prompt tender of the Lexington policy limits for Berenfeld. Failure to tender the policy limits within 30 days shall constitute evidence of bad faith on behalf of Lexington. Concurrent with this demand we are also preserving our statutory bad faith claim by submitting a Civil Remedy Notice, a courtesy copy of which is attached hereto. Notwithstanding the limited coverage available my clients have agreed to accept the policy limits in exchange for full releases to the company as well as its employees. We understand the bankruptcy trustee has also demanded policy limits. We are willing to accept a joint tender to us and the trustee who would also issue a bar order thereby ensuring finality to any litigation whether pending or contemplated.

There is only one rational choice – pay the policy limits immediately or be prepared for the inevitable consequences. If you have any questions regarding the above, please do not hesitate to ask.



Conrad & Scherer
Attorneys at Law

Very truly yours,

William R. Scherer
For the firm

cc: Lexington Insurance Company



Conrad & Scherer
Attorneys at Law



**FLORIDA**
DEPARTMENT OF
**FINANCIAL SERVICES**



Alex Sink
Chief Financial Officer of Florida

## Civil Remedy Notice of Insurer Violations

Filing Number:          **162676**

Filing Accepted:        **7/21/2010**

Warning! Information submitted as part of this civil remedy notice is a public record.  Data entered into this form will be displayed on the DFS website for public review.  Please DO NOT enter Social Security Numbers, personal medical information, personal financial information or any other information you do not want available for public review.

☑   The submitter hereby states that this notice is given in order to perfect the rights of the person(s) damaged to pursue civil remedies authorized by Section 624.155, Florida Statutes.

### Complainant

| | |
|---|---|
| Name: | **RAZORBACK FUNDING,LLC C/O CONRAD & SCHERER, LLP** |
| Street Address: | **633 S. FEDERAL HIGHWAY, 8TH FLOOR** |
| City, State Zip: | **FT. LAUDERDALE, FL  33301** |
| Email Address: | **RCOCALIS@CONRADSCHERER.COM** |
| Complainant Type: | **Third Party** |

### Insured

| | |
|---|---|
| Name: | **BERENFELD, SPRITZER, SCHECTER & SHEER, LLP** |
| Policy #: | **001275584** |
| Claim #: | |

### Attorney

| | |
|---|---|
| Name: | **REID A COCALIS** |
| Street Address: | **633 SOUTH FEDERAL HWY., 8TH FLOOR** |
| City, State Zip: | **FT. LAUDERDALE, FL  33301** |
| Email Address: | **RCOCALIS@CONRADSCHERER.COM** |

### Notice Against

| | |
|---|---|
| Insurer Type: | **Authorized Insurer** |
| Name: | **LEXINGTON INSURANCE COMPANY** |
| Street Address: | |
| City, State Zip: | **,** |

Please identify the person or persons representing the insurer who are most responsible for/knowledgeable of the facts giving rise to the allegations in this notice.

**JANE MOSCOWITZ, ESQ.**

| | |
|---|---|
| Type of Insurance: | **Professional Liability** |





Alex Sink
Chief Financial Officer of Florida

## Civil Remedy Notice of Insurer Violations

Filing Number:   **162676**

### Reason for Notice

Reasons for Notice:

**Unsatisfactory Settlement Offer**

**PURSUANT TO SECTION 624.155, F.S.** please indicate all statutory provisions alleged to have been violated.

**624.155(1)(b)(1)**   **Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests.**

Reference to specific policy language that is relevant to the violation, if any. If the person bringing the civil action is a third party claimant, she or he shall not be required to reference the specific policy language if the authorized insurer has not provided a copy of the policy to the third party claimant pursuant to written request.

**SECTIONI.A.:"THE COMPANY WILL PAY ON BEHALF OF THE INSURED THOSE SUMS IN EXCESS OF THE SELF-INSURED RETENTION, THAT THE INSURED SHALL BECOME LEGALLY OBLIGATED TO PAY AS LOSS AMOUNTS RESULTING FROM A CLAIM THAT IS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AS A RESULT OF A WRONGFUL ACT BY THE INSURED**

To enable the insurer to investigate and resolve your claim, describe the facts and circumstances giving rise to the insurer's violation as you understand them at this time.

**DAMAGES ARE IN EXCESS OF $160 MILLION WHICH FAR EXCEED THE POLICY LIMITS OF $10 MILLION.LIABILITY IS CLEAR AS EVIDENCED IN PART BY THE TESTIMONY OF GARY BERKOWITZ. MR. BERKOWITZ MADE SEVERAL DAMNING ADMISSIONS DURING HIS 2004 EXAMINATION CONDUCTED ON 3 -17-10 AND 3-18-10. IN PART, MR. BERKOWITZ PREPARED A STATEMENT OF ASSETS, LIABILITIES AND STOCKHOLDERS' EQUITY FOR RRA TO PROVIDE TO ITS MALPRACTICE CARRIER. MR. BERKOWITZ ADMITTED THE STATEMENT DID NOT CONFORM TO GENERALLY ACCEPTED ACCOUNTING PRINCIPLES NOR WAS THE STATEMENT ACCOMPANIED BY A COMPILATION REPORT WHICH WOULD HAVE EXPLAINED THE BASIS OF ACCOUNTING UTILIZED. GARY BERKOWITZ ADMITTED HE SHOULD HAVE PROVIDED THE COMPILATION REPORT AND FURTHER ADMITTED THAT HIS DELIVERY OF THE FINANCIAL STATEMENT TO IRENE STAY WITHOUT A COMPILATION REPORT WAS INCONSISTENT WITH THE PRACTICE OF BERENFELD REGARDING THE DELIVERY OF FINANCIAL STATEMENTS. MR. BERKOWITZ FURTHER TESTIFIED THAT IT DIDN'T LOOK TO HIM LIKE THERE WAS ENOUGH LAW BUSINESS TO JUSTIFY HAVING ALL THESE LAWYERS IN THE OFFICE. HE ALSO TESTIFIED THAT HE DID OBSERVE THAT RRA WAS TAKING MONEY FROM TRUST ACCOUNTS AND TRANSFERRING IT INTO ITS OPERATING ACCOUNT AND PAYROLL ACCOUNT. IN JUNE 2009 MR. BERKOWITZ PREPARED A LETTER TO JOHN HARRIS OF GIBRALTAR BANK AT THE REQUEST OF SCOTT ROTHSTEIN. HE BELIEVED GIBRALTAR WAS QUESTIONING A DEPOSIT BY ROTHSTEIN TO DETERMINE IF THE DEPOSIT REPRESENTED INCOME EARNED BY THE FIRM. ROTHSTEIN TOLD HIM IT WAS INCOME AND BERKOWITZ REPORTED TO GIBRALTAR THAT IT WAS INCOME WITHOUT ANY VERIFICATION. TRACY WEINTRAUB FURTHER EDITED THE "NEBULOUS LETTER" TO GIBRALTAR BANK AT ROTHSTEIN'S REQUEST BY REMOVING "WE PROVIDE NO PROOF OF ACCURACY" AND REMOVING THE WORD "VERIFIED" FROM THE SENTENCE "THIS INFORMATION WAS NOT AUDITED OR VERIFIED BY OUR FIRM."
THE INSURANCE COMPANY CAN SATISFY ITS STATUTORY OBLIGATIONS BY TENDERING THE POLICY LIMITS JOINTLY TO THE BANKRUPTCY TRUSTEE AND CONRAD & SCHERER, LLP.**

### Comments

| User Id | Date Added | Comment |
| --- | --- | --- |

DFS-10-363
Rev. 11/2007

# EXHIBIT "C"



we deliver creative and effective business solutions and counsel

# BERGER SINGERMAN
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

Frank Scruggs
(954) 712-5164
FScruggs@bergersingerman.com

August 10, 2010

**_Certified Mail – Return Receipt and Overnight Mail_**

Jane Moscowitz, Esq.
Moscowitz & Moscowitz
1111 Brickell Avenue, Suite 2050
Miami, Florida 33131

> Re   Lexington Insurance Company Policy Number: 001275584 (the "Policy"); Insured, Berenfeld, Spritzer, Shechter & Sheer, LLP (the "Insured"), 2525 Ponce de Leon Boulevard, Fifth Floor, Coral Gables, Florida 33134

Dear Jane:

As you know, we represent Herbert Stettin, as Trustee for the law firm of Rothstein Rosenfeldt Adler, P.A. ("RRA"). For your convenience, attached hereto as Exhibit A is the Trustee's Complaint alleging claims for breach of contract, negligence and aiding and abetting a breach of fiduciary duty against the accounting firm of Berenfeld, Spritzer, Shechter & Sheer, LLP ("BSSS" or the "Insured"). The purpose of this letter is to provide Lexington with a thirty-day window in which to protect its Insured by settling the claims asserted by the Trustee and Conrad & Scherer's clients (the "Razorback Investors") by payment of the captioned Policy's $10 million limit of liability.[1]

As alleged in the Complaint, the Ponzi scheme orchestrated by Scott Rothstein ("Rothstein") involved the fabrication of "confidential" settlements, convincing investors to "purchase" these settlements by promising spectacular rates of return, paying initial investors with the monies of subsequent investors, and projecting the illusion of legitimacy by making lavish contributions to charities and politicians. This Ponzi scheme took hundreds of millions of dollars from investors, and in many ways was a classic Ponzi scheme except for its scope and its breadth. For a number of reasons delineated in the Complaint (including the sheer scale of the Ponzi scheme), it should have been unraveled as early as 2007, by RRA's accountants, the Insured.

---

[1] You have advised the undersigned that there is no additional insurance coverage applicable to the claims asserted by the Trustee, and we have required confirmation in response to the accompanying correspondence, dated August 5, 2010, Exhibit B.

Jane Moscowitz, Esq.
August 9, 2010
Page 2 of 4

The Insured's professional obligations to RRA primarily originated from (but are not limited to) its provision of two types of accounting services to RRA: preparation of tax returns and compilation of financial statements. Each of these categories of accounting services requires accountants to fulfill their obligations to the client by the exercise of due diligence, to make inquiries when the accountant is aware that information supplied by the client is incorrect, incomplete or otherwise unsatisfactory, and to withdraw from the representation if additional information is not provided to the satisfaction of the accountant.

Rothstein, of course, had a decades-long personal friendship with Tracy Weintraub ("Weintraub"), a managing partner at BSSS. Weintraub was the partner-in-charge of the relationship between BSSS and RRA. Rothstein's collaboration with Weintraub enabled the Insured and Rothstein to damage the interests of RRA. The Insured chose to serve Rothstein and in so doing, to disserve RRA by "looking the other way" when presented with obvious evidence reflecting his adverse effects upon RRA. The Insured thereby breached its contract with RRA and failed to fulfill professional obligations it owed to RRA.

BSSS's actions and omissions are particularly troubling because not only was the Insured responsible for filing RRA's tax returns, but also for conducting an audit of Banyon Income Fund, L.P., Banyon USVI, LLC, and Banyon 1030-32, LLC (collectively "Banyon"), Delaware entities that operated as the principal vehicles to purchase the Ponzi scheme settlements with investor funds. Furthermore, accountants at the Insured were responsible for the filing of the personal tax returns of a number of RRA employees, including Rothstein. Simply put, the Insured was one of a select few that had complete knowledge, access and information with respect to the complete financial picture of RRA.

Beginning in mid-2007 and continuing to the date that RRA ceased doing business, the Insured had access to RRA's books and records. These books and records -- especially to the trained eyes of the Insured's professionals -- revealed inconsistent, incomplete, and incorrect financial accounting for RRA under Rothstein's, and his key employees' (Debra Villegas, Bill Brock and Irene Stay) directions. Even though the numbers in RRA's tax returns and financial statements were nonsensical, the Insured did not follow through on its concerns with RRA. The Insured breached its contractual and professional duties to RRA as indicated by the following facts and circumstances alleged in the Complaint, among other yet to be discovered breaches.[2]

Specifically, Gary Berkowitz an employee of the Insured, acknowledged the following improprieties, among others:

- The Insured excluded Stuart Rosenfeldt, a 50% shareholder of RRA, from access

---

[2] These breaches were either testified to by Gary Berkowitz, an employee of the Insured (Mr. Weintraub invoked his Fifth Amendment right against self-incrimination over the course of his Rule 2004 Examination), or were evident from a review of the "work papers" generated by the Insured over the course of its relationship with RRA.

2

Jane Moscowitz, Esq.
August 9, 2010
Page 3 of 4

> to accounting information in its possession, which was not correct or consistent with standard operating procedures or professional standards. *See* March 17, 2010 transcript of the Rule 2004 Examination of Gary Berkowitz, attached hereto as Exhibit C, at 42:14 – 44:1, and Exhibit 2 to Berkowitz Examination.

- The Insured sent RRA's 2006 financial statements to third parties (including an insurance company and a bank), without indicating whether the financial statement was the product of a "compilation" or "review" in violation of AICPA's reporting requirements, and testified that this transmission was a "mistake." *See id.* at 178:17 – 180:4, and Exhibit 5 to Berkowitz Deposition, attached hereto as Exhibit D.

- The Insured provided a "nebulous" letter to Rothstein to help cover up $15,000,000 in suspicious transactions in response to an anti-money laundering compliance inquiry from Gibraltar Bank (and even surprisingly, at the direction of Rothstein to cover up the obviously illegal scheme, removed disclaimer language that certain information was not "verified"). *See id.* at 116:25 – 142:23, and Exhibits 12 and 13 to the Berkowitz Deposition, attached hereto as Exhibit E.

