UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                         CASE NO. 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,

           Debtor.
_____/

HERBERT STETTIN,

           Plaintiff,

vs.                            ADV. NO. 12-1836-RBR-A

QTASK, INC.,

           Defendant.
_____/

ALL MOTIONS ON CALENDAR

(Main 2700,3281,3285,3286,3287,3326,3546)

(Adversary: 8,9,17)

November 14, 2012

           The above-entitled cause came on for hearing

before the Honorable Raymond B. Ray, one of the Judges in

the UNITED STATES BANKRUPTCY COURT, in and for the

SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

Fort Lauderdale, Broward County, Florida on

November 14, 2012, commencing at or about 9:30 a.m., and

the following proceedings were had.


                    Reported By:
                 Cheryl L. Jenkins, RPR

APPEARANCES:


BERGER SINGERMAN, by
ANDREW M. HINKES, Esquire
On behalf of the Debtor


KOPELOWITZ OSTROW FERGUSON WEISELBERG KEECHL, by
BART A. HOUSTON, Esquire
On behalf of Reichart Von Wolfsheild, Qtask, Inc., and
Silent Software


AKERMAN SENTERFITT, by
MICHAEL I. GOLDBERG, Esquire
On behalf of the Creditors Committee


ALSO PRESENT

ROBERT BUSCHEL

BARON REICHART VON WOLFSHEILD

- - - - - - -

THE COURT:  All right.  Now, that leaves me then with Qtask, correct?

MR. HOUSTON:  That's right, Judge.

THE COURT:  Everything remaining before me has got to do with Rothstein and Qtask.

MR. HINKES:  Your Honor had previously -- that's correct, and previously you had asked were there any agreed matters.  Mr. Houston and I, on behalf of our clients, were able to narrow the issues before the Court today.  I'm going to read off the docket entry numbers which the parties ---

THE COURT:  All right.  Well ---

MR. HINKES:  I'm sorry, your Honor, Andrew Hinkes for the trustee.

THE COURT:  Hang on for a just minute.  Let me -- while we're here today, do we want to include the afternoon hearing?

MR. HOUSTON:  We could do that, Judge.

THE COURT:  Are you all prepared ---

MR. HOUSTON:  The motion to dismiss?

THE COURT:  Yes.

MR. HINKES:  Sure, your Honor, that's fine.

MR. HOUSTON:  I don't have a copy with me, but it's relatively simple, Judge.

THE COURT:  Well, I just -- if I can save

Page 4

you all the trip back here this afternoon, I'll do so.

MR. HOUSTON:  That's presuming we're not still here this afternoon, Judge.

THE COURT:  All right.  Turning now to Rothstein Rosenfeldt & Adler.  Let me get appearances for the record.

MR. HOUSTON:  Good morning, Judge.  My name is Bart Houston from Kopelowitz Ostrow.  I represent Reichart Von Wolfsheild, Qtask, Inc., and Silent Software.

MR. HINKES:  Your Honor, good morning.  Andrew Hinkes from Berger Singerman representing the trustee, Herbert Stettin.  We're here on two different notices, one issued in the main case, and one issued in the adversary case, which set a number of proceedings before the Court.

The parties have agreed that certain of those motions which were set for today can be agreed to be moot, and thus denied.

THE COURT:  Okay.  Is that in the main case or in the adversary?

MR. HINKES:  In both, your Honor, and I'll read off those numbers now.

THE COURT:  All right.  Well, let's go first to the main case.

MR. HINKES:  Your Honor, in the main case,

Page 5

Number 3281, Number 3285, Number 3286, Number 3287.

THE COURT:  No, no, you're going too fast.

MR. HINKES:  I'm sorry, your Honor.

THE COURT:  All right.  I have 3281, 3285.

MR. HINKES:  3286.

THE COURT:  3286.

MR. HINKES:  3287.

THE COURT:  3287.

MR. HINKES:  And then in the adversary proceeding then, your Honor.

THE COURT:  All right.  Well, let's go with the main case.  So in the main case ---

MR. HOUSTON:  Judge, if you look at your order that is setting the hearings in the main case, and that's Docket Entry 556, it's actually those court papers that are identified in Subparagraphs B, C, D and E. They're basically all the discovery motions that are mooted out.

THE COURT:  Okay.  So, Mr. Hinkes will draft an order denying without prejudice as moot Docket Entry 3281, 3285, 3286, 3287.

MR. HINKES:  Absolutely, your Honor.

THE COURT:  All right.  That's in the main case.

Now you say in the adversary proceeding,

Page 6

what agreement is there?

MR. HINKES:  The parties have agreed that, similar to prior motions in the main case, Number 8 and Number 17 in the adversary proceeding are moot as well.

THE COURT:  Ex parte motion to shorten time?

MR. HINKES:  Correct, your Honor, they're similar to the others, they're discovery related motions.

THE COURT:  All right.  Mr. Hinkes will see to that order.

MR. HINKES:  Yes, sir.

THE COURT:  That takes me to, in the mean case, the motion to dismiss.  What else is pending?

MR. HINKES:  There is the motion for the order to show cause, which was originally 2700, and has been subsequently re-noticed a number of times, as well as Docket Entry 3326, which is a motion seeking injunction to vacate in part the settlement agreement.

THE COURT:  I'm sorry, 2700.  All right. What other matters?

MR. HINKES:  3326 in the main case, your Honor.

THE COURT:  3326.  What else in the main case?

MR. HINKES:  We just agreed that Mr. Houston's motion, previously set at 1:30, can be

considered now.

THE COURT:  Okay.  Well, let's -- that's in the main case.

MR. HOUSTON:  That's correct, that's my motion to dismiss, 3326.

THE COURT:  All right.  Let me make sure I have all of these in the courtroom.

All right.  2700 resulted in 2774, 2778.

MR. HOUSTON:  And also, Judge, 2978, which is the amended order to show case.  That's the one that's in your order set for hearing today.

I think it's functionally the exact same as the original order to show cause.  It just amended it to -- really to a different date.

THE COURT:  Let me discard the ones I don't need.

All right.  I have it.  Which particular order do you want to deal with?

MR. HOUSTON:  It would make more sense, Judge, for me to deal with my motion to dismiss first I, I would guess, and Mr. Buschel is pulling it up for me now on his I-Pad, since I didn't bring it with me this morning.

THE COURT:  All right.  I have it in front of me.

Page 8

Mr. Houston, do you want me to have my staff make a photocopy?

MR. HOUSTON:  Judge, if you don't mind me standing here, I can probably pull it up on the computer here and ---

THE COURT:  Well ---

MR. HOUSTON:  If you can make a photocopy, I would greatly appreciate it.

THE COURT:  We'll print it right here in the courtroom.

MR. HOUSTON:  That would be great.

So, Judge, this is Court Paper 3546, which is my motion to dismiss Court Paper 3226.

Court Paper 3226 was a motion filed by the trustee, and that motion was seeking the entry of an order enforcing the settlement agreement, and the settlement agreement, of course, we talked about that many, many times, and we'll talk about it many more times today, to vacate the settlement agreement, and for injunctive relief.

The basis for our motion is very simple, Judge.  The Rules of Procedure, the Federal Rules of Bankruptcy Procedure are very clear, that injunction and recession relief are only available pursuant to the filing of an adversary.  That's Rule 7001.

Page 9

We have sought the dismissal of that motion on the basis that it's not well founded as a motion or contested matter, and must be more properly in the form of an adversary proceeding.

Now, post-law to that, about two, or three or four weeks -- two weeks, probably, later the trustee did, in fact, file an adversary proceeding asserting almost the same relief, and that's part of what we're here on today.

However, in that adversary complaint, and in the adversary -- excuse me, in the motion for preliminary injunction in the adversary proceeding, they have incorporated the contents of 3226.

We think 3226 is improperly filed as a contested matter, and was required to be an adversary.  So I think that that motion should be dismissed.

THE COURT:  So you're arguing that the trustee had an election to either move in the main case to enforce the settlement, or in the alternative to bring suit for breach of the settlement.

MR. HOUSTON:  No, sir, not at all.  In fact, the motion that he filed, 3226, is a motion in the main case seeking an injunction, and it also seeks to rescind the settlement agreement, not enforce it, but to rescind it.