As a direct result of BSSS's actions and omissions, RRA was damaged. The damage to RRA includes the claims of all clients and investors who seek to recover losses for injuries that were proximately caused by BSSS's various breaches of its contractual obligations to RRA, its facilitation of Rothstein's breaches of his fiduciary obligations to RRA, and its negligence. These damages include the millions of dollars of client claims for money stolen from RRA trust accounts and more than $450 million that Rothstein and his lieutenants stole from investors. The complicity and assistance of BSSS was instrumental to the success of Rothstein in manipulating the finances of RRA to its detriment and was a proximate cause of the injury sustained by RRA. Had BSSS complied with its professional obligations, it would have either refused to provide the veneer of respectability that Rothstein demanded, thereby exposing the Ponzi scheme much earlier and salvaging RRA, or it would have wholly withdrawn from its relationship with Rothstein in a timely manner, to the same effect.

In sum, if the Insured had done its job in conformity with professional standards and its contractual responsibilities to RRA, considered the information before it, asked the questions it was obligated to ask as RRA's accountants, or refused in a timely manner to sign the tax returns of RRA and Rothstein, then the Ponzi scheme would have been exposed and Rothstein and his co-conspirators could not have continued to abuse the finances and affairs of RRA. The failure to do so constitutes negligence, breach of contract and aiding and abetting a breach of fiduciary duty.

Enclosed as Exhibit F is a copy of the Civil Remedy Notice of Insurer Violation submitted to Florida's Department of Financial Services. The Joint offer by the Razorback Investors and the Trustee to settle their claims against BSS and provide Lexington's Insured with

3

Jane Moscowitz, Esq.
August 9, 2010
Page 4 of 4

a general release for the $10 million policy limits shall remain open for 30 days, through and including, September 9, 2010, and then be automatically withdrawn. We have been advised that Mr. Scherer, on behalf of the Razorback Investors, has stated that "the trustee . . . would also issue a bar order thereby ensuring finality to any litigation whether pending or contemplated." These statements accurately describe the Trustee's position with respect to this Joint Offer of Settlement.

Finally, there is yet another benefit to expeditious resolution of this matter: Endorsement #007 of the Policy provides for the 50% reduction of the Self Insured Retention in the event the Insured mediates this case within the next 55 days and ultimately resolves it. The Trustee is, of course, willing to participate in mediation.

If you require any additional information in the interim, please contact the undersigned.

Sincerely,

BERGER SINGERMAN

Frank Scruggs

cc:     Lexington Insurance Company
        Attn: Professional Liability Claims Manager, Claim Department
        100 Summer Street
        Boston, MA 02110

        Jason Mazer, Esq.
        Ver Ploeg & Lumpkin, P.A.
        100 S.E. Second Street
        Thirtieth Floor
        Miami, Florida 33131

        William Scherer, Esq.
        Reid Cocalis, Esq.
        Conrad & Scherer
        633 South Federal Highway
        Eighth Floor
        Ft. Lauderdale, Florida 33301

2942007-8

4

we deliver creative and effective business solutions and counsel
BERGER  SINGERMAN
attorneys at law

Boca Raton   Fort Lauderdale   Miami   Tallahassee

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

ROTHSTEIN ROSENFELDT ADLER, P.A.,

    Debtor.

Case No. 09-34791-BKC-RBR
Chapter 11

_____/

HERBERT STETTIN, Chapter 11 Trustee for
the estate of Rothstein Rosenfeldt Adler, P.A.

    Plaintiff,

v.

BERENFELD SPRITZER SCHECHTER &
SHEER, LLP,

    Defendant.

Adv. Pro. No.

_____/

### ADVERSARY COMPLAINT ASSERTING NEGLIGENCE, BREACH OF CONTRACT, AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY AND OBJECTION TO PROOF OF CLAIM NO. 38 FILED BY BERENFELD SPRITZER SCHECTER AND SHEER, LLP

Plaintiff, Herbert Stettin, the duly appointed Chapter 11 Trustee ("Trustee" or "Plaintiff") for the estate of Rothstein Rosenfeldt Adler P.A. ("RRA"), sues the Defendant, Berenfeld Spritzer Schecter & Sheer, LLP ("BSSS") and alleges:

1.  The Ponzi scheme of Scott Rothstein ("Rothstein") was outrageous and audacious: fabricate "confidential" settlements, convince investors to "purchase" these settlements by promising spectacular rates of return, pay initial investors with the monies of subsequent investors, and project the illusion of legitimacy by making lavish contributions to charities and politicians. This Ponzi scheme took hundreds of millions of dollars from investors. The scheme should have been unraveled as early as 2007, by RRA's accountants, BSSS.

2.    BSSS's professional obligations to RRA primarily originated from (but are not limited to) its provision of two types of accounting services to RRA: preparation of tax returns and compilation of financial statements. Each of these categories of accounting services requires accountants to fulfill their obligations to the client by the exercise of due diligence, to make inquiries when the accountant is aware that information supplied by the client is incorrect, incomplete or otherwise unsatisfactory, and to withdraw from the representation if additional information is not provided to the satisfaction of the accountant.

3.    Unfortunately, BSSS became captivated by Rothstein's illusory wealth and the prospect of receiving lucrative engagements from Rothstein's personal corporate empire and his clients. Rothstein had a decades-long personal friendship with Tracy Weintraub ("Weintraub"), a partner at BSSS. Weintraub was the partner-in-charge of the relationship between BSSS and RRA. Rothstein's collaboration with Weintraub enabled BSSS and Rothstein to damage the interests of RRA. BSSS chose to serve Rothstein and in so doing, to disserve RRA by "looking the other way" when presented with obvious evidence reflecting his adverse effects upon RRA, thereby breaching its contract with RRA and willfully failing to fulfill professional obligations it owed to RRA.

### The Parties, Jurisdiction & Venue

4.    RRA was a law firm that was incorporated in the State of Florida on February 7, 2002. RRA maintained a principal office at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida, with satellite offices in Miami, Boca Raton, West Palm Beach and New York City.

5.    On November 2, 2009, Plaintiff was appointed as RRA's Receiver.

BERGER   SINGERMAN   a corporation   Fort Lauderdale   Miami   Tallahassee
attorneys at law
350 East Las Olas Boulevard   Suite 1000   Fort Lauderdale, Florida 33301   Telephone 954-625-9900   Facsimile 954-523-2872

6.      This involuntary Chapter 11 case was commenced on November 10, 2009 by four petitioning creditors.

7.      This Court has appointed Plaintiff Chapter 11 Trustee of RRA on November 25, 2009.

8.      On January 28, 2010, BSSS filed a Proof of Claim in this Court, asserting a claim of $36,795.24 against the Bankruptcy Estate for "services rendered." That claim is number 38 in these proceedings, thereby consenting to the jurisdiction of this Court to hear this case.

9.      BSSS is a Florida limited liability partnership which, at all relevant times, served as the primary accountants for RRA and as the auditing firm for Banyon Income Fund, L.P., Banyon USVI, LLC, and Banyon 1030-32, LLC (collectively "Banyon"), Delaware entities that operated as the principal vehicles to purchase the Ponzi scheme settlements with investor funds.

10.     This Court has jurisdiction over this matter and the parties pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (C).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

12.     All conditions precedent to this action have been met, waived or excused.

### Factual Allegations Common to All Counts

13.     On November 10, 2009, a group of creditors filed an involuntary petition for reorganization under Chapter 11 of the United States Code against RRA in the wake of allegations that Rothstein perpetrated a massive Ponzi scheme. Rothstein has confessed to those allegations, entered a guilty plea in open court, and received a lengthy sentence of imprisonment.[1]

14.     The involuntary petition was filed after Rothstein induced unwary investors to fall prey to his scheme. The petitioning creditors showed that Rothstein fraudulently funneled

---

[1] On June 9, 2010 United States District Judge James I. Cohn sentenced Rothstein to 50 years for his crimes. The case is *United States v. Rothstein*, 09-60931-JIC (S.D. Fla. 2009).

BERGER   SINGERMAN   *Boca Raton   Fort Lauderdale   Miami   Tallahassee*
attorneys at law

350 East Las Olas Boulevard   Suite 1000   Fort Lauderdale, Florida 33301   Telephone 954-525-9900   Facsimile 954-523-2872

investors' funds through bank accounts, labeled "trust accounts," titled in the name of RRA, as well as through RRA's other bank accounts, to Rothstein personally and to a variety of corporations beneficially controlled by Rothstein which he used to fund his outrageous personal expenses and investments.

15.    Rothstein represented to prospective investors that ostensible clients of RRA had claims which were settled and that the defendants were obligated to pay settlement proceeds to RRA for the benefit of the clients over an extended period of time.

16.    Rothstein further represented that certain clients of RRA were willing to assign their interests in the periodic payments in exchange for an immediate discounted lump sum payment.

17.    As part of his scheme, Rothstein offered prospective investors the opportunity to pay discounted lump sum payments to RRA purportedly to be paid to its clients in exchange for assignments by those clients of their right to the full periodic payments.

18.    To accomplish this scheme, Rothstein provided prospective investors with purported copies of a redacted contingency fee agreement between RRA and an ostensible client, a settlement agreement between the "client" and the purported defendant, a sale and transfer agreement, an acknowledgement of assignment/purchase of settlement proceeds agreement, a guaranty executed by Rothstein both personally and on behalf of RRA, a defense agreement, a copy of a redacted wire transfer confirmation purporting to evidence the payment of the settlement proceeds into RRA's trust account, and correspondence detailing the transaction on RRA's letterhead.

19.    None of these papers were genuine. Rothstein falsified the existence of the client, falsified the existence of the settlement, falsified the existence of the settlement proceeds,

falsified the documents, and misappropriated the investor funds to himself and to a number of related entities that he beneficially controlled.

20. These "investments" led to significant transfers of investors' monies through Banyon to RRA bank accounts and from there to Rothstein and investors other than Banyon.

21. As shown hereafter, Rothstein's scheme could not have germinated, blossomed and flourished without the complicity of BSSS and his relationship with Weintraub.

*The Rothstein-Weintraub Relationship*

22. The unwarranted protection BSSS provided Rothstein was facilitated by the close personal relationship between Weintraub and Rothstein. The relationship between Scott Rothstein and BSSS was carefully cultivated by Rothstein and Weintraub, to the detriment of RRA, to insure that BSSS would not challenge or reveal Rothstein's actions.

23. Weintraub described his relationship with Rothstein as having begun in elementary school. The relationship evolved to the point that Weintraub and Rothstein repeatedly expressed "love" for each other. Not only did Rothstein bestow lavish perks upon Weintraub and other BSSS accountants, he also continuously raided the sparse coffers of RRA to sponsor events for the benefit of Weintraub. Several of Weintraub's major clients were Scott Rothstein referrals, including Edify, LLC and its related entities, Jewel River Cruise Line US, LLC, RRA Sports & Entertainment, LLC, RRA Goal Line Management, LLC, the Bova restaurant chain, and the Rothstein Family Foundation, collectively representing – together with RRA – significant revenue for BSSS (and presumably substantial personal benefit for Weintraub through the internal awards of compensation by BSSS to partners who originated new business).

24. Weintraub and at least one other senior BSSS partner kept close track of the dollar value of the Rothstein-BSSS relationship, openly expressed the value to BSSS of the Rothstein-

BSSS relationship, and expressed determination to monitor and expand that relationship with Rothstein.

25. The financial benefits of this relationship helped induce BSSS to look the other way when it should have been, consistent with its professional and contractual duties to RRA, asking questions (and getting answers) that would have protected RRA from the abuses of Rothstein and his three top lieutenants, Debra Villegas ("Villegas"), Irene Stay ("Stay") and Bill Brock ("Brock"). These three individuals were, respectively, RRA's Chief Operating Officer, the Chief Financial Officer, and the Director of Law Office Management. Together, they controlled access to the books and records of RRA. BSSS facilitated this exercise of control.

### The RRA-BSSS Relationship

26. From July, 2007 until the closure of RRA in early November, 2009, BSSS was engaged by RRA to perform professional services, including but not limited to preparation of RRA's overdue tax return for 2005 and preparation of RRA's tax returns for 2006 and 2007, tax consulting services, and accounting services such as compilation of financial statements, year-end closure of the books, bank account reconciliations, staffing for RRA's internal bookkeeping operations, and credit card reconciliations.

27. Furthermore, between September, 2008 and February, 2009, BSSS conducted an audit of Banyon for the period ended December 31, 2007 and a review for the period ended June 30, 2008. Weintraub and other officers of BSSS had actual knowledge of Rothstein's improper manipulations of RRA for his individual benefit, his use of Banyon to secure investors' monies, and his diversion of monies from RRA accounts and transfer of same into RRA's operating account, and vice versa, for his personal misuse. That misuse included Rothstein's

bolstering of RRA's payroll, sponsorships and advertising to support his posturing as a major player in Florida legal, political, and philanthropic circles.

28.     Rothstein directed BSSS to withhold RRA's accounting records from all RRA personnel, other than Villegas, Stay and Brock. BSSS surprisingly agreed and, as a result, no one at RRA was privy to the entire financial picture of RRA. Rothstein demanded that BSSS not disclose RRA accounting information to anyone else at RRA, including any of its attorneys including the other shareholder and the other so-called partners.