THE COURT: It says to enforce the amended settlement agreement, to vacate the amended settlement agreement in part, and for injunctive relief.

MR. HOUSTON: So they're seeking to enforce the part where they get the money, but rescind where they give the release.

So, they're seeking rescission relief from this Court, to rescind their obligations under the settlement agreement, and they're also seeking an injunction, and as your Honor knows, that's not appropriate in a motion.

THE COURT: How does the motion, 3226, compare to the relief sought in the new adversary proceeding?

MR. HOUSTON: I think they're fairly -- almost exactly similar.

THE COURT: Are the defendants the same, the respondents the same as the defendants?

MR. HOUSTON: No, sir, because Silent Software was not a respondent in the main case.

THE COURT: And that is the recipient of the transfer, I take it.

MR. HOUSTON: That is a party that is utilizing the --

THE COURT: Software.

MR. HOUSTON:   -- software.

MR. HINKES:   Yes, your Honor, that is the recipient of the transfers of the user information that you're going to hear evidence about later.

THE COURT:   So, that transfer in use, the cause of action against them in the new adversary is based on the actions of Qtask and Wolfsheild, Von Wolfsheild?

MR. HINKES:   Yes, your Honor.

THE COURT:   All right.   Let me have a response to 3546.

MR. HINKES:   Your Honor, Andrew Hinkes for the trustee.

The trustee did file an immediate response, virtually immediate response, which I believe is at 3547, which points out that, yes, indeed, we did file an adversary which asserts some of the same entitlement to relief.   Both papers, the adversary complaint and motion, and the motion in the main case, did ask for injunctive relief.

THE COURT:   Does the adversary proceeding seek to enforce the settlement agreement, or to vacate it and move for damages?

MR. HINKES:   There are two differences, one is that the adversary does not seek to enforce, and the second is that the adversary does not seek contempt

sanctions, both of which are forms of relief sought in the main case, Docket Entry 3226.

THE COURT: Well, no, once again you asked for multiple reliefs in 3226. What I'm trying to do is separate 3226 from the adversary proceeding. What does 3226 do that the adversary does not do?

MR. HINKES: Asks for contempt sanctions, and asks to --

THE COURT: Contempt sanctions --

MR. HINKES: -- enforce.

THE COURT: -- against who?

MR. HINKES: Mr. Von Wolfsheild and Qtask.

THE COURT: Yes, I'm reading it, it seeks an order both to enforce and to vacate the settlement, for a TRO to shut down the operation of the Prolific system, to return any assets transferred by Qtask or RVW to the trustee. That's your opening paragraph in 3226.

So you're seeking -- I'm not sure I understand the difference between the two.

MR. HINKES: Sure, your Honor, let me help.

THE COURT: Concept sanctions against RVW and Qtask I can understand. If there was an order entered, and an agreement made, and they went out willingly and violated that, they are personally liable for their actions.

MR. HOUSTON:  But, Judge, that's what's really before the Court on the order to show cause.  It's no different from the order to show cause.

And, you know, frankly I think maybe a little history.  We had a hearing on the order to show cause, and some issues developed in that hearing, and your Honor ordered that the trustee file a new document, and this is the new document.

So in some respects, it incorporated the contempt that we've been here on four different occasions for in the order to show cause and the sanctions, and then in other respects it added a motion for temporary restraining order, an injunction, and to rescind parts of the settlement agreement, and it's our position that temporary restraining order and rescission are properly in an adversary proceeding.  It can't be by motion.

THE COURT:  Mr. Hinkes, why is that not so?  You have a settlement agreement, it's been approved by the Court, that is a final order.

MR. HINKES:  Correct, your Honor.

THE COURT:  Now you say I want to rescind that because the other side failed to live up to it.

MR. HINKES:  That's part of the relief that's sought here, Judge.

THE COURT:  Will you rescind the entire

Page 14

thing?

MR. HINKES:  Partial rescission, your Honor.

THE COURT:  All right.  How do you partially rescind something, keep the good parts and throw away the bad?

MR. HINKES:  Keep the parts that have already been complied with, and seek further relief ---

THE COURT:  Which are?

MR. HINKES:  I'm sorry?

THE COURT:  Which are?

MR. HINKES:  You're going to see a lot of evidence today about that, Judge.  The trustee's position is that the evidence will show that there has been intellectual property conveyed, there has been some software conveyed, and that's really about it.

MR. HOUSTON:  And money paid.

MR. HINKES:  And there has been money paid.

THE COURT:  Money paid by who to who?

MR. HINKES:  Mr. Von Wolfsheild agreed to a rolling schedule of payments, which to my knowledge he has kept up with.

THE COURT:  So the issues is a transfer of the usage of the software.

MR. HINKES:  The issue is the transfer of a number of assets, other compliance, and further actions

taken by Prolific -- I'm sorry, by Mr. Von Wolfsheild, Qtask and Silent Software, who is the company that owns -- the recipient of the transfer of ---

THE COURT:  Well, then your adversary proceeding seems to be an adversary proceeding against RVW ---

MR. HINKES:  And Qtask, and Silent.

THE COURT:  Well, Qtask -- is Qtask active as we sit here today, as an active corporation?

MR. HOUSTON:  Qtask, Inc., I believe, is an existing corporation.  Whether it's current with the relevant Secretary of State, I don't know, Judge.

THE COURT:  Well, is it currently in business?

MR. HOUSTON:  No, sir, it is not.

THE COURT:  That's kind of my recollection.

MR. HOUSTON:  No, Judge.

THE COURT:  So, there is a judgment against Qtask ---

MR. HOUSTON:  The judgment was part of the settlement agreement, and that's why Mr. Von Wolfsheild is making payments of $150,000 to the trustee over a period of time.

So, in essence, it vacates the judgments or vesicates the judgments.

THE COURT: The cause of action that really exists is whether or not RVW and, to that extent, Qtask transferred or somehow sold, transferred, joined in business with a third party to use the very software that the trustee owns.

MR. HINKES: The adversary filed -- the adversary included causes of action for breach of the agreement, for fraudulent inducement of the agreement, and for tortious interference with the trustee based upon Mr. Von Wolfsheild, and through him Qtask's actions.

THE COURT: How is that distinguishable from the contempt proceeding being sought in the main case?

MR. HINKES: It's distinguishable for one simple fact, your Honor. The compliance with the agreement is what -- the compliance with one specific order, and as its evolved, the current order being I think 2770, or 2978, is the compliance issue, and that's the order to show cause.

The remaining claims have to do with things that have happened after the settlement agreement was entered into, that being Mr. Von Wolfsheild's intentional interference with the system and its users.

THE COURT: I'm having difficulty distinguishing 3226 from the adversary proceeding. Can't all the relief being sought in 3226 be resolved in the

adversary proceeding?

MR. HINKES: I don't believe, your Honor, that the contempt is properly done in the adversary and, your Honor, Qtask will probably say that the concept can be handled through the order to show cause, but there is a separate and independent basis for a finding of contempt being offered to the Court by the trustee, and that is for subsequent interference, which has the effect of both damaging the estate, harming creditors, wasting the Court's time and the estate's money, and also interfering with ability to liquidate the assets to be received by the trustee when ---

THE COURT: But that's part of your adversary proceeding, correct, that very relief?

MR. HINKES: Contempt, your Honor?

THE COURT: No, no, no, the other matters that you just mentioned.

MR. HINKES: Right, what I'm saying is contempt is separate and apart, your Honor.

THE COURT: So contempt is the only issue in the main case that is separate and distinct from the adversary.

MR. HINKES: The adversary ---

THE COURT: All the other relief that the adversary seeks would resolve the relief being sought in

the main case?

MR. HINKES:  The adversary does not seek to compel performance, which is something that the main case Docket Entry 3226 does.

THE COURT:  If you're seeking all the other relief.

MR. HINKES:  Damages, not specific performance, Judge.  We didn't ask for specific performance.

THE COURT:  All right.  Mr. Houston.