29.     BSSS complied with Rothstein's directive of secrecy, to the detriment of RRA.

30.     Even though Stuart Rosenfeldt was a 50% shareholder and President of RRA, Rothstein excluded him from direct participation in the BSSS-RRA relationship. Rosenfeldt did not participate in directing service delivery by BSSS. He did not facilitate or endorse BSSS's negligence, breach of contract, or its aiding and abetting Rothstein's breaches of his fiduciary duty to RRA. BSSS and Rothstein did not include Rosenfeldt in overseeing or monitoring service delivery to RRA. Indeed, BSSS chose not to inform or educate Rosenfeldt about the "red flags" BSSS observed in the course of delivering services to RRA. BSSS elected not to verify important information it received from Rothstein, Stay, Villegas and Brock with Rosenfeldt.

31.     BSSS learned of the details of both the dire financial straits of RRA and the real source of profligate spending by Rothstein. BSSS knew that RRA was hemorrhaging cash because it extensively reviewed and reconciled RRA's operating and trust bank accounts, saw RRA's overdraft positions, and obtained actual knowledge of its NSF (not sufficient funds) bank charges. These and other circumstances were clear indications that RRA was in a grim cash position caused by Rothstein's profligate spending.

BERGER   SINGERMAN   Boca Raton   Fort Lauderdale   Miami   Tallahassee
attorneys at law
350 East Las Olas Boulevard   Suite 1000   Fort Lauderdale, Florida 33301   Telephone 954-525-9900   Facsimile 954-525-2872

32. Between 2005 and October 2009, Rothstein incurred approximately $22 million of credit card charges (increasing steadily from $1.2 million in 2005 to almost $7 million in the first ten-months of 2009); BSSS had complete knowledge of this because it helped to summarize/reconcile the American Express charges for each of the compilations and/or annual tax returns that they prepared and because it posted or requested that RRA post those summaries of charges to RRA's records.

33. Of course, as BSSS observed these developments, it knew that RRA was not generating nearly enough income from the practice of law to justify the rapid increase in the number of attorneys in its Fort Lauderdale and other offices, and in the extraordinary expenditures of the law firm.

34. In other words, throughout BSSS's engagement with RRA, accountants at BSSS knew that the RRA financial picture simply made no sense.

35. At no time during BSSS's engagement was RRA merely an instrumentality used and abused by Rothstein to perpetrate his Ponzi scheme. Rather, it was a law firm that employed 70 lawyers, many of whom were good and honest. Unfortunately, RRA had the Rothstein-Villages-Stay-Brock cabal that, facilitated by BSSS, poisoned the legitimate interests of RRA thereby injuring clients and third parties, and subjecting RRA to enormous liabilities.

36. While knowing of Rothstein's actions and observing his financially damaging effects upon RRA, BSSS was simultaneously conducting an audit of Banyon. Banyon was collectively the largest investor in Rothstein's Ponzi scheme. As discussed in more detail below, as BSSS was auditing Banyon, it was concurrently preparing tax returns for RRA, delivering accounting services to RRA and providing tax advice to Rothstein. While doing so, BSSS

ignored numerous red flags, entranced by the allure of Rothstein's money and personality and the profits it realized from the relationship.

37.    Weintraub, a partner on the Executive Committee at BSSS and head of its office in Fort Lauderdale, had access to and personal knowledge of RRA's, Scott Rothstein's and Banyon's financial information. Serving in multiple capacities as auditor of Banyon, accountant and tax preparer for RRA, tax preparer for Rothstein individually, recipient of Rothstein's requests for the preparation of personal financial statements, holder and user of a power of attorney to communicate with the IRS on behalf of Rothstein, and accountant for various Rothstein businesses, BSSS failed to comply with basic provisions of the AICPA Code of Professional Conduct and applicable provisions of the Statement on Standards of Accounting and Review Services ("SSARS"). And of course its audit of Banyon was woefully inept; it was not conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

38.    In addition, and at a minimum, as BSSS provided various accounting services to RRA, it was obligated to comply with the AICPA Code of Professional Conduct and those standards set out in Codified Section of AICPA Professional Standards AR 100, setting forth BSSS's responsibilities concerning the compilation of financial statements and the AICPA's Statement on Standards for Tax Services No. 3, setting forth BSSS's responsibilities concerning the preparation of tax returns. It failed to do so.

39.    In so failing to adhere to applicable professional standards, BSSS breached its professional and contractual duties to RRA. BSSS failed or refused to fulfill professional duties arising from its engagements. BSSS undertook duties over time that were far broader than those applicable to compilations of financial statements by its course of conduct in service delivery, including but not limited to becoming part of the internal accounting department of RRA upon

Rothstein's directions and obeying restraints that Rothstein imposed upon those activities. BSSS learned of the obvious breaches of basic accounting and reporting duties and did nothing.

40. BSSS did extensive tax work for RRA as well as for a number of RRA's employees individually, including Rothstein, Villegas and Brook. Billing (and collecting) over $120,000.00 in fees for its work for RRA alone, BSSS prepared RRA's tax returns for 2005, 2006 and 2007, and was on the cusp of preparing the 2008 tax return for RRA when Rothstein's Ponzi scheme hit the newswire. The 2005 return was already late when BSSS began to prepare it in 2007. BSSS alerted Rothstein to the likelihood that IRS liens would be imposed if the late return were not completed and taxes immediately paid.

41. As the accountants at BSSS prepared RRA's tax returns, BSSS also (as auditor for Banyon) observed as multi-million dollar transfers were made from Banyon's accounts into RRA's trust accounts, payroll account, and operating account. In fact, Weintraub — the preparer signatory on the RRA tax returns — had knowledge of and full access to Banyon's financial information. He was the originator and concurring audit partner on the Banyon audits and he participated in service delivery to Banyon.

42. BSSS neglected its responsibilities under applicable professional standards to provide accounting services consistent with the standards required of a public accounting firm.

43. The negligence of BSSS materially and detrimentally contributed to the fall of RRA and proximately caused the damages that RRA sustained as a foreseeable consequence of BSSS's negligence and breaches of its contractual responsibilities.

### *Requirements of the Profession*

44. The Code of Professional Conduct of the American Institute of Certified Public Accountants consists of two sections—(1) the Principles and (2) the Rules. The Principles

provide the framework for the Rules, which govern the performance of professional services by

members.

The Principles are as follows:
- Section 52 - Article I: Responsibilities
  *"...members of the American Institute of Certified Public Accountants have responsibilities to all those who use their professional services."*

- Section 53 - Article II: The Public Interest
  *"Members should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism."*

  *"The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce."*

- Section 54 - Article III: Integrity
  *"Service and the public trust should not be subordinated to personal gain and advantage. Integrity can accommodate the inadvertent error and the honest difference of opinion; it cannot accommodate deceit or subordination of principle"*

- Section 55 - Article IV: Objectivity and Independence
  *"The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest."*

  *"Although members not in public practice cannot maintain the appearance of independence, they nevertheless have the responsibility to maintain objectivity in rendering professional services. Members employed by others to prepare financial statements or to perform auditing, tax, or consulting services are charged with the same responsibility for objectivity as members in public practice...."*

- Section 56 - Article V: Due Care
  *"Due care requires a member to discharge professional responsibilities with competence and diligence."*

  *"Diligence imposes the responsibility to render services promptly and carefully, to be thorough, and to observe applicable technical and ethical standards."*

- Section 57 - Article VI: Scope and Nature of Services
  *"Each of these Principles should be considered by members in determining whether or not to provide specific services in individual circumstances. In some*

*instances, they may represent an overall constraint on the nonaudit services that might be offered to a specific client."*

45.     Statements on Standards for Accounting and Review Services, issued by the Accounting and Review Services Committee of the AIPCA, establish the pronouncements in connection with the compilation and review of financial statements.

- *AR Section 100.05*
  *"The accountant should establish an understanding with the entity, preferably in writing, regarding the services to be performed..."*

- *AR section 100.07*
  *"The accountant should possess a level of knowledge of the accounting principles and practices of the industry in which the entity operates that will enable him or her to compile financial statements that are appropriate in form for an entity operating in that industry...."*

- *AR section 100.08*
  *"To compile financial statements, the accountant should possess a general understanding of the nature of the entity's business transactions, the form of its accounting records, the stated qualifications of its accounting personnel, the accounting basis on which the financials are to be presented, and the form and content of the financial statements. The accountant ordinarily obtains knowledge of these matters through experience with the entity or inquiry of the entity's personnel. On the basis of that understanding, the accountant should consider whether it will be necessary to perform other accounting services, such as assist in adjusting the books of account or consult on accounting matters, when he or she compiles financial statements."*

- *AR Section 100.09*
  *"The accountant is not required to make inquiries or perform other procedures to verify, corroborate, or review information supplied by the entity. However, the accountant may have made inquiries or performed other procedures. The results of such inquiries or procedures, knowledge gained from prior engagements, or the financial statements on their face may cause the accountant to become aware that information supplied by the entity is incorrect, incomplete, or otherwise unsatisfactory. If any evidence or information comes to the accountants attention regarding fraud or an illegal act that may have occurred, the accountant should request that management consider the effect of the matter on the financial statements. Additionally the accountant should consider the effect on his or her compilation report. In circumstances where the accountant believes that the financial statements are materially misstated, the accountant should obtain additional or revised information. If the entity refuses to provide additional or revised information the accountant should withdraw from the engagement..."*

- *AR Section 100.10*
  *"Before submission, the accountant should ...consider whether such financial statements appear to be ...free from obvious material errors. In this context, the term error refers to mistakes...including inadequate disclosure."*

- *AR Section 100.11*
  *"When the accountant is engaged to report on compiled financial statement or submits financial statement[2] that are reasonably expected to be used by a third party, the financial statements should be accompanied by a (compilation) report.....Any other procedures that the accountant might have performed before or during the compilation engagement should not be described in the report."*

46.    Statements on Standards for Tax Services, issued by the Tax Executive Committee of the AICPA, establish the ethical tax practice standards for members of the AICPA. These standards are more encompassing than those contained in Treasury Department Circular No. 230 and the penalty provisions of the Internal Revenue Code ("IRC").

- SSTS No. 3 – Certain Procedural Aspects of Preparing Returns
  *"...sets forth the applicable standards for members concerning the obligation to examine or verify certain supporting data or to consider information related to another taxpayer when preparing a taxpayer's tax return."*

  *"...a member should not ignore the implications of information furnished and should make reasonable inquiries if the information furnished appears to be incorrect, incomplete, or inconsistent either on its face or on the basis of other facts known to a member."*

  *"The preparer's declaration does not require a member to examine or verify supporting data. However, a distinction should be made between (a) the need either to determine by inquiry that a specifically required condition, such as maintaining books and records or substantiating documentation, has been satisfied or to obtain information when the material furnished appears to be incorrect or incomplete and (b) the need for a member to examine underlying information. In fulfilling his or her obligation to exercise due diligence in preparing a return, a member may rely on information furnished by the taxpayer unless it appears to be incorrect, incomplete, or inconsistent."*

47.    As established by the principles of the AICPA Code of Professional Conduct and other standards promulgated by the profession, a certified public accountant has basic obligations

---

[2] Submission of financial statements: Presenting to a client or third parties financial statements that the accountant prepared either manually or through the use of computer software (AR Section 100.04)

of inquiry regardless of the professional services performed. When the accountant believes or knows that the information provided appears to be incorrect, incomplete or otherwise unsatisfactory information, the accountant must consider the affect on the financial statements and compilation report. In addition, when a CPA is engaged to compile a financial statement or if the CPA has knowledge that the financial statement being compiled will be used by parties other than management, then the CPA must attach a compilation report which indicates the level of service and the reliance or lack thereof that the third party (and management) should ascribe to those financial statements.

## *The Red Flags and Breaches*

48. Beginning in mid-2007 and continuing to the date that RRA ceased doing business, BSSS had access to RRA's books and records. These books and records -- especially to the trained eyes of Berenfeld's professionals -- revealed inconsistent, incomplete, and incorrect financial accounting for RRA under Rothstein's, Villegas's, Stay's and Brock's directions. Even though the numbers in RRA's tax returns and financial statements were nonsensical, BSSS did not follow through on its concerns with RRA. BSSS breached its contractual and professional duties to RRA as indicated by the following facts and circumstances, among other yet to be discovered breaches:

- BSSS knew that excluding Rosenfeldt, a 50% shareholder of a Subchapter S company from access to accounting information in its possession was not correct or consistent with standard operating procedures or professional standards;

- BSSS prepared tax returns that reported client trust funds in a way that did not distinguish between RRA operating cash and client trust funds, giving the misimpression that RRA had more available cash than it actually owned. Client trust funds are commonly listed on a balance sheet as an "Other Current Asset" along with an offsetting "Other Current Liability" and not as "Cash" as shown by BSSS;

- BSSS saw that RRA's trust accounts did not contain investor funds in amounts commensurate with the vast sums that RRA's books and records reflected as held in trust;

- BSSS knew that RRA's payroll accounts were running large negative daily balances and that NSF charges were extensively incurred;

- BSSS knew that RRA was paying for credit card charges that Rothstein, his wife, as well as other employees incurred and that the credit card was used to pay for substantially all costs and expenses of the law firm;

- BSSS sent confirmations, during its 2007 audit of Banyon, to Rothstein in order to verify $42 million of investments held in attorney trust accounts however no corresponding liabilities were reflected on RRA's income tax return or trial balance. Likewise, for the 2008 Banyon audit, BSSS sent confirmations to substantiate $545,000,000 of investments purportedly held in attorney trust accounts, yet the RRA trial balance reflected no such cash balance or corresponding trust liability;

- BSSS failed to comply with its own quality control standards by not completing necessary checklists. The RRA work-papers produced by BSSS do not include copies of their "Tax Return Preparation Checklist" which indicates it is a "guideline" and "to be used as a working tool in preparation and self-review of tax returns";

- BSSS suspected that the revenue reflected in RRA's books was not "fee income," as Rothstein and Stay insisted it was, but took no steps to track down and document the true source of this revenue;

- BSSS knew of the wildly inaccurate RRA bookkeeping and inadequate accounting personnel evidenced by the way in which the books and records were created and maintained, leading to extraordinary adjustments, tantamount to re-writing the books and records of RRA;

- BSSS knew that Rothstein gave lavish gifts to Villegas and Stay, individuals who had access to RRA financial information that Rothstein and BSSS withheld from RRA lawyers.