MR. HOUSTON:  Judge, it's our viewpoint that the contempt that they're seeking is really part of the order to show cause, and not part of the adversary properly, and as your Honor just pointed out, when Mr. Hinkes described the damages that are occurring from this subsequent contempt, they really go to the tortious interference claim that's in the adversary proceeding, and if that's what they're seeking, is damages for tortious interference, and that's in the adversary, and for that reason 3226, especially because it's asked for injunctive relief, which we know can't be in a motion ---

THE COURT:  Well, that's -- that relief cannot be sought in the multiple -- what has happened with 3226 is you've asked for multiple relief in one pleading, some of which you may be entitled to, some of which you

Page 19

cannot receive through that pleading, and as such, instead of simplifying the issue, you've complicated it, and I'm trying to clean it up so that I can have a clear record for purposes of my ruling, for purposes of appeal.

Turing back to 3226, Page 1, the first paragraph seeks an order to enforce the settlement. Are you doing that in the adversary proceeding?

MR. HINKES: Give me a moment to consult the paper just to verify. I'd like to make a faithful representation to the Court.

Your Honor?

THE COURT: Yes.

MR. HINKES: Docket Entry Number 9 of the adversary seeks temporary injunctive relief, and seeks a partial vacate of the settlement agreement, and seeks contempt.

So both of the papers, 3326 and Number 9 seek the same, those three same forms of relief. The substantive difference being that 3326 goes for enforcement, whereas Adversary ---

THE COURT: Enforcement of something that you're seeking to set aside?

MR. HOUSTON: Correct.

MR. HINKES: Enforcement of certain parts of performance.

Page 20

The key issue, Judge, and forgive me for not being clear before, is the following:  When the order to show cause issued, there was a certain set of facts.

THE COURT:  I can deal with Docket Entry 2700, order to show cause, contempt of RVW and Qtask separately in the main case.

MR. HOUSTON:  Yes.

MR. HINKES:  Yes, your Honor.

THE COURT:  So I don't need 3226 for that, I've got 2700.

MR. HOUSTON:  Yes, sir, and it's progeny.

MR. HINKES:  Your Honor, I would say that ---

THE COURT:  And then I have the adversary proceeding, which incorporates the new defendants, as well as all the relief sought in 3226.

MR. HINKES:  With the exception of enforcement, your Honor.

MR. HOUSTON:  You know, from a procedural standpoint, Judge, maybe this can be clearer.  3226 is not one of the matters that was set for hearing today.  The two matters, now that counsel and I have stipulated to the discovery, not the stuff that should be denied, is really just the order to show cause in the main case.

THE COURT:  2700.

MR. HOUSTON:  Yes, sir, 2700 and its progeny, ultimately, as your Honor says, on Page 2 of Court Paper 3556, it's subsequent amended order to show cause, which is 2978.  So that's in the main case, and that's a separate, distinct set of facts.

The other matter that really comes before the Court today in the adversary proceeding, after stipulation of matters that are peripheral, is the motion for temporary or preliminary injunction.

So 3226 is not set to be heard by the Court. The only reason we're discussing it is because I filed a motion to dismiss it, and it was set for a separate hearing, and we've kind of melded it in here.  So, maybe if your Honor is looking for the connect, I don't think it's there.

THE COURT:  Well, no, what I'm going to proceed to do is to deny 3226; grant, without prejudice, to proceeding in the adversary proceeding and under Docket Entry 2700.

MR. HOUSTON:  And then ---

THE COURT:  That way it simplifies the issues, I have the adversary issues framed in the adversary proceeding, I have the contempt issues framed.

With that ruling, what has the trustee lost, if anything?

MR. HINKES: The trustee has lost the ability to seek a judgment that enforces and vacates at the same time portions of the agreement.

THE COURT: Well, why can't you enforce that in the adversary proceeding?

MR. HINKES: Can I have a moment, your Honor?

THE COURT: Yes.

MR. HINKES: Your Honor, just so the Court is aware, Mr. Houston, about 25 minutes before the hearing, did file a motion that seeks to exclude the testimony of Mr. Robert Moody ---

THE COURT: I have it right here.

MR. HINKES: -- who has been disclosed, and as your aware, Judge ---

THE COURT: That's in the adversary proceeding.

MR. HOUSTON: It is, Judge.

MR. HINKES: Understood, but the effect of that would be to preclude his giving any testimony with respect to his classification as an expert, so that is what the trustee is losing.

THE COURT: How can that be if I haven't heard the motion or ruled?

MR. HOUSTON: Presuming that the motion is

Page 23

granted, that would be ---

THE COURT: Why would you presume that?

MR. HINKES: I'm not, your Honor, but I'm saying if it is possibly granted, and obviously the trustee takes the position that it should not be granted, that would be the potential loss to the trustee, that the trustee would not be able to offer the evidence that it wants to.

MR. HOUSTON: Judge, I'm not sure how that connects to 3226, though, which is not even set for Court hearing today.

I think the question was, can the relief from 3226 be stated in the adversary, and if I was being asked, I would say, yes. I mean, we're not here for trial, so they certainly could amend to include that, but to the extent it does contain mixed relief, which is, as a matter of law not permissible in a motion.

THE COURT: Well, 3226 and 3546, 47, 48 are set for hearing today. They are set for hearing at 1:30. I've agreed to take them early in the day, in the morning, to keep you all from having to come back in the afternoon.

So my ruling on that is going to be, grant 3546, deny without prejudice 3226, and my office will see to that order.

MR. HOUSTON: Thank you, Judge.

Page 24

MR. HINKES:  Thank you, your Honor.

THE COURT:  Now hold on.  Let me -- now turning back to the main case, I then address 2700, which is the only issue remaining today for hearing, correct?

MR. HOUSTON:  No, sir, the motion for preliminary injunction in the adversary I think is also set.

THE COURT:  Not on my calendar.

MR. HINKES:  Well, again, that's in the adversary.  So you've got the adversary and the main case, each one has one motion, 2700, and its progeny in the main case, and Docket Entry Number 9 in the adversary.

MR. HOUSTON:  Judge, that matter was set by your order, which is ---

THE COURT:  Well, no, I see what happened.

MR. HOUSTON:  Okay.

THE COURT:  Once again they filed a single motion that seeks to do multiple things.

So, 8 is denied, 17 is denied.  9 in the adversary is a motion for temporary restraining order.

Let me see if I have -- print me a copy of 9.

MR. HOUSTON:  Judge, and 27 is our response to 9.

THE COURT:  I have a copy of 27.

Page 25

MR. HOUSTON:  Yes, sir.

THE COURT:  What is the docket entry number of the order, or notice of hearing setting Docket Entry 9 for hearing?

MR. HOUSTON:  25, Judge.

THE COURT:  Make me a copy of that.

All right.  Let me hear from you in reference to Number 9.

MR. HINKES:  Your Honor, Andrew Hinkes for the trustee, Berger Singerman.

It seems, Judge, that a lot of the issues here are sort of intermingled between the two, both are going to require evidence, and as the parties have disclosed to each other, we're going to be calling the same two witnesses, that is Mr. Moody and Mr. Von Wolfsheild, both of whom are here in the courtroom, and so the trustee's counsel humbly suggests that the Court allow the parties to give openings pertaining to both of the -- both of the motions, which are set for before the Court, the order to show cause and the ---

THE COURT:  No, I want to keep them separate for purposes of appeal.

MR. HINKES:  Okay.  In that case I'll take just ---

THE COURT:  An opening statement under 9, and then we'll proceed.

MR. HINKES:  All right.  Just a moment, your Honor.

May I proceed?

THE COURT:  Yes.

MR. HINKES:  From the beginning, your Honor, the trustee's interactions with Qtask, starting with the subpoena sent on December 9th of 2009 in this case, there has been a few recurring themes, the trustee has always been greeted with courtesy in discussions professing a stated desire to cooperate, only to be stymied by a lack of disclosure, or direct interference by Qtask and its principal, Mr. Von Wolfsheild.

The Court, no doubt, remembers entering its first order to compel, which was responded to by Mr. Von Wolfsheild and Qtask with what we affectionately refer to as the slam notice, which was sent allegedly to all Qtask users saying that Qtask will never cooperate with the trustee, and Qtask intends to overturn the Court's order.

This same spirit of obstruction, duplicity and bad faith has continued to permeate these proceedings. We thought that we had settled all of the open issues related to the adversary filed against Qtask with respect

to the $7.5 million alleged to have been received from the Rothstein Ponzi scheme, and from the $525,000 sanction judgment, entered by the Court at 1527, against Qtask, in an agreement that we thought was going to provide everybody with a pretty good deal. The trustee would receive the software, and an enumerated list of assets, and the parties would receive releases, the estate could stop throwing money after the enforcement of the subpoena and the adversary proceeding, and the parties could continue on, and the estate could focus on more lucrative goals.