- BSSS provided a "nebulous" letter to Rothstein to help cover up $15,000,000 in suspicious transactions in response to an anti-money laundering compliance inquiry from Gibraltar Bank (and even surprisingly, at the direction of Rothstein to cover up the obviously illegal scheme, removed disclaimer language that certain information was not "verified");

• BSSS considered it strange that Stay refused to provide copies of bank statements, did not insist upon seeing them, despite the incredible numbers being provided to BSSS;

• BSSS recognized that information concerning transfers from trust accounts made "no sense" but did not pursue the true source of these transfers, which information was readily available in the documentation concerning the Banyon audit;

• BSSS prepared 2006 compiled financial statements for RRA which reflected current liabilities in excess of current assets; which reflected positive available cash of only approximately $4,000; and which reflected distributions made of 99% of the alleged current year's net income;

• BSSS knew that operating cash balances were significantly overdrawn at the end of each year from 2005 to 2008;

• BSSS observed that tens of millions of dollars of "loans/fee income" were being deposited into RRA's various trust and operating accounts without any supporting documentation to support shifting revenues from trust accounts to operating and payroll accounts;

• BSSS's requests to see detailed information concerning trust accounts and fee income were rebuffed by Villegas, and neither followed up, protested, nor refused to sign the tax return for that year;

• BSSS adjusted RRA's 2007 and 2008 income by almost $95,000,000 under suspicious circumstances. BSSS reclassified this liability as income in order to keep the books in balance – a liability that remains and that the RRA estate has to deal with;

• BSSS prepared the 2006 compiled financial statement without an accountants' report which should have indicated the level of services being performed;

• BSSS sent RRA's 2006 financial statements to third parties (including an insurance company and a bank), without indicating whether the financial statement was the product of a "compilation," or "review" in violation of AICPA's reporting requirements.

49.    If BSSS had done its job in conformity with professional standards, considered the information before it, asked the questions it was obligated to ask as RRA's accountants, or refused in a timely manner to sign the tax returns of RRA and Rothstein, then the Ponzi scheme

would have been exposed and Rothstein and his henchman could not have continued their abuse of the finances and affairs of RRA.

50. The actions of Rothstein and his lieutenants, Villegas, Stay and Brock were adverse to the interests of RRA, as indicated by the way Rothstein improperly manipulated and damaged RRA. BSSS indulged, tolerated, and effectively condoned Rothstein's wrongful actions.

### The BSSS Proof of Claim and Offsetting Damages

51. On January 28, 2010, BSSS filed proof of claim No. 38 against the Bankruptcy Estate asserting an unsecured claim in the amount of $37,795.24 for professional fees incurred from September 1, 2009 through the Petition Date. BSSS is liable to the estate of RRA in these proceedings in amounts that substantially exceed the amount of its claim and is, therefore, not entitled to any recovery on its claim.

52. Working with Rothstein and without exercising due care, BSSS made improper adjustments to the income of RRA in the approximate amounts of $20,000,000 in 2007 and $75,000,000 in 2008. BSSS made these accounting entries to reconcile an "exchange account" on RRA's books and records. Almost the entire amount of this $95,000,000 adjustment represents a liability to RRA equal to the net amount of cash RRA received from clients or investors under circumstances that BSSS knew to be highly suspicious. At the time BSSS made these adjustments, there was no such cash.

53. The purpose of these adjustments was simply to hide the reclassification of $95,000,000 in liabilities as income. BSSS helped to hide the reality of RRA's financial position from the IRS, the Florida Department of Revenue, bankers, law firm members, insurers, and

others who reviewed and relied upon the financial statements prepared by BSSS in collaboration with Rothstein.

## COUNT I - NEGLIGENCE

54.     Plaintiff repeats and realleges each allegation set forth in paragraphs 1 - 53 as if herein set forth.

55.     In connection with its representation of RRA, under common law and professional standards for accountants, BSSS owed RRA a duty of care to provide professionally sound, correct and ethical services regarding the accounting matters that BSSS was engaged to provide.

56.     BSSS breached and neglected its duty to RRA by compiling financial statements and preparing tax returns that were materially inaccurate, and by using information from Rothstein that it knew to be incorrect, incomplete or inconsistent. BSSS abandoned its responsibilities to RRA in favor of earning fees.

57.     BSSS knew that RRA relied upon its expert accounting advice for tax preparation, compilation of financial services, staffing of its internal bookkeeping operation, reconciliations of accounts, year end closings, and delivery of other accounting services and tax consulting services.

58.     RRA did in fact rely on BSSS's advice and expertise when BSSS prepared and disseminated RRA's tax returns, compiled its financial statements, and delivered such accounting services and tax consulting services.

59.     As a result of BSSS's material breach of its duty to RRA and its provision of negligent and wrong advice, RRA has sustained damages that include all those naturally flowing from BSSS's breach, such as undermining the governance structure of RRA by withholding accounting information from co-shareholder Stuart Rosefeldt; subjecting RRA to the

consequences of Rothstein's extensive violations of the Rules Regulating the Florida Bar applicable to the segregation of clients' trust accounts until the monies are legitimately earned; exposure of RRA to the claims of creditors seeking relief for its having been transformed by Rothstein from a legitimate law firm to one devastated by Rothstein's fraud; and ultimately to the dismantling of the firm and destruction of its value as a going concern.

60.    Had BSSS performed its responsibilities to RRA properly, then Rothstein's financial abuse of RRA would have come to light, the accounting errors would have been challenged and fixed, the Ponzi scheme would have unraveled, and grievous damage to RRA would have been curtailed. The services of BSSS fell below the applicable standard of care.

61.    The damages for which BSSS is liable to the Trustee consist of (a) the liabilities of RRA to the clients and investors who by their claims in these proceedings seek to recover losses for injuries that were proximately caused by the negligence of BSSS and its aiding and abetting of Rothstein's breaches of his fiduciary duties to RRA, and (b) the natural and foreseeable consequences of its breach of its contract to provide accounting and tax services to RRA in accordance with the standards of professionalism that were incorporated by operation of law into that contract. As a result of BSSS's breaches and negligence, a $95,000,000 liability has been passed to the RRA estate in the form of claims.

WHEREFORE, RRA seeks judgment against BSSS for compensatory damages, plus all such other relief as the Court deems just and appropriate.

## COUNT II – BREACH OF CONTRACT

62.    Plaintiff repeats and realleges each allegation set forth in paragraphs 1 - 53 as if herein fully set forth.

63.    RRA was BSSS's client, and engaged BSSS to perform accounting services for RRA's benefit, including tax return preparation, accounting services, and tax consulting services.

64.    An oral contract existed between RRA and BSSS. While not memorialized by a signed engagement agreement, BSSS billed for and was paid for its services. The scope of services under that contract was well understood by the BSSS professionals who participated in service delivery, including but not limited to Tracy Weintraub and Gary Berkowitz. At all material times, BSSS conducted itself as if its undertakings to prepare tax returns, compile financial settlements, and deliver broader and more extensive accounting services and tax consulting services had been memorialized by a written instrument signed by both BSSS and RRA.

65..    BSSS breached its contract with RRA by preparing and compiling incorrect financial statements and tax returns based upon inaccurate, incomplete, and incorrect information from Rothstein and his three lieutenants as herein previously described and by failing to deliver services in accordance with the previously described applicable professional standards.

66.    RRA has been damaged by BSSS's breach of contract and is entitled to recover all damages proximately flowing from the breach.

WHEREFORE, RRA seeks judgment against BSSS for compensatory damages, plus all such other relief as the Court deems just and appropriate.

### COUNT III – AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

67.    Plaintiff repeats and realleges each allegation set for the in paragraphs 1 – 53 as if herein fully set forth.

68.    Rothstein, as a 50% shareholder, managing partner and CEO of RRA, owed fiduciary duties to RRA.

69.    Rothstein breached his fiduciary duties to RRA by directing the corporate resources of RRA to his personal use; improperly commingling client account funds with RRA's operating account and spending millions of dollars from that account for his personal use; destroying the financial stability of RRA by causing it to incur expenses beyond levels warranted by its revenue from delivery of legal services; enlisting BSSS in his efforts to mislead bankers; disguising the money-laundering that he conducted through misuse of RRA accounts; and acting in a manner that was adverse to RRA, as herein previously alleged.

70.    BSSS knew of Rothstein's breaches because of the information it received while providing extensive accounting and tax preparation services. Those services were provided by BSSS employees within the course and scope of employment, including Tracy Weintraub and Gary Berkowitz, who provided services to RRA, RRA Entities, and Rothstein individually. Through them, BSSS gained knowledge of RRA's tax returns, credit card statements, internal accounting documentation, and bank statements. In the course of auditing Banyon, moreover, BSSS obtained actual knowledge of the Ponzi scheme that Rothstein conducted and of his manipulation of RRA to promote the Ponzi Scheme.

71.    BSSS substantially assisted and encouraged the Rothstein breaches by delivering comprehensive services to him in a way that facilitated actions that he took to the detriment of RRA for his individual benefit. BSSS injured RRA by aiding and abetting Rothstein's breaches of fiduciary duties. The damage to RRA includes the claims of all clients and investors who seek in these proceedings to recover losses for injuries that were proximately caused by BSSS's aiding and abetting of Rothstein's breaches of his fiduciary duties to RRA. These include the millions of dollars of client claims for money stolen from RRA trust accounts and more than $450 million that Rothstein and his lieutenants stole from investors. The complicity and assistance of BSSS

was instrumental to the success of Rothstein in manipulating the finances of RRA to its detriment and was a proximate cause of the injury sustained by RRA.

72.    Furthermore, aiding and abetting of Rothstein facilitated Rothstein's success in attracting investors to his Ponzi scheme, injuring them and subjecting RRA to liability for the injuries sustained by those investors as well as by the clients of RRA. BSSS provided the veneer of propriety that Rothstein needed to perpetrate his scheme.

73.    RRA has been damaged by BSSS's aiding and abetting Rothstein's breach of fiduciary duty to RRA and is entitled to recover all damages proximately flowing from said breach.

WHEREFORE, RRA seeks judgment against BSSS for compensatory damages, plus all such other relief as the Court deems just and appropriate.

### COUNT IV – OBJECTION TO AND/OR EQUITABLE SUBORDINATION OF PROOF OF CLAIM NO. 38

74.    Plaintiff repeats and realleges each allegation set forth in paragraphs 1 - 53 as if herein fully set forth.

75.    This is a claim asserting an objection to and/or equitable subordination of Proof of Claim No. 38.

76.    On or about January 28, 2010, BSSS filed Proof of Claim No. 38 against the Bankruptcy Estate.

77.    The Trustee objects to and/or seeks equitable subordination of Proof of Claim No. 38 based upon the following grounds: (i) set-off, recoupment and/or equitable subordination based upon the allegations and claims referenced above, thereby requiring that the claim be disallowed and/or subordinated in full or in part; (ii) other objections, if any, to be determined through discovery.

WHEREFORE, RRA demands that Proof of Claim No. 38 be disallowed and/or subordinated in full and for any other relief the Court deems appropriate.

BERGER SINGERMAN
*Attorneys for the Trustee, Herbert Steltin*
350 East Las Olas Blvd.
Suite 1000
Fort Lauderdale, Florida 33301
Phone: (954) 525-9900
Facsimile: (954) 523-2872

By: __/s/ Frank Scruggs_____
Frank Scruggs
Fla. Bar No. 251488
fscruggs@bergersingerman.com
Charles H. Lichtman, Esq.
Fla. Bar No. 501050
clichtman@bergersingerman.com
Etan Mark, Esq.
Fla. Bar No. 720852
emark@bergersingerman.com

# EXHIBIT "B"



we deliver creative and effective business solutions and counsel

# BERGER SINGERMAN
### attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

Frank Scruggs
(954) 712-5164
FScruggs@Bergersingerman.com

August 5, 2010

**VIA U.S. Mail**

Jane W. Moscowitz, Esq.
Moscowitz & Moscowitz, P.A.
1111 Brickell Avenue
Suite 2050
Miami, FL 33131

  Re: Rothstein Rosenfeldt Adler, P.A., Case No. 09-34791-RBR

Dear Jane:

  I write to formally request, pursuant to Section 627.4137, Florida Statutes, on behalf of the Trustee, disclosure of the following information with regard to each policy of insurance covering the following professional associations that are partners of Berenfeld, Spritzer, Shechter & Sheer, LLP ("BSSS"), as well as any other professional associations affiliated with BSSS that are not listed below:

   (1) Robert P. Bedwell, C.P.A., P.A.
   (2) Marc A. Berenfeld, C.P.A., P.A.
   (3) Madeline Elias, C.P.A., P.A.
   (4) Isabel Goldberg, P.A.
   (5) Michael F. O'Rourke, C.P.A., P.A.
   (6) Philip J. Shechter, C.P.A., P.A.
   (7) Emery B. Sheer, C.P.A., P.A.
   (8) Michael Spritzer, C.P.A., P.A.
   (9) Tracy D. Weintraub, C.P.A., P.A.