What really happened is that Mr. Von Wolfsheild and Qtask sold the trustee a bill of goods with a scheme in mind ahead of time, and the first instance of this came to bear when the trustee sought to actually follow through with the obligations of the amended settlement agreement, which was approved at 2296 by the Court. There was a number of things that the parties had to do. Mostly, in paragraph -- or Section 6, I should say, of the amended settlement agreement, Qtask and Mr. Von Wolfsheild were required to do certain things, they were required to make certain conveyances of certain assets.

Among the things that they were required to do was to convey software assets. They were to provide a

copy of the source code for Qtask.  They were to provide a copy of the source code for something calling Rebel, which we're advised is the programming language which Mr. Von Wolfsheild used to create the Qtask system.

THE COURT:  Wait one minute, Mr. Hinkes.

Run me a copy of the docket sheet for the new adversary.  I don't apparently have one.

MR. HINKES:  They were to provide patents owned by Qtask, they were to provide trademarks to certain enumerated domain names, and the hard -- the computer hardware the hosts the Qtask system's software, and six sub -- little six, was a provision that said all other intellectual property assets, licenses and contract rights held at any time by Qtask, or for the benefit of Qtask by any other parties, and that consistent with the full transfer of any and all intellectual property that pertains to Qtask.

So the trustee sought to follow through with this, and in accordance with the agreement, the trustee prepared the form of documents to effectuate the transfers that were required.

This is when the games by Qtask and Mr. Von Wolfsheild began.  Mr. Von Wolfsheild wouldn't sign anything.  He wouldn't sign anything, even though it was explained to him that certain assets were a ticking

time bomb, so to speak.  Certain intellectual property assets needed to be -- have filings done with the U.S. Patent and Trade Office, or else they would expire, and functionally degrade the value of the assets to be provided to the trustee.

Communications took place, even without Mr. Von Wolfsheild having lawyers, long before papers were filed, here are documents, please sign them, and Mr. Von Wolfsheild refused.

A motion to compel was filed, which sought, as its relief, to compel the execution of all documents and to complete all transfers required to satisfy the obligations of the amended settlement agreement.

We had a hearing, your Honor.  The trustee provided Court Call access so that Mr. Von Wolfsheild, whether he be in his home in Hawaii, or his home in California, was able to participate in the call, and Mr. Von Wolfsheild agreed, right before the call, that he was going to go ahead and provide those assets, so we were able to stand, metaphorically, shoulder to shoulder and say, yes, Judge, we're getting this part settled, and the Court did, in fact, enter the order provided by the trustee, which compelled not just the transfer of that one specific, I'll call it the exploding asset, but all the assets that were required.

After that particular asset, and a few other trademark assets were transferred by Mr. Von Wolfsheild, then we went back to the familiar pattern of, I don't understand, I have a lot of questions, I don't like the form of the paperwork, I'm not a lawyer, you're the lawyer, fix this, change this, do this, and this was, in retrospect, simply delay on Mr. Von Wolfsheild's part.

So having not complied with the Court's order to compel, which I believe was issued on February 24th of this year, the trustee then brought another motion for an order to show cause, which is what we're here for today, your Honor. So ---

THE COURT: That's 2700.

MR. HINKES: 2700, which through its various iterations, is ---

THE COURT: I'm talking about the adversary proceeding.

MR. HINKES: I'm sorry?

THE COURT: I said we're proceeding first on the adversary proceeding.

MR. HINKES: Okay. I'm sorry, I misunderstood. I thought you wanted ---

THE COURT: You want to go on to 2700?

MR. HINKES: Whichever the Court prefers. I'm happy to shift gears right now, your Honor.

I apologize for not ---

MR. HOUSTON:  Judge, we started on Court Paper 9, the motion for injunction, which seeks pretty serious relief.

THE COURT:  The adversary.

MR. HOUSTON:  That's the adversary.  I think, as your Honor indicated, we should stick with that and then we can go to the other one.

MR. HINKES:  Sure.

THE COURT:  That's what I propose to do.

First of all, there has been no responsive pleadings filed by the defendants, and their answer was due in September.

MR. HOUSTON:  No, sir, there was an abatement order your Honor entered that abated any and all deadlines, and that was just vacated last week.

THE COURT:  What order was that?

MR. HOUSTON:  Judge, that was the order that was entered August 28th when we were engaging in discussions with Mr. ---

THE COURT:  August 29th?

MR. HOUSTON:  That probably is the date, Judge, it was entered.  That abated any and all deadlines, including, you know, motions objecting to core jurisdiction, motions -- the various motions, and the

answer, and so I have prepared an answer, but it's not due.

MR. HINKES:  Your Honor, Docket Entry Number 9 was filed on August 10th.

THE COURT:  I ---

MR. HOUSTON:  I think he's talking about a response to the complaint.

THE COURT:  Service of process on the defendants and responsive pleading, there has been service on the defendants, they have made their appearance.

MR. HOUSTON:  That's right, Judge.

THE COURT:  They've not filed a responsive pleading to the complaint.

MR. HOUSTON:  That's right, Judge.

MR. HINKES:  That was filed August 8th, your Honor.

THE COURT:  What was filed?

MR. HINKES:  Complaint, Docket Entry Number 1.

THE COURT:  Oh, I understand that.  I'm saying there has been no answer or motion to dismiss, or jury trial, or any other responsive pleading to that complaint.

MR. HOUSTON:  Correct, that's right, Judge. We're not here for trial on that.  We're here on the

Page 33

preliminary injunction.

THE COURT: No, no, I realize that.

MR. HOUSTON: Okay.

THE COURT: Just so the record is clear, there is no responsive pleading to the complaint.

MR. HOUSTON: Yes, sir, and, just again for a clear record, we don't think it's due yet because of the abatement order, and that was the intent, that everyone stand down. I think that order is very clear that Mr. Lichtman prepared, that all deadlines would be preserved.

THE COURT: Run me a copy of 22.

Proceed, Mr. Hinkes.

MR. HINKES: Thank you. So proceeding on -- just to clarify, on Number 9.

Your Honor, one of the hearings that was conducted with respect to the order to show cause, was conducted on March 30th. The same time as that hearing was conducted, a number of persons filed other motions, because they had concerns with respect to user data, they were concerned that their user data, populated on the Qtask system, was going to somehow end up in front of the trustee, and everyone agreed at that March 30th, 2012 hearing that, at least equitably, the trustee owned the Qtask system, notwithstanding the evidence that you're

going to hear today, which will demonstrate Qtask's refusal to convey title or ownership of the system hosting the platform to the trustee, and you're also going to hear evidence today, which will demonstrate that Mr. Von Wolfsheild, through his new Internet platform called Prolific, and through Silent Software, the defendant in the adversary, set up a competing version of Qtask, literally just changing the name, otherwise it looks facially as though it's the same Qtask system, and then Mr. Von Wolfsheild, the evidence will show, went into the Qtask system, which was equitably owned by the trustee, and subject to a Court order, that is the settlement agreement, requiring that to be conveyed to the trustee, and actually moved user data to a new platform, and shut down user access to the old Qtask system.

Now keep in mind, Judge, that at no time has the trustee, or any of its representative, been provided with administrator access to the Qtask system, notwithstanding the fact that it was supposed to be transferred to us.

So, what we have, Judge, is a situation where Mr. Von Wolfsheild, who has, and I'll call it God access over his own system, goes in, takes data, moves it to a new system that he owns and controls through an entity, and then shuts users out of the system that they

were previously using, without giving the trustee any inclining of what he's doing, irrespective of the fact that he had already signed away rights to that system over to the trustee.

And you're going to hear evidence today from one specific Qtask user that his data was migrated from Qtask to Prolific without his consent, without his notice, and without an opportunity to opt in or out of that move.

Qtask has done what it has said it feared the trustee was going to do this whole time. Qtask, since they won, has said nobody can look at your stuff, nobody can touch your stuff, and I'm going to fight the trustee, and I'm going to disobey court orders because I want to make sure that I, Qtask, get to be the sentinel and the guardian of your privacy and your rights.