  Specifically, the Trustee seeks the following information with respect to each policy held by any individual associated with each professional association that may provide coverage for any events related to the allegations of the Complaint filed with respect to the above-captioned case:

   a. The name of the insurer;

   b. The name of each insured;

Jane W. Moscowitz, Esq.
August 5, 2010
Page 2

        c.      The limits of the liability coverage;

        d.      A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer regarding claims for professional liability that the Trustee may assert against BSSS, any of the aforementioned professional associations, their directors and officers, and any successors and predecessors to BSSS or any of the aforementioned professional associations; and

        e.      A copy of the policy.

We also request that BSSS forward this request for information to all affected insurers along with a request that each such insurer, pursuant to Section 627.4137, Florida Statutes, supply the information requested herein within thirty days of this request.

Sincerely,

BERGER SINGERMAN

Frank Scruggs

cc:    Paul Singerman, Esq.
       Chuck Lichtman, Esq.
       Etan Mark, Esq.

2973206-1

we deliver creative and effective business solutions and counsel

BERGER SINGERMAN
attorneys at law

Boca Raton    Fort Lauderdale    Miami    Tallahassee

# EXHIBIT "C"

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In Re:

Case No. 09-34791-BKC-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,

**CERTIFIED COPY**

Debtor.

BERGER SINGERMAN, P.A.
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL   33301

Wednesday, March 17, 2010
9:15 a.m. – 5:19 p.m.

RULE 2004 EXAMINATION
OF
GARY BERKOWITZ

Reported by: Jacquelyn Ann Jones, Court Reporter

A.   Yes.

MS. MOSCOWITZ:   Objection.

MR. SCRUGGS:   You answered yes both as to his officer status.

THE WITNESS:   I believed he was an officer.

MS. MOSCOWITZ:   And that's the point, you asked two questions at the same time.

THE WITNESS:   I know he was a 50 percent shareholder in the company.

BY MR. SCRUGGS:

Q.   And went by the title, partner?

A.   Yes.

Q.   So here did you understand Scott Rothstein to be giving you instructions that the only four people were four that did not include Scott Rothstein -- I'm sorry, that did not include Stuart Rosenfeldt?

A.   Yes.

Q.   And he was saying that in effect that Stuart Rosenfeldt -- that you were not to give Stuart Rosenfeldt any "RRA" -- you were not to discuss any "RRA accounting matters with him"?

A.   Yes.

MS. MOSCOWITZ:   Objection to form.

Page 43

BY MR. SCRUGGS:

    Q.    You followed Mr. Rothstein's instructions?

    A.    Yes.

    Q.    Did you discuss this with Tracy Weintraub?

    A.    I believe so.

    Q.    Tell me about the discussion between you and Tracy Weintraub with respect to Scott Rothstein's instructions that neither of you were to discuss any RRA accounting matters with Stuart Rosenfeldt?

    MS. MOSCOWITZ:  Objection to form.

    MR. SCRUGGS:  You can answer.

    THE WITNESS:  Okay.  I remember discussing with him that it was a bit strange, but it wasn't unusual.

BY MR. SCRUGGS:

    Q.    Who said it was a bit strange?

    A.    I might have said that.

    Q.    What did you regard as strange about it?

    A.    Well, not really discussing it with the partner.  He was a 50 percent owner.  But I didn't understand the exact relationship between the two.

    Q.    What was the context that led you to view it as strange, that is strange as compared to what?

    A.    Well, that he didn't include Stuart as part of the four -- part of the people to discuss the

Page 44

accounting with.

Q.   Now, as part of your work at other accounting firms you had performed accounting services for other law firms?.

A.   Yes.

Q.   Were any of those taxed as sub Chapter entities?

A.   Yes.

Q.   And did you provide --- review services for those firms?

MS. MOSCOWITZ:  Objection to form.

BY MR. SCRUGGS:

Q.   I mean that, I think it's pretty clear.

A.   What do you mean by review?

Q.   Did you provide any accounting review services?  You previously testified that you provided compilation services.

A.   No, I did not.

Q.   You did not provide any review services?

A.   Yes.

Q.   Only compilation services?

A.   Yes.

Q.   Just as you were providing compilation services to RRA; correct?

MS. MOSCOWITZ:  Objection to form.

From: Tracy D. Weintraub (x1701)
To: "Scott Rothstein") Gary Berkowitz (x1737)
Subject: RE: 2005 taxes
Date: Tuesday, October 09, 2007 11:42:16 AM

Understood.

Tracy

**Tracy D. Weintraub, C.P.A.**
Senior Audit Partner
Berenfeld, Spritzer, Shechter, & Sheer
Certified Public Accountants & Consultants
401 East Las Olas Blvd., Suite 1090
Ft. Lauderdale, Florida 33301
T: (954)728-3740 F: (954)728-3798
Tweintraub@bsss-cpa.com
www.bsss-cpa.com

From: Scott Rothstein [mailto:srothstein@rra-law.com]
Sent: Tuesday, October 09, 2007 11:45 AM
To: Tracy D. Weintraub (x1701); Gary Berkowitz (x1737)
Subject: 2005 taxes

I am holding off sending out for a day or so. I believe you are missing a payment I made of 80k to irs just a few months ago. Also, I think my charitable contributions are way off. Need to check with debra but she is out....daughter having surgery today.
I will get with you later today or tomorrow.
I am sending firm return today.

FYI,
The only people authorized to discuss any RRA accounting matters are as follows:

1. me
2. irene
3. debra
4. bill brock

no one else is authorized. No one else is to be given any info or shown any documents. If anyone inquires, regardless of their title or position with the firm, they are to be directed to

EXHIBIT
#2

BGJ008608

me. we have spies :-)    and very curious people......
ciao ciao,
scott



IRS Circular 230 Disclosure: Please note that the views expressed herein or in any attachments hereto are not intended to constitute a "reliance opinion" under applicable Treasury Regulations, and accordingly are not intended or written to be used, and may not be used or relied upon, for the purpose of (i) avoiding tax-related penalties that may be imposed by the Internal Revenue Service, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

NOTICE: THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE COLLECT AND DELETE THE MATERIAL FROM ANY COMPUTER. THANK YOU.

BGJ008509

# EXHIBIT "D"

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In Re:

                              Case No. 09-34791-BKC-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,   **CERTIFIED COPY**

    Debtor.

_____

BERGER SINGERMAN, P.A.
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL  33301

Wednesday, March 17, 2010
9:15 a.m. – 5:19 p.m.

RULE 2004 EXAMINATION
OF
GARY BERKOWITZ

Reported by: Jacquelyn Ann Jones, Court Reporter

Page 178

tax return upon the receipt of information from Scott Rothstein on the basis that the information was an estimate, even if inaccurate?

A.   Yes.   We prepared the personal tax return based on an estimate, which was the best we could do at that time.

Q.   So you concluded at that time in October of 2009 that the best you could do at that time would be good enough for purposes of reporting to the IRS?

MS. MOSCOWITZ:   Objection to form.

THE WITNESS:   Yes.

BY MR. SCRUGGS:

Q.   Let's go back to Exhibit 5 that we looked at earlier.

(A brief recess was taken.)

BY MR. SCRUGGS:

Q.   Do you have Exhibit 5 in front of you?

A.   Yes, I do.

Q.   We talked about this some earlier, do you remember?

A.   Yes.

Q.   We are going to at this time talk about the attachment of this.   What information did you have when you prepared this, this being the statement of assets, liabilities and stockholders' equity of RRA,

for the period ending December 31, 2006?

A. We had their balance sheet and income statement, we had their general ledger, we had copies of bank reconciliations, we had copies of fixed assets schedules, and we had copies of the statements from Colonial Bank and Gibraltar Bank reflecting their line of credit balance at the end of the year.

Q. What information did you have with respect to the source of the cash in the Gibraltar trust II account referred to among the current assets of RRA?

A. I'm not sure.

Q. Did you receive any form of documentation that allowed you to understand where the cash came from that is in that trust account as of December 31, 2006?

A. I can't recall at this moment.

Q. Is there anything you could point to that would refresh your recollection?

A. The work paper file.

Q. Did you send this document, that is the statement of assets, liabilities and stockholders' equity to Gibraltar Bank?

A. Yes, I did.

Q. Did you send it to Gibraltar Bank without the compilation report about which you have previously

testified?

A.   Yes, I did.

Q.   Was that a mistake?

A.   Yes, it was.

Q.   What is the cash Morse escrow that's referred to here?

A.   That refers to a bank account.

Q.   As you prepared this statement of assets, liabilities and stockholders' equity, did you have information that would inform you about the source of the money in that account?

A.   It was a bank account that held money in it.

Q.   I understand.  The question is, did you have any information that informed you of the source of the money in that account?

A.   I had the client's Quickbooks.

Q.   What did that tell you, if anything, about the source of this money?

A.   I don't recall.

Q.   This document we're looking at presents current assets on page 1 and current liabilities and stockholders' equity on page 2; right?

A.   Yes.

Q.   Could you explain to me first whether or not

| From: | Gary Berkowitz (x1737) |
|---|---|
| To: | Irene B. Shannon (ishannon@rra-law.com) |
| Cc: | Gary Berkowitz (x1737) |
| Subject: | FW: |
| Date: | Thursday, March 20, 2008 12:48:23 PM |
| Attachments: | 20080320113232899.pdf |

Hi Irene,

Here is a copy of the financials for 2006. Please be sure to cross out audited and put compilation for type of financial statements in the insurance application.

These financials are prepared on the cash basis which means that we aren't including accounts receivable or unbilled wip as part of assets. The insurance company may be looking for this information when they ask for the total of the assets.

I am going for lunch now, but I can be reached on my cell phone at 954-816-4615.

Also, I was wondering when I can pick up the information for 2007?

Thanks,

Gary

Gary Berkowitz, CPA
Accounting Services
Berenfeld, Spritzer, Shechter & Sheer, LLP
401 East Las Olas Boulevard, Suite 1090
Fort Lauderdale, FL 33301

T:  954-728-3740 (Main)
T:  954-728-3755 (Direct)
F:  954-728-3798

Email:  gberkowitz@bsss-cpa.com
Website:  www.bsss-cpa.com

NOTICE: To ensure compliance with Treasury Regulations (31 CFR Part 10, §10.35), we inform you that any tax advice contained in this correspondence was not intended or written by us to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code.

CONFIDENTIALITY NOTICE: If you have received this e-mail in error, please immediately notify the sender by e-mail at the address shown. This e-mail transmission may contain confidential information. This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank you for your compliance.

-----Original Message-----
From: Gary Berkowitz [mailto:gberkowitz@bsss-cpa.com]
Sent: Thursday, March 20, 2008 12:33 PM
To: Gary Berkowitz (x1737)
Subject:

This E-mail was sent from "FTL-LD275" (MP 7500/LD275).

EXHIBIT
#5

BSEC004186

Scan Date: 03.20.2008 11:32:32 (-0500)
Queries to: administrator@bsss-cpa.com

BSEC004187

## ROTHSTEIN, ROSENFELDT, ADLER P.A.
### STATEMENT OF ASSETS, LIABILITIES, AND LIABILITIES AND STOCKHOLDERS' EQUITY
### (INCOME TAX BASIS)
### DECEMBER 31, 2006

### ASSETS

**CURRENT ASSETS:**

| | | |
|---|---:|---:|
| Cash in bank | $ 4,140 | |
| Cash- Trust II - Gibralter | 1,949,612 | |
| Cash - Trust - Gibralter | 54,779 | |
| Cash - Trust - Colonial | 12,872 | |
| Cash - Morse Escrow | 8,121 | |
| Loan Receivable | 1,652,193 | |
| Loans Receivable | 67,096 | |
| **Total Current Assets** | | $ 3,748,813 |

**PROPERTY AND EQUIPMENT:**

| | | |
|---|---:|---:|
| Furniture and Fixtures | 183,037 | |
| Equipment | 206,027 | |
| Computer Equipment | 145,187 | |
| Leasehold Improvements | 142,886 | |
| Accumulated Depreciation | (408,939) | |
| **Total Property and Equipment** | | 268,198 |
| **Deposit** | | 50,000 |
| **TOTAL ASSETS** | | $ 4,067,011 |

See accountants' report.

## ROTHSTEIN, ROSENFELDT, ADLER P.A.

### STATEMENT OF ASSETS, LIABILITIES, AND LIABILITIES AND STOCKHOLDERS' EQUITY
### (INCOME TAX BASIS)
### DECEMBER 31, 2006

### LIABILITIES AND STOCKHOLDERS' EQUITY

**CURRENT LIABILITIES:**

| | | |
|---|---:|---:|
| Client Deposit Liability | $ 2,017,263 | |
| Client Deposit - Morse Escrow | 7,684 | |
| Other Payables | 494,916 | |
| Line of Credit, Colonial Bank | 595,000 | |
| Line of Credit, Gibraltar Bank | 899,694 | |
| **Total Current Liabilities** | | $4,014,557 |

**STOCKHOLDERS' EQUITY:**

| | | |
|---|---:|---:|
| Common Stock | 300 | |
| Additional Paid In Capital | 42,610 | |
| Distributions | (2,615,098) | |
| Net Income | 2,650,319 | |
| Retained Earnings | (25,677) | |
| **Total Stockholders' Equity** | | 52,454 |
| **TOTAL LIABILITIES AND EQUITY** | | $ 4,067,011 |

See accountants' report.