Instead, we're going to show you evidence today, Judge, that Qtask actually took somebody's data and moved it without letting them know, or seeking their consent.

The bottom line, these users did not move their data, and would not have moved their date, and Qtask would not be restricted from access for its users without Mr. Von Wolfsheild setting up a new service, without Mr. Von Wolfsheild interfering with the Qtask service by literally, when a user logs in, saying you have to go to

Prolific now for it. Mr. Von Wolfsheild has removed the active user base from Qtask, has destroyed the value of the acquired assets, and has violated the amended settlement agreement, and has damaged the estate. It's no accident, it can't be an accident that happened this way, it had to have been planned.

There was a hearing on July 18th, 2012 where Mr. Von Wolfsheild and Qtask, through counsel, for the first time claimed that they had complied with the order to show cause, notwithstanding having been subject to an order to compel since February.

Qtask will not be able to show you evidence of compliance, because it has not happened. It could not have happened, because as long as Qtask has control of the servers, irrespective of them being equitably provided to the trustee, Qtask can continue to do what it's been doing, which is barring Qtask's users from using the system and inducing them by saying, hey, we transferred your data over to the new system, Prolific.

THE COURT: Who owns the servers?

MR. HINKES: The servers, as a virtue of the amended settlement agreement, are to be conveyed to the trustee. It hasn't happened yet.

The trustee is paying the bill to have them maintained, but there has been no assignment of any

contract rights, there has been no opportunity to negotiate.

THE COURT:  And why hasn't there been a transfer of the servers?

MR. HINKES:  That's ---

MR. HOUSTON:  There has, Judge.  There has.

If you listen to his answer, he says, there has been a transfer of the user's rights.  This isn't about user's rights.  It's about equipment.  The trustee owns ---

MR. HINKES:  Absolutely not what we said.

MR. HOUSTON:  The trustee ---

COURT REPORTER:  Judge, can you have them speak one at a time, please?

THE COURT:  One at a time.

MR. HOUSTON:  The trustee gets billed for it.  We don't operate those servers.  They're in Dallas.  There at a facility.  The trustee has exclusive control and access to those servers.

THE COURT:  So the trustee can close them down?

MR. HOUSTON:  Absolutely and, in fact, he has, Judge, by not paying for the security certificates.

MR. HINKES:  Your Honor, this is the first that the trustee has ever heard of anything about security

certificates.

The fundamental issue, which Qtask is not being forthright with the Court about, is the following, although the trustee is now the payor for the services of maintaining the servers, that is paying for the electricity and the connectivity of those boxes to the Internet, the trustee has no ability to do anything on the boxes because Mr. Von Wolfsheild remains the administrator, does whatever he wants on that system, and has never once provided the trustee with the ability to do anything.

We can't configure the system. We can't access the system. We can't upgrade the system. We can't maintain the system. If we had ---

THE COURT: Then you have no objection to the system being closed down?

MR. HINKES: Well, we went -- we had an intention, your Honor -- the trustee's intention was to acquire these assets, with the idea of having a live system, with a live user base that could be sold to somebody who would be able to properly maintain it.

The extent of the damage done by Mr. Von Wolfsheild's action is still not clearly understood.

THE COURT: That's going to be established

in this adversary proceeding.

MR. HINKES: Well, through the evidence, I'm hoping.

THE COURT: So ultimately at the end of the day you're going to seek to obtain a judgment, a monetary judgment against RVW?

MR. HINKES: Ultimately -- an injunction would be a great start, and a money damages claims ---

THE COURT: Your ultimate goal is the money damages.

MR. HINKES: The ultimate goal would be, if it's possible, to reconstitute the Qtask system, as it was supposed to be provided to the trustee by the amended settlement agreement. That is what the injunction seeks to accomplish.

THE COURT: Then you seek by the temporary restraining order to obtain all of the relief being sought in the adversary proceeding, absent a money judgment?

MR. HINKES: Your Honor, it is laid out clearly ---

THE COURT: On Page 2, the top paragraph.

MR. HINKES: Page 20 of Docket Entry Number 9, your Honor, it seeks out the specific terms of the injunction that are sought.

THE COURT: Hold it.

MR. HINKES: The Court does rightfully observe on Page 2 that the trustee sought damages, rescission and a temporary restraining order through the TRO motion at Docket Entry Number 9.

THE COURT: All right. Proceed.

MR. HINKES: Now, Mr. Von Wolfsheild and Qtask may tell you today, they may try to offer evidence to the Court to say that interference with the user rights is not a big deal, because the trustee did not acquire any rights to its users.

Qtask has been playing a game with the Court. Qtask has either been forgetting, or telling different stories to the Court.

The Court should be aware of this. Qtask and Mr. Von Wolfsheild filed a response to this, it's Docket Entry Number 27, and it's repeatedly stated in Docket Entry Number 27 that there are no agreements between Qtask and its users.

So, they're taking the position in that paper, Judge, that Qtask doesn't have any relationship -- any form of contractual relationship with its users.

I don't know if this is a lie, or a fantasy on the part of Qtask, but on March 30th the Court had a hearing, and I alluded to it earlier, this was the hearing where Mr. Buschel, and Mr. Adler, and the U.S. Government,

and British Telecom, and a number of other folks sought help from the Court in determining whether they had any standing, which ultimately they did not, but they wanted the Court to know that they had opinions and feelings with respect to what happens to their data held on the system.

During that hearing there was discussion of the contract rights, and Mr. Lichtman pointed out that in the amended settlement agreement, at Section 6, I think it's (a) little six, there was a provision for the conveyance of actual contract rights, it's in the actual agreement, it's written in letters in the agreement, and Mr. -- I'm sorry, and counsel for Qtask, and Mr. Von Wolfsheild were both in attendance at that hearing, and the evidence will show that they both made comments which illustrated, or, at, minimum, suggested to the Court that contracts exist.

The Court then entered an order to that effect later on which said, Qtask, you need to give the trustee a list of your users, and you need to give them the contracts.

Mr. Houston, on behalf of Qtask, was ahead of the Court. He heard the Court say that information was to be provided within five days. So on April 4th, Mr. Houston provided a response. Mr. Houston provided a letter with an 80-some odd page list of Qtask users, or

what he said were Qtask users, and he provided a three-piece contract, and it's referred to as an end user licensing agreement, or a EULA, and now I'm going to call it a EULA.

The EULA itself was curious, and there is going to be evidence to show you that the EULA may not be exactly what it appears to be, but, your Honor, they were subject to a motion -- or, I'm sorry, subject to an order which said you must provide those contracts, and on April 4th, the evidence will show, Qtask and Mr. Von Wolfsheild did, in fact, provide what are called contracts.

So now either Qtask forgot, or changed their mind as to whether they do have contracts with their users or not.

I think now that they need to make a decision, were they in violation of the Court's order when they provided something that wasn't the contracts, were they being disingenuous with the trustee in responding to your order, Judge, or are they now taking a position that is directly contradicted by their response to your order just a few months before?

We can't tell because Qtask seems to change their mind about whether there are contract rights or not, but whatever evidence Qtask wants to put up, and however

they want to try to explain away how they attempted to comply with your order, and now we're trying to change their mind and retroactively erase what they've provided, they cannot erase the wording of the actual settlement agreement. They cannot take away what is on Page 7 of the amended settlement agreement, at sub 6 that says, all other intellectual property assets, licenses and contract rights held at any time by Qtask; no matter whether they say that it is or is not a contract, or they meant it in April but they don't mean it now, we have a -- the trustee has an entitlement to receive those contract rights, and it's pretty obvious that's Qtask is playing a game, the evidence will support that.

Now, Mr. Von Wolfsheild had to do something to move the data over from the live Qtask system, which the trustee was to obtain, over to the new Silent Software owned Prolific system, and he's just the guy to do it, he's the one who still has God level access over the box and the system, which the trustee was to be provided.

And when he did that, he interfered with what was intended and supposed to be property of the trustee, that is the system and the data on it, and the contract rights with the users. It's a system that was no longer his to tamper with.

The data that was used was the data that was

-- I'm sorry, the data moved was the data that was created by the Qtask users.  This is unique data.  This is data that for many, many reasons would be vitally impossible to replicate, and you're going to hear evidence that will explain how, not just the data put in by users is unique, but how the interaction among the data put in by users is also unique.