ROTHSTEIN, ROSENFELDT, ADLER P.A.
STATEMENT OF REVENUES AND EXPENSES
(INCOME TAX BASIS)
FOR THE YEAR ENDED DECEMBER 31, 2006

| | |
|---|---:|
| REVENUES | $ 14,181,540 |
| OPERATING EXPENSES (SEE SCHEDULE) | 11,552,339 |
| Income From Operations | 2,629,201 |
| OTHER INCOME (EXPENSES): | |
| Interest Income | 21,118 |
| Total Other Income (Expenses) | 21,118 |
| NET INCOME | $ 2,650,319 |

See accountants' report.

## ROTHSTEIN, ROSENFELDT, ADLER P.A.
## SCHEDULE OF OPERATING EXPENSES
## DECEMBER 31, 2006

**OPERATING EXPENSES:**

| | |
|---|---:|
| Advertising | $ 258,714.33 |
| Auto Expense | 5,044.30 |
| Bank Charges | 45,107.14 |
| Computer Support & Supplies | 16,149.14 |
| Contributions - Charitable | 93,875.00 |
| Contributions - Nondeductible | 76,505.00 |
| Corporate Co-Counsel Fees | 540,000.00 |
| Depreciation - Regular | 175,413.22 |
| Dues and Memberships | 30,542.11 |
| Education and Seminars | 5,955.30 |
| Employee Events | 70,776.01 |
| Entertainment and Meals | 257,527.35 |
| Equipment Rental | 275,570.07 |
| Imaging and Scanning | 34,788.72 |
| Insurance - Employee Benefits | 293,673.92 |
| Insurance - Liability and WC | 193,200.78 |
| Insurance - Other | 86,082.52 |
| Interest expense | 145,640.56 |
| Legal and Professional | 304,366.82 |
| Lodging | 53,228.28 |
| Miscellaneous | 35,912.67 |
| Office Expense | 44,390.53 |
| Office Supplies | 47,166.29 |
| Payroll - Other | 5,158,823.57 |
| Payroll - Stockholders | 952,550.04 |
| Payroll Processing | 5,676.83 |
| Postage and Delivery | 59,695.80 |
| Practice Development | 192,626.91 |
| Profit Sharing Contribution | 16,538.28 |
| Promotion | 66,787.67 |
| Publications and Books | 76,372.28 |
| Recruiting and Staffing Fees | 82,437.30 |
| Relocation | 25,421.00 |
| Rent | 1,043,883.42 |
| Repairs and Maintenance | 7,583.04 |
| Secretarial Services | 68,166.10 |
| Storage | 114,248.64 |
| Taxes - Payroll | 311,771.12 |
| Taxes and Licenses | 10,176.36 |
| Telephone | 74,908.43 |
| Travel | 176,142.51 |
| | |
| **TOTAL OPERATING EXPENSES** | **11,552,339.36** |

See accountants' report.

# EXHIBIT "E"

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In Re:

Case No. 09-34791-BKC-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,

**CERTIFIED COPY**

Debtor.

_____

BERGER SINGERMAN, P.A.
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL  33301

Wednesday, March 17, 2010
9:15 a.m. - 5:19 p.m.

RULE 2004 EXAMINATION
OF
GARY BERKOWITZ

Reported by: Jacquelyn Ann Jones, Court Reporter

Q.    And on his personal tax return?

A.    On the tax return of the law firm.

Q.    When you say this revenue, what revenue are you talking about?

A.    I believe the Gibraltar Bank was questioning a deposit.

Q.    Do you know why they were questioning a deposit?

A.    I believe it was because it was for a large amount.

Q.    And what about the large amount to your knowledge, would occasion a bank, that bank's inquiry?

MS. MOSCOWITZ:  Objection.

MR. SCRUGGS:  I'll rephrase the question.

BY MR. SCRUGGS:

Q.    To your knowledge why was the bank questioning the deposit?

MS. MOSCOWITZ:  I think that one is asked and answered.

THE WITNESS:  I would assume because it was such a large amount being deposited.

(Exhibit No. 12 marked.)

BY MR. SCRUGGS:

Q.    I'm going to show you a document marked by

the reporter as Exhibit 12, consisting of four pages, and ask whether you can identify this as an e-mail exchange involving communications between you, Tracy Weintraub and Scott Rothstein?

MS. MOSKOWITZ: What number is it?

MR. MARK: 12.

THE WITNESS: Yes, it is.

BY MR. SCRUGGS:

Q. Let me ask you to start on page 1 with this portion of the e-mail communication chain that involves a message from Scott Rothstein to Tracy Weintraub. Do you see that?

A. Yes.

Q. It commences again, Hey Bro, as you've described before; right?

A. Yes.

Q. For the subject matter, do you recognize that reference?

A. Yes.

Q. What is it?

A. Bank crap.

Q. Bank crap. To what is Scott Rothstein referring in this message to Tracy Weintraub?

MS. MOSCOWITZ: Objection.

THE WITNESS: Would you please repeat the

question?

BY MR. SCRUGGS:

Q.   Sure.   I'll back up a couple of steps.

On page 1 of Exhibit 12 there are two messages; correct, right?

A.   Yes.

Q.   One from Scott Rothstein to Tracy Weintraub; right?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   And then the other is Scott Rothstein -- I'm sorry, Tracy Weintraub relaying to you his exchange with Scott Rothstein; right?

A.   Yes.

Q.   Okay.  So you're aware -- you became aware of this Rothstein to Weintraub communication on the same day it occurred, that is on June 24, 2009; correct?

A.   Yes.

Q.   When you got the message did you read it?

A.   Yes.

Q.   Okay.  So did you notice when you read it these words in the reference line of the June 24 message from Scott Rothstein to Tracy Weintraub, bank

crap?

A.    Yes.

Q.    What was Scott Rothstein addressing?

A.    He was addressing the fact that Gibraltar Bank wanted to determine that this deposit was income.

Q.    Gibraltar Bank, to your knowledge, was making an inquiry in light of the receipt of a large deposit of funds; correct?

A.    Yes.

Q.    And these funds were deposited into the RRA operating account at Gibraltar Bank; correct?

A.    Yes.

Q.    So Tracy Weintraub relays to you a message from Scott Rothstein that says, need to see you this afternoon if possible so I can get that nebulous letter over to Gibraltar Bank.  The message continues; right?

A.    Uh-huh.

Q.    You have to say yes.

A.    Yes.

Q.    What is Rothstein referring to as a nebulous letter?

A.    I don't know.

Q.    When you read this did you ask -- when you

Page 120

read Weintraub's message to you saying what do you think, did you ask him, what is Scott Rothstein referring to here as a nebulous letter?

A.   I don't know what the word nebulous means.

Q.   Vague.

A.   Okay.

MS. MOSCOWITZ:   Maybe.

THE WITNESS:   I just remember Tracy asking me to write a letter.

BY MR. SCRUGGS:

Q.   Did Tracy describe to you the purpose of the letter?

A.   It was just a letter to the bank saying that Scott's -- stating that this is income to the law firm.

Q.   Income to the law firm.  Do you recall what the bank was asking?

A.   No, I do not know.

Q.   Before preparing this letter at Scott Rothstein's request, did you seek to find out what the bank was asking Scott Rothstein for?

A.   No, I don't recall.

Q.   Did you seek to find out how the letter that you wrote would be used by Rothstein, if at all, in his communications with Gibraltar Bank?

A.   I knew it would be sent to Gibraltar Bank.

Q.   But you wrote a letter for use by Scott Rothstein without knowing the purpose for which he would use it in his communications with Gibraltar Bank?

A.   I mean, at the time I thought they were just questioning whether or not what the deposit was, and Scott was saying that it was income, so we wrote a letter to them saying that Scott told us that it was income.

Q.   So again, my question is, did you seek to find out how Scott Rothstein would use the letter in his communications with Gibraltar Bank?

MS. MOSCOWITZ:   Asked and answered.

THE WITNESS:   I believe I thought I answered the question.

BY MR. SCRUGGS:

Q.   Okay.  I'll ask it a different way.

Before writing this letter for Scott Rothstein did you ask Tracy Weintraub, what is Scott Rothstein referring to here as the nebulous letter that he wanted to give to Gibraltar Bank?

MS. MOSCOWITZ:   Asked and answered.

THE WITNESS:   I'm -- it was a letter to be given to the bank.

(Exhibit No. 13 marked.)

BY MR. SCRUGGS:

Q.    So just to clarify the record, you did write a letter to Gibraltar Bank?

A.    Yes, I did.

MS. MOSCOWITZ:    Asked and answered.

BY MR. SCRUGGS:

Q.    This Exhibit No. 13 purports to be a copy of a memorandum to Scott Rothstein from Julia Ansari, A-n-s-a-r-i.  Do you see that in front of you?

A.    Yes, I do.

Q.    Have you ever seen that before now?

A.    Yes, I have.

Q.    In what context did you see it?

A.    In writing the letter.

Q.    So you had this in your possession when you wrote the letter to Gibraltar Bank?

A.    Yes, I did.

Q.    Does Julia Ansari -- did you observe Julia Ansari's title when you wrote the letter?

A.    Yes, I did.

Q.    And that title is BSA officer?

A.    Yes.

Q.    Do you know what a BSA officer is?

A.    No, I don't.

Page 123

Q.    Have you ever heard the term, bank secrecy act officer in the context of any of your accounting work?

A.    I don't believe so, no.

Q.    Are you familiar with the acronym, AML in the context of bank officer responsibilities respecting deposits?

A.    No, I'm not.

Q.    Are you familiar with the concept -- strike that.

Do you know whether banks routinely make inquiries regarding large deposits in connection with their responsibilities for making reports to Federal authorities in connection with anti-money laundering?

A.    I'm not aware.

Q.    Do you know what money laundering is?

A.    Yes, I do.

Q.    What is money laundering?

A.    It's the laundering of money from, I guess from criminal activities or suspicious activities into a business operation to clean it.

Q.    You used the word suspicious activity.  Are you familiar with something called a suspicious activity report?

A. No, I'm not.

Q. Never heard of the concept?

A. No.

Q. Was it apparent to you whether or not Gibraltar Bank was making an inquiry about deposits because it was seeking to report the reason -- to report itself the reason for those deposits?

MS. MOSCOWITZ: Objection to form.

THE WITNESS: Yes.

BY MR. SCRUGGS:

Q. Explain what you understood Gibraltar Bank to be doing.

A. They're looking to determine the source of these funds.

Q. And why, to your understanding?

A. As far as I knew at the time, it was just to determine the source of the funds.

Q. As far as you knew. You used the word criminal activity, to detect criminal activity earlier.

MS. MOSCOWITZ: Objection. He did not use that term that way.

THE WITNESS: You asked me the definition of money laundering.

BY MR. SCRUGGS:

Page 125

Q. Okay. Right. And in the course of defining money laundering you used the words, "criminal activity"; correct?

A. Yes.

Q. In sending this letter did you make any inquiry directly of Gibraltar Bank about the purposes for which it sought the letter?

A. No, I did not.

Q. Did you inquire of Tracy Weintraub regarding why -- strike that -- of Scott -- did you inquire of Tracy Weintraub in any way in connection with this letter?

MS. MOSCOWITZ: Objection. Asked and answered.

MR. SCRUGGS: Go ahead, you can answer it.

THE WITNESS: Okay. I'm sure I asked Tracy if he wanted me to write the letter.

BY MR. SCRUGGS:

Q. I'm going to show you a copy of an exhibit that was marked at a previous deposition as Exhibit 3. The prior witness identified this as invoices, including the portions of the invoices that relate time on task, related to the services by Berenfeld Spritzer to RRA.

MS. MOSCOWITZ: Are you renumbering it for

this?

MR. SCRUGGS: No, I'm not going to mark it again. It's already No. 3. You have a copy.

MS. MOSKOWITZ: I do.

BY MR. SCRUGGS:

Q. Please take a look in the lower right hand corner of this set of invoices, and go to the page that is marked at the end of a long set of letters and numbers as 36. For the record it is Bates number BRRABILL000036. Have you ever seen this before?

A. Yes.

Q. In what context did you see it?

A. The invoice?

Q. Yeah.

A. I prepared the invoice.

Q. And in the last line of this invoice you inserted words, correspondence to Gibraltar Bank regarding bank deposits.

A. Yes.

Q. Please turn to page 39 of this exhibit. That is the page ending in Bates number 39. Do you see that page?

A. Yes.

Q. Take a moment to look at it, and I'm going to ask you some questions about several of the items

here.  Look particularly at the description of the activity.

A.    Okay.

Q.    On the first line there is, starting from left to right at the top of the page, it says, client. See the word client at the top of the page?

A.    Yes.

Q.    Is it customary for Berenfeld Spritzer to prepare -- deliver invoices to its clients for service delivery?

A.    Yes.

Q.    In this instance RRA was a client of Berenfeld?

A.    Yes.

Q.    By the way, what is a client as Berenfeld used that term?

A.    They're a client of the firm.

Q.    A customer with whom Berenfeld has an engagement for service delivery?

A.    Yes.

Q.    And to whom Berenfeld bills for its services?

A.    Yes.

Q.    Principally through time on task?

A.    Yes.

Page 128

Q.   So for this entry there's some initials in the first line of the page.  Those initials are GB. Who is that?

A.   That's me.

Q.   Gary Berkowitz?

A.   Yes.

Q.   And then there's a description of activity. Is this a description of what you did for service delivery to RRA on June 26, 2009?