So the issues today before the Court on Docket Entry Number 9 is whether Mr. Von Wolfsheild and Qtask have either committed tortious interference, a breach of contract, or fraudulent inducement.

Today the trustee intends to move on the breach of contract and tortious interference with contract claims only, while reserving its right after discovery, if necessary, to come back on the fraudulent inducement claims.  The evidence today will show you that not only has Qtask failed to convey the critical assets that were required by the amended settlement agreement, including the contract rights, title or possession of the servers, source code ---

THE COURT:  Hold it.  You said failure to convey contract rights, failure to convey possession of servers.

MR. HINKES:  Failure to convey source code for Qtask, failure to fully transfer the intellectual

property noted in the amended settlement agreement, including administrator passwords for the system.

THE COURT: These failures all evidence the breach of the amended settlement agreement, notwithstanding the trustee's considerate efforts to facilitate these transfers.

Then on compliance with the amended settlement agreement, I think it's ---

THE COURT: Well, no, no, we're here on a TRO, that is the sole issue before me today.

MR. HINKES: Correct, your Honor.

THE COURT: It is not set for evidentiary hearing. The order, Docket Entry 25, merely set it for hearing, among other things. That order was prepared by Mr. Lichtman.

MR. HINKES: Your Honor, I'm advised that there may have been an amended order entered yesterday.

THE COURT: I don't remember seeing anything.

MR. HOUSTON: I think there was, it's in the main case.

THE COURT: Well, that's in the main case.

MR. HOUSTON: It is.

THE COURT: But I'm separating the main case and the adversary .

Incidentally, Docket Entry 22, the agreed order prepared by Mr. Lichtman, continuing the hearing on Adversary 9, contains references to the main case in this adversary proceeding.  So that order has not been abated.

So, in the adversary proceeding, the order that says, the August 28th evidentiary hearing on DE, and it refers to the main case, and Adversary DE 9 is continued pending further order of the Court.

Then the further order of the Court is Docket Entry 25, which set a hearing for today on DE 9.

So, I suppose you could argue that DE 25 amended DE 22.

MR. HOUSTON:  You know, Judge, I think, and it's probably -- and frankly this is probably evidence or an indicator to all of us that this should be set, all be set for a trial, which is probably briefed in advance, but there was at least one order your Honor entered, perhaps in the main case, that vacated the order that you just read from, and I don't have that DE paper with me.

THE COURT:  Well, the main case has, what, 4 or 5000 --

MR. HOUSTON:  Yes, sir, it does.

THE COURT:  -- entries now?

MR. HOUSTON:  3800.

THE COURT:  All right.  Let's proceed on

Page 47

DE 9.

So you say that you want to supply to me evidence that would entitle you to a preliminary injunction, that would basically grant all the relief sought pending a trial on the merits?

MR. HINKES:  Correct, your Honor.

THE COURT:  And what kind of bond are you proposing to post?

MR. HINKES:  To the Court's pleasure.

THE COURT:  Let me hear an opening statement from Mr. Houston.

MR. HOUSTON:  Yes, sir.

Judge, restricting my comments to DE 9, which is before the Court now, on a procedural basis, and we've laid this out in our response, on a procedural basis they, being the trustee, is seeking monetary relief in each of these counts, except for the fraudulent inducement count, which they seek recision.

Now, Mr. Hinkes just announced to the Court they're not proceeding on that count today, and frankly I don't see how they could, since the individual that says he was fraudulently induced is not in Court today.

So, they're proceeding only on the breach of contract, and the tortious interference, for which they've sought money damages.  Money damages certainly could be

sufficient, an adequate remedy of law, and quite frankly, it's highly unusual, if not non-existent to give a TRO, preliminary injunction, or permanent injunction on a breach of contract count. That's the classic, perennial relief, not equitable relief, and the legal relief of breach of contract does not support the issuance of an injunction.

So, we think that on the procedural basis the motion today, Court Paper Number 9, is not well taken as a matter of law, on the basis they have adequate remedies of law, i.e., money damages, and that's what they've plead, and those are the counts that we are proceeding on today.

Going to the substantive matters that have been raised by Mr. Hinkes in his opening, it is true, Judge, that we have been before this Court on at least four occasions during my tenure, and multiple occasions prior to my entering into the case, dealing with this issue, this mercurial, and hard to grab ahold of issue of who owns the user data. Who owns the data that the users of this system put up into the data base, if you will, or the -- into the servers?

And by the way, I'm corrected, Judge, on my response to you that we transferred the servers. We did not -- Qtask did not transfer the servers. They do not

own the servers.  They simply, in essence, rent the servers, and that is the bill that Mr. Hinkes indicated the trustee is paying, albeit late.

So, they have the ---

THE COURT:  RVW and Qtask have access to those servers.

MR. HOUSTON:  They don't have access.  They don't pay for them.  They -- it's no different than a mini storage warehouse, where the contract owner is the trustee, and this gentleman can't go there and say, hey, I want to get in and see my servers.  They don't belong to Qtask.  They belong to the facility that hosts them.  So there really was not a physical assets, and you and I might call it, like a, you know, a coffee cup to transfer. It was simply the rights to access the server, and the rights to pay the bill, and the rights to utilize it, to host whatever program you want.

So, Judge, the only real dispute in my mind, since I've been involved in this case is who owns the private data?  We've two, or three, or four hearings.  At one hearing two or three interested parties came in, one was British Telecom, another was the United States Government, and they indicated, Judge, this is our data, and we don't want it transferred to the trustee.  We want to keep it secure for ourselves, and your Honor, by your

April 11th order, which is 2979, said, Mr. Wolfsheild, you hang onto the software, you be the gatekeeper of it, and he's done that ever since.

So, there is no issues here of being a compromise of user data.  It's not for us to give to the trustee, and not for the trustee to own, any more than if I sold my law practice to you, that you own the clients. The clients can go wherever they like.

The settlement agreement that was executed between the parties, and approved by this Court in 2296 required that conveyances be made within 10 days after approval of the settlement.  It's been said in this Court many times, and it was said today that the trustee's counsel was tasked with the responsibility of drafting those documents, and they did not draft those documents within the 10 days the Court order required.  In fact, it was approximately 60 days later that they drafted the documents and, quote, the documents, end quote, were not conveyance documents.  In fact, it was a new agreement, that had new provisions, new obligations that were not part of the settlement.

Mr. Von Wolfsheild resisted signing a new agreement, indicated that he would -- and the evidence will show that he would sign whatever conveyance documents, and no conveyance documents were ever given to

Mr. Von Wolfsheild.

In fact, at some point I filed my own motion to compel the trustee to comply with the settlement agreement, and that's 3057, saying give us the conveyance documents so we can convey these assets to you.

And so we resist the concept that we interfered with the settlement and, again, that bleeds over into the order to show cause, but it is relevant for today's hearing.

The reference to the exploding asset, the exploding asset was a patent application that has now been transferred to the trustee, and the trustee has not prosecuted it.  So, to the extent that it is an exploding asset, presumably it's now exploding in the hands of the trustee, as they have never sought to have that application ruled upon, or otherwise prosecute the application to obtain the patent.

And finally, Judge, I think to the real crux of the issue here today, is what is Qtask?  Qtask, as a software, as opposed to Qtask as a corporation, what we have called Qtask is a software program that allows users to secure their data in a, what I guess we would call today, in the cloud, or in some virtual location, which is hosted in Dallas, Texas, and Qtask is -- another term that you'll hear is, open software.

Open software means that that software is available to anybody on the Internet that wants to utilize it. In fact, others have utilized it.

Open software, by it's very nature, is not proprietary software. It's available for anybody else to take, and to use, and to improve, enhance, do what they want to for their own purposes.

So, there is no such thing as exclusive right to the Qtask software and, in fact, the settlement agreement even echos that by saying that Qtask will provide a copy of the Qtask source code. There are multiple copies, and they can be found on the Internet today. So there is no proprietary, or exclusive asset that was required to be conveyed to the trustee under the settlement agreement.

And the final thing I'd like to address, Judge, is this concept of contract rights. I was at the hearing, the March 30th hearing, and the Court's order is really clear, if there is any contracts with the Qtask users, produce them, and there is a contract of sorts, it's call a license agreement. Mr. Hinkes called it an end user license agreement, the acronym being a EULA. A EULA is not a contract right, like you and I would think it is, in the sense of a subscription agreement, or something that can be transferred and sold, that has some

commercial value.