A.   Yes.

Q.   Does this entry accurately reflect your devotion of an hour to the preparation of a letter for the bank and review with Tracy and Scott?

A.   Yes.

Q.   So is this time entry referring to this letter that I've -- that you've referred to earlier?

A.   Yes.

Q.   For the moment we're going to leave the invoices and go back to Composite Exhibit 12.

A.   Okay.

Q.   Is the last page of Composite Exhibit 12 the letter that you wrote for delivery by Scott Rothstein -- strike that -- for delivery by Tracy Weintraub to Gibraltar Bank?

A.   Yes.

MS. MOSCOWITZ:  Objection.  Compound.

BY MR. SCRUGGS:

Q.    Did you write the letter?

A.    Yes, I did.

Q.    For what reason did you write the letter?

A.    We wrote the letter --

MS. MOSCOWITZ:  Asked and answered.

THE WITNESS:  We wrote the letter on request of Scott Rothstein to Gibraltar Bank.

BY MR. SCRUGGS:

Q.    When you say here your time entry, review with Tracy and Scott, can you describe what you did by way of a review with Tracy and Scott on June 26, 2009?

A.    Yes.  I gave the letter first to Scott -- I mean to Tracy to review.  He made some changes.  And then we finished and then we gave the letter to Scott to review.

Q.    Did you prepare the letter we're talking about now that's part of Composite Exhibit 12 in Microsoft Word?

A.    Yes, I did.

Q.    Is a copy of this letter saved into Berenfeld's system?

A.    Yes, it should be.

Q. Did you do any track changes to reflect the changes that Tracy made to the letter?

A. Well, Tracy wouldn't have made changes in Microsoft Word, he would have just scribbled the changes on a piece of paper.

Q. You would have made the changes to the letter?

A. Yes.

Q. To digress for a moment, how is this document electronically stored, if at all, within Berenfeld?

A. The Microsoft Word file?

Q. Yes.

A. It would be saved somewhere on our network.

Q. Do you know whether the document was scrubbed electronically to remove any meta data?

A. I don't know what that is.

Q. Okay. So did you personally save the letter?

A. Yes.

Q. You personally typed the changes that Tracy Weintraub asked to have made --

MS. MOSCOWITZ: Objection.

THE WITNESS: Yes, I did.

BY MR. SCRUGGS:

Q. And then you personally stored the letter as edited following the communication with Tracy Weintraub?

A. Yes.

Q. Do you have any reason to believe that this document is still stored within Berenfeld's system?

A. I would assume so, yes.

Q. Tell me what Tracy Weintraub asked you to change about this letter.

A. It wouldn't have been much. It would have been maybe some wording as far as just how something is said. I mean, nothing -- the bulk of the letter would still be there. I mean, it wasn't any big changes.

Q. To the best of your recollection, tell me what changed.

A. I really can't recall. It would have been just minor cosmetic changes.

Q. What do you mean by minor cosmetic changes? Give me an example, please.

A. It might be something such as saying, I might have put down I write to you in response to these changes, to, I am writing to you in response. Just minor.

Page 132

Q.    What discussions did you have with Scott Rothstein on June 26th, 2009 about this letter?

A.    We gave him the letter to review, and he said okay.

Q.    Did he ask to have any changes made?

A.    Yes, he did.

Q.    What did he seek to change?

A.    We had an additional line in there, something to the affect stating that we provide no accuracy to this number.

Q.    I'm sorry?

A.    We provide no accuracy to these numbers, or something to that affect.

Q.    Scott Rothstein asked you to take that out?

A.    I believe so, yes.

Q.    And you took it out?

A.    Yes.

Q.    Did he ask for any other changes?

A.    There might have been something in there saying -- I think originally this line said, this information was not audited or verified by our firm.

Q.    And you took out the word, or verified?

A.    I believe so.

Q.    Why did you do that?

A.   I believe he requested the change.

Q.   Did he explain why he wanted to take out the reference to Berenfeld not having verified the numbers in the letter?

A.   I don't recall.

Q.   Did Scott Rothstein seek to have any other changes made to the letter?

A.   Not that I know of.  At least I don't recall.

Q.   You, as the author of the letter, did you see any difference in the meaning of the letter with Mr. Rothstein's change to paragraph 2, taking out the word, verified?

A.   No.  I felt the letter still conveyed what we were trying to say.

Q.   Okay.  Then further down on this page for June 22nd, you see the June 22nd entry there?

A.   I don't see anything for June -- I'm sorry, yeah, I do.

Q.   It's not in chronological order, is it?

A.   No.

Q.   Okay.  So there's an entry on this invoice that you prepared for Tracy Weintraub for June 22nd, 2009, three quarters of an hour, and the task that's in the invoice is, review letter/revisions to

Gibraltar Bank.   Do you see that?

A.    Yes.

Q.    What activity does that refer to?

A.    It should refer to this letter.

Q.    This is Tracy Weintraub referring to his revisions to the letter?

A.    Yes.

Q.    So he made revisions on June 22nd, and you made revisions on June 26th.   When did Scott Rothstein make his revisions?

A.    It would have been June 26th.

Q.    On that same day?

A.    I believe so, yes.

Q.    How do you know that?

A.    Because I believe that was the day that he came up to talk to us to pick up the letter.

Q.    So was this letter revised in the Berenfeld offices?

A.    Yes.

Q.    Whose office within Berenfeld, yours or Tracy Weintraub?

A.    I believe it would have been mine.

Q.    Were you sitting at your keyboard with him in your office?

A.    Well, I wasn't sitting at the keyboard.   We

Page 135

were just standing.

Q.   Standing?

A.   Yes.

Q.   Anybody else present?

A.   It would have been me, Tracy Weintraub and Scott Rothstein.

Q.   Did you make the changes to the letter while they were still present?

A.   No.

Q.   After they left?

A.   Yes.

Q.   And then once you prepared the letter, what did you do with it on that same day?

A.   I brought it to Tracy, and I don't recall who delivered it to Scott.

Q.   But you didn't?

A.   I'm sorry?

Q.   But you didn't take it to him?

A.   I don't recall if I brought it to him or Tracy brought it to him.

Q.   Let's go back to Exhibit No. 13. There are a lot of numbers in the middle of this page under a subtitle, wire transfers. Do you see those?

A.   Yes, I do.

Q.   What are those numbers?

A.    Are you referring to dollar amounts?

Q.    Yes.  Among other things.  Dollar amounts and the dates as well.

A.    Okay.

Q.    Let me rephrase the question.  What are the transactions that are reflected here in this document?

A.    These are wire transfers into the operating account of RRA.

Q.    From RRA trust accounts at Commerce Bank?

A.    Yes.

Q.    What could you tell me about those trust accounts?

A.    I'm not sure what you mean by that.

Q.    In the course of performing bank reconciliations did you become aware that RRA maintained trust accounts at Commerce Bank?

MS. MOSCOWITZ:  Objection to form.

THE WITNESS:  Yes, I knew they had trust accounts at Commerce Bank.

BY MR. SCRUGGS:

Q.    Commerce Bank has since become TD Bank?

A.    Yes.

Q.    And what was the nature of those trust accounts, and I'll call it TD Bank for the moment?

A.   I'm sorry?

Q.   What were these trust accounts for?

A.   For the holding of their clients' money.

Q.   And in this instance these clients, can you further describe these clients?

A.   No.

Q.   Are you aware now that these trust accounts contained the moneys of investors in a business proposition presented to them by Scott Rothstein?

A.   Now I know that.

Q.   And in plain English, these accounts that are the subject of this memo, are the accounts containing the moneys invested in the ponzi scheme conducted by Mr. Rothstein.

MS. MOSCOWITZ:   Is that your testimony, Frank?

MR. SCRUGGS:   Is that correct?

MS. MOSCOWITZ:   Wait a second.  Predicate. You need to ask him when he may have known that. I will not let him answer without your doing that.

MR. SCRUGGS:   I think he's made it clear that, now, but I'll go back and ask.  We'll clarify.

BY MR. SCRUGGS:

Q.   Tell me what you now know about what these moneys in the TD Bank were?

A.    Well, you told me that these were deposits from investors in a business proposition.

Q.    I did ask that question of you.  But now I want to have you tell me what you know now.

MS. MOSCOWITZ:   Regarding these specific wires?

MR. SCRUGGS:   Regarding these wires, yes.

THE WITNESS:   What I knew when?  Now?

BY MR. SCRUGGS:

Q.    What you now know, yes.  What you now know. Look at these moneys in TD Bank in something denominated as a trust account and tell me what this is -- what this is, based on your knowledge, at this time.

A.    These were moneys transferred over from their trust account at Commerce Bank into their operating account.

Q.    So now we're talking -- you're going back to the time of May 27, 2009, the date of this memorandum?

A.    Okay.

Q.    I'm asking you.  This is what you knew then?

A.    Yes.

Q.    Okay.  So you could see that RRA was

Page 139

transferring moneys from trust accounts at Commerce Bank/TD Bank, in sufficiently large numbers, to cause Gibraltar Bank, the depository institution, to raise its hand and ask, hey, what is this money for?

A.   Yes.

Q.   With that knowledge did you make any inquiry of Commerce Bank about the source of these funds?

A.   No, I did not.

Q.   Aside from the discussions you've previously testified about between you and Scott Rothstein and Tracy Weintraub, did you make any further inquiry of anyone in or about May 27th, 2009 about the source of the funds in these Commerce Bank accounts?

A.   I don't believe so, no.

Q.   Mr. Berkowitz, was it clear to you in May of 2009 that Commerce -- that Gibraltar Bank was seeking to determine whether or not RRA earned these moneys in the course of delivering legal services to clients?

A.   Yes.

Q.   And what made that clear to you?

A.   The letter from Gibraltar Bank.

Q.   You're speaking of the memorandum marked as Exhibit 13?

A.   Yes.

Q.   With that understanding of the bank's reason

for inquiries, is there a reason why you didn't write a letter that says -- that clearly said that RRA, in receiving these funds, did not receive them through the delivery of legal services?

MS. MOSCOWITZ:  Objection to form.

THE WITNESS:  Are you -- are you saying that I should have put in the letter that these deposits are not from legal fees?

BY MR. SCRUGGS:

Q.    Let's take it step by step.

A.    Okay.

Q.    You knew why the bank was asking, we've established that?

A.    Yes.

Q.    Armed with the knowledge that the bank was trying to determine whether or not RRA earned these moneys through the delivery of legal services, did you write a letter that clearly informed the bank whether or not the bank -- whether or not RRA earned these moneys through the delivery of legal services?

A.    Yes.  In the letter we said that, per discussion with Scott Rothstein.

Q.    And it's your view that the letter that you wrote clearly told the bank that RRA earned these moneys through delivering legal services?

A. We wrote, are recorded as revenue on the books of the firm.

Q. It was revenue on the books of the firm to the extent that the firm received the money; correct?

A. Yes.

Q. But it didn't inform the bank as to whether or not RRA earned the money through delivering legal services?

A. No, it did not.

Q. As you look back on this in retrospect, do you wish you had handled this differently?

A. Knowing what I know now, yes.

Q. Knowing what you know now, what would you have done different, if anything, in the wording of that letter that you showed to Scott Rothstein and Tracy Weintraub for review?

A. Well, now that I know it was a big ponzi scheme, it's a little different.

Q. So what would you have done differently in writing the letter?

A. I wouldn't have written the letter.

Q. At all?

A. Well, no, because it's -- no.

Q. Is there any financial information about the

Page 142

income and expenses of RRA as of May, 2009, that is available to you now that was not available to you in May of 2009?

A.    I'm sorry, could you please repeat that?

        MR. SCRUGGS:    Read it back, please.

            (Read back by court reporter.)

        THE WITNESS:    Yes.

BY MR. SCRUGGS:

Q.    What?

A.    The financial information at this time.

Q.    I'll rephrase the question and be really specific.    In October of 2007 you were working on the RRA tax return for 2005; correct?

A.    Yes.

Q.    You had information available to you at that time about the revenue earned from delivering legal services; correct?

A.    Yes.

Q.    Do you have any more information available to you now than you did then about the revenue earned by RRA for tax year 2005 for delivering legal services?

A.    We had the same information.

Q.    So the answer is no?

A.    I'm not really following the question.    I'm

| | |
|---|---|
| From: | Tracy D. Weintraub (x1701) |
| To: | Gary Berkowitz (x1737) |
| Subject: | FWi bank crap |
| Date: | Wednesday, June 24, 2009 2:22:00 PM |

What do you think? .

Tracy Weintraub
PARTNER


berenfeld
spritzer + shechter + sheer llp a
certified public accountants & business advisors

401 East Las Olas Boulevard
Suite 1090
Fort Lauderdale, FL 33301
954.728.3740 main
954.728.3741 direct
954.728.3798 fax
tweintraub@berenfeldllp.com
berenfeldllp.com

**From:** Scott Rothstein [mailto:srothstein@rra-law.com]
**Sent:** Wednesday, June 24, 2009 11:53 AM
**To:** Tracy D, Weintraub (x1701)
**Subject:** bank crap

Hey bro,....need to see you this afternoon if possible so I can get that nebulous letter over to gibraltar about the fact that I am declaring certain funds as income to my firm....need the letter so I do not breach confidentiality on the settlement side.
Love ya,
Me
Me
And me
Lets do the info over a CIGAR :-)
How is the SEC....hehehehehehehehehe



EXHIBIT
# 12
3/17/10 ST

IRS Circular 230 Disclosure: Please note that the views expressed herein or in any attachments hereto are not intended to constitute a "reliance opinion" under applicable Treasury Regulations, and accordingly are not intended or written to be used, and may not be used or relied upon, for the purpose of (i) avoiding tax-related penalties that may be imposed by the Internal Revenue Service, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

NOTICE: THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE COLLECT AND DELETE THE MATERIAL FROM ANY COMPUTER. THANK YOU.