In fact, the evidence is going to show that this software, at the time of this litigation, and still today, is in bata production, which means that it's not a completed, commercial package that can be sold, that can be owned by a company like Word Perfect or Microsoft, and then sold, or allowed to be used by users for a fee.

In fact, of the list of users that I've given to the trustee back in March, maybe three or four of them pay a monthly fee, amounting to less than $100.  The rest of users use it for free, and that's the concept of bata software, that the user is going to use it, and if they find there is a glitch, they let somebody know, and that glitch gets improved and enhanced, and so there is no commercial value to this software.  There never was.  That was disclosed in the settlement agreement.  That was disclosed prior to the settlement agreement by disclosure of financial information of monies earned by the Qtask software.

So, there is no agreement, as it were. There is the end user license agreement, which somebody simply clicks on a box when they go into the software, and it says, I agree I won't do anything damaging to the software, and we produced that to the trustee in March.

So, Judge, we think for legal reasons the

TRO, or preliminary injunction is not well taken, and for the substantive reasons that the evidence cannot establish the interference that's been alleged by the trustee.

THE COURT:  All right.  How many witnesses does the trustee propose to put on?

MR. HINKES:  Your Honor, the trustee intends to call Mr. Robert Moody, and Mr. Von Wolfsheild, as an adverse witness.

THE COURT:  How many defendant's witnesses?

MR. HOUSTON:  Judge, I would call Mr. Von Wolfsheild as the sole witness, and just remind the Court that I filed a motion in limine to exclude Mr. Moody as an expert witness.

THE COURT:  All right.  How much time do you think it will take?  A day?

MR. HOUSTON:  You know, Judge, there will be some cross-over between the adverse examination of my examination, but I think three quarters of a day is a fair assessment, and I think we said that when we were here last, Mr. Lichtman and I did.

MR. HINKES:  The trustee agrees.

THE COURT:  All right.  What I'm going to do is continue the hearing on Docket Entry 9 and 27, to be set for an evidentiary hearing all day.  It will be set by

the Court, because we're running out of time this morning, and I still have to hear 2700 in the main case, and then I have a full afternoon calendar.

MR. HOUSTON:  Judge, I know you have some upcoming surgery, I know your dates are limited.  So, I would propose to the Court that Mr. Hinkes and I agree on what will be an expedited discovery schedule, because I'm assuming we're going to want to do discovery now, and then advise the Court on a full day, and the Court ---

THE COURT:  Because what we're doing is you're trying the case on the merits on the preliminary injunction.

MR. HOUSTON:  As is normally the case.

THE COURT:  If you prove up the preliminary injunction, or the initial restraining order, you've, in essence, proved your case.

MR. HINKES:  Correct, your Honor.

MR. HOUSTON:  Largely true, and that's always the case in these situations, Judge.

THE COURT:  So with that thought in mind, I'm not going to create appellate error by trying the case in a half way manner.  I'm going try it.

MR. HOUSTON:  Yes, sir.

THE COURT:  So, I will see to the e-order setting it for an evidentiary hearing.

Page 56

MR. HOUSTON: If I could ask, your Honor, if you would give -- how much time do you want to have before the hearing?

MR. HINKES: For discovery, 60 days?

THE COURT: Well --

MR. HOUSTON: So, Judge ---

THE COURT: -- let me tell you my surgery is scheduled for Monday morning at 9:00, I think.

MR. HOUSTON: We're talking about January, though.

THE COURT: I wouldn't know until after the surgery when I'll be back.

MR. HOUSTON: We're talking about January, Judge. Mr. Hinkes and I agree.

MR. HINKES: A reasonable time to conduct some discovery.

MR. HOUSTON: Yes, sir.

THE COURT: All right.

MR. HOUSTON: And, Judge, respectfully, I think that we might all be fairly well served if we have two separate hearing dates, a half day on the order to show cause, because we've ventilated that quite a bit, so that we don't mix these issues over, and then the full day on the ---

THE COURT: But they're not going to get

mixed. I'm treating -- now let's turn -- we have now resolved the adversary proceeding.

MR. HOUSTON: Yes, sir.

THE COURT: It will be set for a full day evidentiary hearing on Docket Entry 9 and 27, in probably the latter part of January. It will be set by my staff.

MR. HOUSTON: Yes, sir.

THE COURT: All right. Turning now to the main case. We have before me 2700, 2774, 2778 and 290 -- I'm sorry, 2978, the amended order on 2700, and then the response 2904.

The trustee is seeking an order to show cause and sanctions against RVW and Qtask. Mr. Hinkes.

MR. HINKES: Thank you, your Honor.

Again, a lot of this is going to bleed over into what's been presented to the Court previously. I'll attempt to keep my comments brief.

Pursuant to 2700 of this Court's docket entry and its progeny, since the entry of an order to compel in February of this year, which emanated from the previously discussed motion to compel Mr. Von Wolfsheild to comply with the amended settlement agreement, the trustee finds himself in the familiar situation of spending a lot of money, wasting a lot of estate assets trying to chase down Qtask and Mr. Von Wolfsheild to

comply.

The Court will obviously remember Docket Entry Number 1527 which liquidated more than a year's worth of contempt into a judgment for the amount of $585,000, spread between the Court, the Court's expert, Mr. Moody, and the trustee for their efforts to obtain compliance. That was settled through the amended settlement agreement. The amended settlement agreement required certain things to be conveyed.

Based upon presentation from counsel a few moments ago I'm somewhat concerned. The amended settlement agreement said that the trustee was to obtain servers. Now we find out that Qtask doesn't have any servers to give. Qtask says we don't get -- or the trustee doesn't get user data, and it said that it doesn't get user contract relationships.

So, it sounds to me like -- I just don't know what the consideration was for that amended settlement agreement. I'm not exactly sure what exactly the trustee got when it compromised $7.5 million worth of claims from the initial adversary against Qtask, in this Courts final judgment for $585,000.

But be that as it may, that's for another time.

Mr. Buschel and -- I'm sorry,

Mr. Von Wolfsheild and Qtask were required to do certain things under the amended settlement agreement, as was enforced by the Court's Docket Entry 2700, it was clarified at 2978.

THE COURT:  Oh, let me back up and put on the record, on the motion in limine in the adversary proceeding, Docket Entry 28, that will be denied without prejudice as moot.  I'll see to that order.

MR. HOUSTON:  Yes, sir.  Thank you, Judge.

THE COURT:  Sorry, I didn't mean -- I didn't want to get so far away from the adversary that that wasn't resolved.

MR. HINKES:  Thank you, your Honor.

Continue.

THE COURT:  Yes, please.

MR. HINKES:  At the -- at a subsequent hearing, I believe in May, Qtask and Von Wolfsheild, for the first time, said they had complied with the order to show cause, notwithstanding being subject to the order to compel since February.

Qtask and Mr. Von Wolfsheild here carry the burden to show that they have complied with the order to show cause, which required them to comply with the order to compel issued in late February, with the requirements of the amended settlement agreement, and all the transfers

that are required therein.

As was previously explained, Qtask and Mr. Von Wolfsheild will not be able to show that contract rights were conveyed, will not be able show that title or possession of the servers were conveyed, will not be able to show that the source code for Qtask has been conveyed, will not be able to show that the full transfer of intellectual property that pertains to Qtask, including administrator passwords has been completed, and I just want to touch upon that, your Honor.

Administrator passwords are something of a ethereal concept, because what it is, essentially, is a set of keys. Now when you go to use Qtask, you go to the same front door as everybody else, you go to log into the system, you have a user name and a password, and depending on who you are, you get access to certain resources within the system.

The system resides on servers, which counsel for Mr. Von Wolfsheild and Qtask has just informed the trustee are not owned by Qtask, and what's important, I guess, is the software. The software is what has the power. The software creates the structure for the users to put their information in.

Now, depending on what keys, and I mean what access credentials you use, you can do different things.

A standard Qtask users can go into the system and bring up a picture, and create some information about themselves, and interact with other users.