From:       Tracy D. Weintraub (x1701)
To:         Gary Barkowitz (x1737)
Subject:    FW: Request from Bank
Date:       Thursday, June 25, 2009 4:48:35 PM

FYI


Tracy Weintraub
PARTNER

401 East Las Olas Boulevard
Suite 1090
Fort Lauderdale, FL  33301
954.728.3740 main
954.728.3741 direct
954.728.3798 fax
tweintraub@berenfeldllp.com
berenfeldllp.com


-----Original Message-----
From: srothstein@rra-law.com [mailto:srothstein@rra-law.com]
Sent: Thursday, June 25, 2009 4:49 PM
To: Tracy D. Weintraub (x1701)
Subject: Request from Bank

Tracy,
Please be advised that the wires on the attached May 27 2009 fax from julia ansari are all attorneys fees, costs and other revenue to RRA and all shall be treated by you, as my CPA, as income to RRA.
Thank you,
Scott W. Rothstein
Sent via BlackBerry by AT&T



spritzer + shechter + sheer LLP =
certified public accountants & business advisors

·June 26, 2009

Julia A. Ansari
BSA Officer
Gibraltar Private Bank & Trust

Dear Ms. Ansari:

I am writing to you in response to a request by our clients Scott W. Rothstein and his law firm, Rothstein, Rosenfeldt, & Adler P.A.  Per discussion with Scott Rothstein, the deposits listed in your fax dated May 27, 2009 are recorded as revenue on the books of the law firm and will be reflected as income on their tax return for 2008.

This information was not audited by our firm, and we make no representation regarding the sufficiency of this information for any credit-decision making purposes.

This letter is not intended to establish a client relationship with you, nor is it intended to establish any obligation on our part to provide any future information to you with regard to Scott W. Rothstein and his law firm Rothstein, Rosenfeldt, & Adler, P.A.

Sincerely,


Tracy D. Weinkranb
Partner


Berenfeld Spritzer Shechter & Sheer LLP
2525 Ponce de Leon Boulevard, Fifth Floor, Coral Gables, FL 33134    305.274.4600 main    305.274.4601 fax
401 East Las Olas Boulevard, Suite 1090, Ft. Lauderdale, FL 33301    954.728.3740 main    954.728.6798 fax    berenfeldLLP.com

06/27/2009   14:57    3056495912                    3RD_FL                              PAGE   01/07

# GIBRALTAR PRIVATE
## Bank & Trust

### FASCIMILE

TO:              Scott W. Rothstein, Rothstein, Rosenfeldt,& Adler, PA
FAX:             954-462-0809
DATE:            May 27, 2009
FROM:            Julia A. Ansari, BSA Officer – Tel: 305-476-5589; Fax 305-648-5912
REF:             Additional Information for RRA – Banyon Account Activity, July – September 2008
Pages Included : 7

As per our telephone conversation below please find the activity requiring additional supporting information/documentation. As discussed, we need to know and document the purpose of the payments. Please indicate which are attorney's fees/costs, attorney's settlements, etc.,. A letter from your CPA supporting the information will be greatly appreciated;

## WIRE TRANSFERS:

INCOMING WIRES : to Rothstein Rosenfeldt Adler, P.A. (RRA PA - A/C# XXXXXXX82)

| | | |
|---|---|---|
| 1,322,178.21 | 07/01/08 | Rothstein Rosenfeldt Adler PA Trust Account at COMMERCEBANK, FT. Lauderdale |
| 1,880,909.41 | 07/02/08 | Rothstein Rosenfeldt Adler PA Trust Account at COMMERCEBANK, FT. Lauderdale |
| 1,331,229.79 | 07/02/08 | Rothstein Rosenfeldt Adler PA Trust Account at COMMERCEBANK, FT. Lauderdale |
| 9,873,488.48 | 07/03/08 | Rothstein Rosenfeldt Adler PA Trust Account at COMMERCEBANK, FT. Lauderdale |
| 2,565,218.02 | 07/03/08 | Rothstein Rosenfeldt Adler PA Trust Account at COMMERCEBANK, FT. Lauderdale |
| 4,060,339.21 | 07/31/08 | Rothstein Rosenfeldt Adler PA Trust Account at COMMERCEBANK, FT. Lauderdale |

EXHIBIT

#13



**FLORIDA**
DEPARTMENT OF
**FINANCIAL SERVICES**



Alex Sink
Chief Financial Officer of Florida

## Civil Remedy Notice of Insurer Violations

| | |
|---|---|
| Filing Number: | **163587** |
| Filing Accepted: | **8/9/2010** |

Warning! Information submitted as part of this civil remedy notice is a public record. Data entered into this form will be displayed on the DFS website for public review. Please DO NOT enter Social Security Numbers, personal medical information, personal financial information or any other information you do not want available for public review.

☑ The submitter hereby states that this notice is given in order to perfect the rights of the person(s) damaged to pursue civil remedies authorized by Section 624.155, Florida Statutes.

### Complainant

| | |
|---|---|
| Name: | **HON. HERBERT STETTIN, AS CHAPTER 11 TRUSTEE FOR THE ESTATE OF ROTHSTEIN ROSENFELDT ADLER, P.A.** |
| Street Address: | **C/O JASON S. MAZER, ESQUIRE, VER PLOEG & LUMPKIN, P.A., 100 SE 2ND STREET, 30 FLOOR** |
| City, State Zip: | **MIAMI, FL 33131** |
| Email Address: | **JMAZER@VPL-LAW.COM** |
| Complainant Type: | **Third Party** |

### Insured

| | |
|---|---|
| Name: | **BERENFELD, SPRITZER, SHECHTER & SCHEER, LLP, C/O JANE MOSKOWITZ** |
| Policy #: | **001275584** |
| Claim #: | |

### Attorney

| | |
|---|---|
| Name: | **JASON S MAZER** |
| Street Address: | **VER PLOEG & LUMPKIN, P.A., 100 SE 2ND STREET, 30 FLOOR** |
| City, State Zip: | **MIAMI, FL 33131** |
| Email Address: | **JMAZER@VPL-LAW.COM** |

### Notice Against

| | |
|---|---|
| Insurer Type: | **Authorized Insurer** |
| Name: | **LEXINGTON INSURANCE COMPANY** |
| Street Address: | |
| City, State Zip: | **,** |

Please identify the person or persons representing the insurer who are most responsible for/knowledgeable of the facts giving rise to the allegations in this notice.

**UNKNOWN**

| | |
|---|---|
| Type of Insurance: | **Professional Liability** |

DFS-10-363
Rev. 11/2007

 **FLORIDA**
DEPARTMENT OF
**FINANCIAL SERVICES**



Alex Sink
Chief Financial Officer of Florida

## Civil Remedy Notice of Insurer Violations

Filing Number:      **163587**

## Reason for Notice

Reasons for Notice:

**Claim Delay**

**Unsatisfactory Settlement Offer**

**Unfair Trade Practice**

---

**PURSUANT TO SECTION 624.155, F.S.** please indicate all statutory provisions alleged to have been violated.

**624.155(1)(b)(1)**      **Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests.**

**626.9541(1)(i)(3)(a)**      **Failing to adopt and implement standards for the proper investigation of claims.**

---

Reference to specific policy language that is relevant to the violation, if any. If the person bringing the civil action is a third party claimant, she or he shall not be required to reference the specific policy language if the authorized insurer has not provided a copy of the policy to the third party claimant pursuant to written request.

**THE COMPANY WILL PAY ON BEHALF OF THE INSURED THOSE SUMS, IN EXCESS OF THE SELF-INSURED RETENTION, THAT THE INSURED SHALL BECOME LEGALLY OBLIGATED TO PAY AS LOSS AMOUNTS RESULTING FROM A CLAIM THAT IS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD . . . AS A RESULT OF WRONGFUL ACT BY THE INSURED.**

---

To enable the insurer to investigate and resolve your claim, describe the facts and circumstances giving rise to the insurer's violation as you understand them at this time.

DFS-10-363
Rev. 11/2007

HON. HERBERT STETTIN, AS CHAPTER 11 TRUSTEE ("TRUSTEE") FOR THE ESTATE OF ROTHSTEIN, ROSENFELD, ADLER, P.A. ("RRA") HAS MADE DEMAND ON LEXINGTON INSURANCE COMPANY FOR THEIR $10 MILLION POLICY LIMITS TO RESOLVE THE CLAIMS ASSERTED BY THE TRUSTEE AGAINST BERENFELD, SPRITZER, SCHECHTER & SCHEER LLP (THE INSURED). THE INSURED'S LIABILITY TO THE TRUSTEE IS CLEAR, AS EVIDENCED IN PART BY THE TESTIMONY OF THE ACCOUNTANT WHO PROVIDED EXTENSIVE ACCOUNTING SERVICES ON BEHALF OF THE INSURED, GARY BERKOWITZ, DURING HIS RULE 2004 EXAMINATION CONDUCTED ON MARCH 17 AND 18, 2010.

THE INSURED'S PROFESSIONAL OBLIGATIONS TO RRA PRIMARILY ORIGINATED FROM (BUT ARE NOT LIMITED TO) ITS PROVISION OF TWO TYPES OF ACCOUNTING SERVICES TO RRA: PREPARATION OF TAX RETURNS AND COMPILATION OF FINANCIAL STATEMENTS. EACH OF THESE CATEGORIES OF ACCOUNTING SERVICES REQUIRES ACCOUNTANTS TO FULFILL THEIR OBLIGATIONS TO THE CLIENT BY THE EXERCISE OF DUE DILIGENCE, TO MAKE INQUIRIES WHEN THE ACCOUNTANT IS AWARE THAT INFORMATION SUPPLIED BY THE CLIENT IS INCORRECT, INCOMPLETE OR OTHERWISE UNSATISFACTORY, AND TO WITHDRAW FROM THE REPRESENTATION IF ADDITIONAL INFORMATION IS NOT PROVIDED TO THE SATISFACTION OF THE ACCOUNTANT.

THE INSURED BREACHED ITS CONTRACTUAL AND PROFESSIONAL OBLIGATIONS TO RRA, WHICH BOTH DIRECTLY DAMAGED RRA AND ALLOWED SCOTT ROTHSTEIN TO CONTINUE OPERATION OF THE PONZI SCHEME TO THE CONSIDERABLE DETRIMENT OF RRA. HAD THE INSURED COMPLIED WITH ITS PROFESSIONAL OBLIGATIONS, THE ROTHSTEIN SCHEME WOULD HAVE BEEN EXPOSED AND RRA WOULD NOT HAVE SUFFERED THE EXTENSIVE DAMAGES IT HAS SUSTAINED.

LEXINGTON HAS UNREASONABLY DELAYED RESOLUTION OF THIS CLAIM, BUT MAY CURE ITS STATUTORY VIOLATIONS AND PROTECT ITS INSURED FROM AN EXCESS VERDICT BY PAYING ITS $10 MILLION POLICY LIMITS JOINTLY TO THE TRUSTEE AND THE RAZORBACK INVESTORS REPRESENTED BY CONRAD AND SCHEER.

## Comments

| User Id | Date Added | Comment |
|---------|-----------|---------|
|         |           |         |

# EXHIBIT "D"

664210-1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                                                    CASE NO.:  09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,              CHAPTER 11

    Debtor.

_____/

**ORDER GRANTING MOTION TO APPROVE COMPROMISE AND SETTLEMENT**
**BETWEEN THE CHAPTER 11 TRUSTEE AND BERENFELD SPRITZER SHECHTER**
**& SHEER, LLP AND FOR ENTRY BAR ORDER**

    **THIS CAUSE** came before the Court upon the Trustee's *Motion to Approve*

*Compromise and Settlement Between The Chapter 11 Trustee and Berenfeld Spritzer Shechter &*

*Sheer, LLP  And For Entry of Bar Order* [ECF No. ___] (the "Motion") filed by the Trustee on

November 3, 2010.  The Court has reviewed the Motion, and has considered the entire record in

this case and the arguments of counsel at the hearing on the Motion and evidence adduced in

support of the Motion (including any evidence offered by proffer and accepted by the Court

without objection of any party).  The Court finds that notice of the Motion and the hearing

3179473-1

thereon is sufficient (*See* ECF No., ___for the Certificate of Service of the notice of hearing on the Motion).  Based on the foregoing, it is

ORDERED as follows:

1.     The Motion is **GRANTED**, any and all Objections [ECF No. _____] are **OVERRULED**. The request for a bar order shall be dealt with by separate order.

2.     The terms of the Settlement Agreement attached to the Motion as Exhibit "A" are approved and incorporated herein in their entirety. The Trustee is further authorized to take any action necessary to effectuate the Settlement.

3.     The Court reserves jurisdiction regarding the interpretation, effectuation, and enforcement of the terms of the Settlement Agreement and this Order.

# # #

Submitted by:

**BERGER SINGERMAN, P.A.**
Paul Steven Singerman, Esq.
200 S. Biscayne Blvd, Suite 1000
Miami, Florida 33131
Main Line: (305) 755-9500
Facsimile: (305) 714-4340

Copies to:
(*Attorney Singerman shall serve this order on all interested parties and file a certificate of service within 3 days of entry of this Order*).

3179473-1