Mr. Von Wolfsheild can do a lot of different things.  Mr. Von Wolfsheild, as he said in his deposition, is the architect of this system.  He has created it with a team of other developers from the ground up, and I believe his deposition testimony will reflect it was actually a side project for a time, and that it was invigorated, and it's development accelerated by the payments from the Rothstein firm, $7.5 million.

The concept of the administrator passwords is absolutely critical to understand the requirements of the amended settlement agreement, and what is required to be shown today to satisfy the amended order to show cause.

Without the administrator passwords, you could have the server, your Honor, in your Chambers, and as long as it's connected to the Internet, everybody in the world can metaphorically get to that front door, but Mr. Von Wolfsheild has a different key than everybody else, and his key lets him do things that everybody else can't do.  He can see every user's data, he can change the configuration of the system, he can extract user data from the system and move it to his new system, Prolific, he can lock you out, meaning your key isn't going to work any

Page 62

more, he can take out your information.

And, your Honor, there is no ability to do anything with Qtask except to let people log in and look at their data. You can't maintain the system. You can't change it. You can't upgrade it. You can't do certain things necessary to keep it functioning properly without the administrator password access.

Mr. Von Wolfsheild has never given that to the trustee and, indeed, had he done so, he would not have been able to do what he did, which is the subject of the adversary, which is the transfer and interference with the amended settlement agreement.

However, for the purposes of 2700, your Honor, the burden is on Mr. Von Wolfsheild and Qtask to show ---

THE COURT: Well, not so. Well, in a way you're right, look at Docket Entry 2978, the order continuing amended order granting trustee's expedited motion for order to show cause, Page 3, given the foregoing, the Court finds the RVW and Qtask have violated and failed to comply with both the amended settlement order and the Court's order to compel, period. They did it.

MR. HINKES: Correct, your Honor.

THE COURT: Now, their order to show cause

why they should not be found in contempt of Court and sanctioned.

MR. HINKES: Correct.

THE COURT: The burden of going forward is on them.

MR. HINKES: Absolutely, your Honor.

THE COURT: Is that understood, Mr. Houston?

MR. HOUSTON: Judge, I understand it and I am prepared to go forward.

THE COURT: Well, let me ask this: What response is there? I have 2978, 2700, 2774, 2904? Are there any pleadings I'm missing?

MR. HOUSTON: I think it was 2904, Judge.

THE COURT: 2904.

MR. HOUSTON: I believe also, Judge, 3057. I think 2904 is the response.

THE COURT: 2700, 2774 is the order granting trustee's expedited motion for order to show cause.

MR. HOUSTON: Judge, it is 2904, and it was filed by Mr. Buschel, as I wasn't in the case at that point.

THE COURT: Run me a copy of 2904 in the main case.

Well, let me see what happened to it. It may be within the other Rothstein papers.

MR. HINKES:  Your Honor, I can probably save the Court a little bit of time on that.  2904 went to the issues with respect to Mr. Buschel's specific reservation of rights, about the turnover of his user data to the trustee.  I don't believe it was filed on behalf of Qtask. I believe it was actually filed on behalf of Mr. Buschel.

THE COURT:  Well, nevertheless I need a copy in front of me.

All right.  Buschel was not a respondent to the order to show cause, was he?

MR. HINKES:  No, your Honor.

MR. HOUSTON:  No, he wasn't, Judge.  He filed -- maybe he can speak for himself, this is before I was involved in the case, but I think that ---

THE COURT:  The pleading speaks for itself.

MR. HOUSTON:  Yes, sir.

Judge, I would say that that's our response, that's what I said in the very first hearing I appeared before your Honor in this Court.

Had I been involved earlier, I would have filed a separate response, but that's the response we've relied upon.

THE COURT:  So you're saying that the RVW and Qtask will submit a notice of ---

MR. HOUSTON:  Joinder.

Page 65

THE COURT: Well, it's more than joinder.

MR. HINKES: Adoption, your Honor?

THE COURT: You're adopting.

MR. HOUSTON: Yes, sir, I would do that.

THE COURT: All right. So, then it leaves us with a response by RVW and Qtask to the order to show cause, and then the trustee's response or reply to that response.

Who will the debtor call or, I'm sorry, RVW and Qtask call?

MR. HOUSTON: I would call RVW, Judge, Mr. Von Wolfsheild.

THE COURT: Okay, and who will the trustee call?

MR. HINKES: The trustee will call Mr. Moody.

THE COURT: All right. How long will RVW take?

MR. HOUSTON: Something less than two hours from my standpoint, Judge.

THE COURT: Cross?

MR. HINKES: No more than an hour.

THE COURT: How long will Moody take?

MR. HINKES: An hour to an hour and a half, your Honor.

THE COURT: Let's be safe, two hours, and then an hour of cross. So, we're talking about four to six hours.

So I need to set 2700, 2774, 2904 and 2978, and whatever docket number --

MR. HOUSTON: My notice of adoption is.

THE COURT: -- the notice of adoption is --

MR. HOUSTON: Yes, sir.

THE COURT: -- for a full day evidentiary hearing.

MR. HOUSTON: It may be a lot to ask, Judge, but I'm going to have Mr. Von Wolfsheild, who flies here from the State of Hawaii for both those hearings. If we could potentially do them back to back, in close -- in a two-day proximity, it would certainly make a lot of sense.

THE COURT: That I can't --

MR. HOUSTON: Okay.

THE COURT: -- voice an opinion on, because I have no idea what my schedule looks like, since I have no idea what my future looks like.

MR. HOUSTON: So if we at least look for two days in either January, or early February, I think that would be preferable. If not, then we'll separate them, Judge, then that's fine, and Mr. Von Wolfsheild will appear, and we can certainly speak to Edy about that.

Page 67

THE COURT:  Now, between now and the dates of the evidentiary hearing, there will obviously be discovery being taken in the adversary proceeding.

MR. HOUSTON:  Yes, sir.

MR. HINKES:  Correct.

THE COURT:  I want an order entered that -- by you, Mr. Hinkes, that any discovery that occurs in the adversary proceeding, or in the main case will be admissible in the respective proceedings.

MR. HOUSTON:  Yes, sir.

THE COURT:  In other words, if you take the deposition of John Jones in the adversary case, and you want to submit that deposition as part of your case in chief, or in response --

MR. HINKES:  Correct, your Honor.

THE COURT:  -- there has to be an order in place adopting that, otherwise the appellate Court won't understand how we got there.

MR. HOUSTON:  Understood.

MR. HINKES:  Yes, your Honor.

THE COURT:  Any other things that I've missed or that you can think of?

MR. HOUSTON:  We'll put in there probably a scheduling order, Judge, and have a final pretrial stipulation since we've got sufficient time to clarify the

issues.

THE COURT: Well, prepare your own pretrial orders then with your deadlines and discoveries, leaving only the trial date vacant.

MR. HOUSTON: Yes, sir.

THE COURT: Give them to my law clerk, the order, both in the adversary and in the main case, and she will get the hearing dates from my stuff.

MR. HOUSTON: Sure.

MR. HINKES: Thank you, your Honor.

THE COURT: All right. Hold on to this. Remember we're treating them separately.

All right, then I believe that concludes for the morning.

MR. HOUSTON: Thank you, Judge.

MR. HINKES: Thank you, your Honor.

THE COURT: Mr. Houston, Mr. Hinkes, the order that you will -- the agreed order that you will prepare will be an order setting the matter for trial. You'll leave the trial date blank. You'll then put in your pre-submission and other requirements.

MR. HOUSTON: Understood.

MR. HINKES: Yes.

THE COURT: Then the order goes to my staff, we'll provide the date and the execution of the order.

MR. HINKES:  Yes, sir.

MR. HOUSTON:  Yes, sir.  Thank you, Judge.

(Thereupon, the hearing was concluded.)

Page 70

CERTIFICATION

STATE OF FLORIDA         :

COUNTY OF MIAMI-DADE   :


I, Cheryl L. Jenkins, RPR, Shorthand

Reporter and Notary Public in and for the State of Florida

at Large, do hereby certify that the foregoing proceedings

were taken before me at the date and place as stated in

the caption hereto on page 1; that the foregoing

computer-aided transcription is a true record of my

stenographic notes taken at said proceedings.

WITNESS my hand this 21st day of November,

2012.


_____

CHERYL L. JENKINS, RPR,

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #DD 920461
December 27, 2013