**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                    CASE NO.: 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,        CHAPTER 11

      Debtor.

_____/

## <u>INTERVENOR-VICTIM L.M.'S MOTION TO COMPEL JEFFREY EPSTEIN TO PROVIDE ANSWERS TO DEPOSITION QUESTIONS</u>

Intervenor L.M., proceeding pseudonymously, having previously been allowed to intervene in this action, now respectfully submits this Motion to Compel Jeffrey Epstein to Provide Answers to Deposition Questions. Because Epstein has improperly refused to answer multiple questions at his recent deposition, the motion should be granted.

### Relevant Factual Background

The facts of this case are familiar to this Court. For present purposes, it is enough to note that on October 13, 2018, Jeffrey Epstein sat for his deposition in this matter, as previously ordered by this Court (DE 6366). The subject of the deposition was "allegations of federal civil contempt regarding the alleged discovery violations of the Agreed Order." DE 6366 at 5 (citing DE 1194). Mr. Epstein improperly refused to answer many questions about this subject during his deposition, as enumerated below.

### Relevant Legal Standards

Under Federal Bankruptcy Rule 7030, Rule 30 of the Federal Rules of Civil Procedure applies in adversary bankruptcy proceedings of this type. Under Rule 30, a deponent can refuse to answer questions only to protect a privilege or enforce a limitation ordered by the Court. Under Rule 37(a)(3)(B)(i) (made applicable to bankruptcy proceedings under Federal Bankruptcy

7037), a party may move to compel an answer to a question asked during a deposition.  *See, e.g.,*
*In re Stasch*, 2007 WL 1491109 (Bankr. S.D. Fla. 007) ("Fed. R. Civ. P. 37 applies in adversary
proceedings. Rule 37(b)(2) permits the Court to impose sanctions for discovery violations. A
primary purpose of Rule 37 is to prevent and deter future discovery abuses.").  Of course, it is
well-known that discovery depositions are not limited to collecting evidence that may be
admissible at trial.  Instead, discovery is allowed to obtain information that is "germane,
conceivably helpful to plaintiff, or reasonably calculated to lead to admissible evidence. . . . In
short, information can be relevant and therefore discoverable, even if not admissible at trial, so
long as the information is reasonably calculated to lead to the discovery of admissible evidence."
*Donahay v. Palm Beach Tours & Transp., Inc.*, 242 F.R.D. 685, 687 (S.D. Fla. 2007) (internal
quotations omitted).  The burden is on the party asserting a privilege or other basis for refusing to
answer a deposition question to establish the basis for doing so.  *See In re Fisher Island
Investments, Inc.,*, 2015 WL 148449 at * 2 (Bankr. S.D. Fla. 2015) (placing burden on party
asserting privilege).

### Improper Refusal to Answer Questions

During his deposition, Mr. Epstein improperly refused to answer multiple questions he was
asked.  Illustrative of the questions he improperly refused to answer are each of the following
questions.  These examples are illustrative, and Mr. Epstein should be ordered to answer all these
questions and others of equivalent character or on similar subjects, including followup questions
based on the answers to the questions below.

*Invoices showing description of services*

Q: Were you ever billed by Fowler White with invoices that included a description
of the services that Fowler White rendered on your behalf?
MR. LINK: I am instructing him not to answer.

2

First Epstein Depo Transcript at 14 (hereinafter "1st Epstein Depo. Tr.", attached as Exhibit A). The descriptions of the services that Fowler White rendered on Epstein's behalf could be vital in developing a timeline about when the disc was review or copied, and questioning about the possible existence of such records is appropriate. If counsel is asserting an attorney-client objection, merely describing the kinds of invoices that Epstein received would not reveal the substance of any communication. And, in any event, Epstein bears the burden of proof on the applicability of any privilege.

*Remainder of Conversation with Attorney that Epstein Partially Disclosed*

Q: Paragraph four of your declaration, Exhibit Number 1, states, "In February 2018, Scott J. Link of Link & Rockenbach, PA, informed me that he had located a disc in Fowler White's files labeled," quote, Epstein Bate Stamp, unquote. Did I read that accurately?
A: Correct.
Q: That was a communication from Mr. Link, your lawyer, to you, correct?
A: Yes.
Q: What else did Mr. Link tell you?
MR. LINK: So, I'm going to instruct you not to disclose any of your conversations that involved legal advice or strategy or protected communication. If you recall that I said anything other than I located a disc specific to that topic, you can answer.
THE WITNESS: I remember that. Everything else I talked with my attorneys.
BY MR. SCAROLA:
Yes, I know you were talking to your lawyer. I want to know everything that your lawyer told you in this conversation that you have partially disclosed. . . . What else did he tell you?
MR. LINK: So, I'm going to instruct you not to answer based both on attorney-client privilege and exceeds the scope of Judge Hafele's order.

1st Epstein Depo. Tr. at 22. Clearly Epstein put forward the conversation with his attorney about the disc in paragraph four of his declaration in this case. Accordingly, he waived attorney-client privilege over the conversation. *See* Fla. Stat. § 90.507 ("A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person, or the person's predecessor while holder of the privilege, voluntarily discloses . . . or consents to disclosure of, any significant part of the matter or communication."). He should be compelled to

3

describe the rest of the conversation.  And Epstein bears the burden of proving the applicability of attorney-client privilege.

*Receipt of Documents from the Disc*

Q: What specific documents that originated on the disc did you receive?
MR. LINK: So, I'm going to instruct you not to answer that question based on attorney-client and work product.

1st Epstein Depo. Tr. at 22.  Clearly Epstein put forward the conversation with his attorney about the disc in paragraph four of his declaration.  Accordingly, he waived attorney-client privilege over the conversation.  *See* Fla. Stat. § 90.507 ("A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person, or the person's predecessor while holder of the privilege, voluntarily discloses or makes the communication when he or she does not have a reasonable expectation of privacy, or consents to disclosure of, any significant part of the matter or communication.").  He has no right to put forward the part of the conversation that he believes is helpful to him, without at the same time answering questions about other parts of the conversation.  And he bears the burden of proving privilege.

*Epstein's Awareness of Assertion of Privilege over Emails*

Q: You are aware that there are emails which Bradley Edwards alleges to be privileged emails, correct?
A: I am aware that there -- I was told 27,000 emails [were] alleged -- in some form to be privileged.
Q: Who told you [that 27,000 documents were alleged to be privileged]?
A: My attorneys.
Q: Which one?
A: I don't recall.
Q: When?
A: I don't recall.
Q: Was it before or after March of 2018?
A: Before.
Q: Was it before or after February of 2018?
A: I don't recall.
Q: What do you remember about that conversation?
MR. LINK: Again, I don't want you to share the details of the conversation.

MR. SCAROLA: He has already done that.  He has already made an assertion of what he was told.  That's a waiver of the privilege.  I want to know about the conversation in its entirety.

MR. LINK: And I don't believe that it was a waiver of the privilege. He gave you non-privileged communication, and he's not going to share with you privileged communications.

1st Epstein Depo. Tr. at 51-52.  In the exchange quoted here, Epstein states that he "was told 27,000 emails [were] alleged -- in some form to be privileged."  That constituted a waiver of any privileges regarding what he was told, which is clearly critical to this contempt proceeding where the willfulness of Epstein's (and his attorneys') actions is central.  Here again, Epstein cannot put forward the part of the conversation that he believes is helpful to him, without at the same time answering questions about other parts of the conversation.  And he bears the burden of establishing a privilege.

*Existence of Relevant Documents*

Q: Were you informed that you had an obligation to bring with you at the time of this deposition those items that are described on the second page of Exhibit Number 3, quote, All communications and all records relating to all communications concerning or containing information derived from documents or data over which a claim of privilege was asserted by or on behalf of Rothstein, Rosenfeldt, Adler PA; Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; or Bradley J. Edwards?

MR. LINK: I think -- which subpoena duces tecum are you looking at, Jack? Which case?

MR. SCAROLA: This is the subpoena duces tecum issued in the bankruptcy court proceedings.

MR. LINK: So in the bankruptcy court proceeding, we filed an objection to the subpoena duces tecum, and you and your law firm never responded, so there are no documents being produced in the bankruptcy matter.

BY MR. SCAROLA: Q: Do you have any documents that fit within the description that I just read?

MR. LINK: You are not going to answer that question.

MR. SCAROLA: And the basis for that?

MR. LINK: I filed my objection and it has sat there for months and you didn't respond to it or move to compel it. I am not going to let him answer any questions about it.

1st Epstein Depo. Tr. at 59-61.  In the exchange quoted here, Epstein is merely asked whether he has documents of a certain type.  Epstein's counsel argues that he had filed a motion to quash a subpoena associated with those documents.  But even assuming the existence of such a motion to quash, that hardly constitutes a basis for instructing the witness not to answer. Epstein should be compelled to answer about the existence of such documents.

*Bias in Answering Questions*

Q: Do you have any bias against L.M., sir?
MR. LINK: I'm going to instruct you not to answer that question. It exceeds the scope of the permitted deposition by Judge Ray.

2nd Epstein Depo. Tr. at 8, attached as Exhibit B. Epstein's deposition was taken in connection with the pending contempt proceedings, and some of the answers that Epstein gave were unfavorable to L.M.  L.M. is entitled to ask whether Epstein bears any bias against her.  *See, e.g., Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony'") (*quoting* 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)).

*Reason to Deny Having Knowledge about the Disc.*

Q: Mr. Epstein, would you have any reason to deny having knowledge about a disc that contains information about L.M.? ….
MR. LINK: I am going to instruct you not to answer the question. I don't understand it.  I believe it exceeds the scope of this deposition as set by Judge Ray.

2nd Epstein Depo. Tr. at 10. Epstein's deposition was taken in connection with the pending contempt proceedings, and some of the answers that Epstein gave were unfavorable to L.M.  L.M. is entitled to ask whether Epstein bears any bias against her.  *See, e.g., Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony'") (*quoting* 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)).

*Reason to Deny Having Knowledge about a Disc Referred to in Paragraph .*

Q: Do you see paragraph four of that sworn declaration of facts?
A: Yes.
Q: And do you see a reference there to a disc, quote, CD, in that paragraph?
A: Yes.
Q: Would you have any reason to deny knowledge about that CD?
MR. LINK: Object to the form. And I'm going to instruct him not to answer.
MR. CASSELL: On what basis?
MR. LINK: The question is not consistent with what Judge Ray, in his ruling, where he says very limited to asking him about his knowledge.

2nd Epstein Depo. Tr. at 13. In this contempt proceeding, Epstein filed a sworn declaration of

facts, including an assertion in paragraph four regarding a CD at the center of this proceeding.

Counsel is entitled to explore reasons why Epstein might not want to admit knowing about the CD,

as that goes directly to his testimony on central issues in this proceeding.

*Failure to Disclose Knowledge of the Disc to the Court*

Q: [In your declaration] [why didn't you inform Judge Ray that you had the information from the CD in other ways?
. . .
MR. LINK: Well, then I am going to instruct him not to answer the question, because, A, it's nonsensical. And, B, it is beyond the scope of Judge Ray's order.

2nd Epstein Depo. Tr. at 16-17. This question asks about a paragraph in Epstein's declaration, in

which he represented to the Court that he had "never seen the CD."   During questioning in the

deposition, it became apparent that Epstein had in fact seen the information from the CD.  This

question simply asks the natural followup question on this important issue: Why didn't Epstein

disclose this fact to the Court?

*Prejudice Again L.M.*

Q: Do you have any prejudice against my client [i.e., L.M.] that would lead you to say no when in fact the answer is yes?
MR. LINK: I am going to instruct you not to answer.

2nd Epstein Depo. Tr. at 22-23. This question simply asks about Epstein's prejudice against L.M.,

which might lead him to give inaccurate testimony.  Questioning about such bias is always

relevant, as discussed earlier.

*Possession of Documents Connect to the CD*

Q: On or after February 1st, 2018, do you have any documents connected to the
CD?
A: I don't know what you mean by connected to.  Are asking me if I kept any copies
of the emails that reference your client [i.e., L.M.]?
Q: No. I am asking you whether you have any documents connected to the CD.
MR. LINK: Mr. Cassell, I am just going to object and instruct him not to answer
the question.
BY MR. CASSELL: Q: Mr. Epstein, on or after February 1st, 2018, do you have
any documents related to the CD?
MR. LINK: Again, I'm going to object to the form. I don't know how he can answer
that question. I believe it exceeds what the bankruptcy court has permitted.
The bankruptcy court was very clear that what has happened post my receipt of the
CD is not an issue for the bankruptcy court, so I am going to instruct you not to
answer, Mr. Epstein.
BY MR. CASSELL:
Q:  Mr. Epstein, on or after February 1st, 2018, do you have any documents
connected to L.M. that came from the CD?
MR. LINK: I have got the same objection and the same instruction.

2nd Epstein Depo. Tr. at 27-28. The CD is at the center of this contempt proceeding, and this

passage merely shows a question about whether Epstein has document connected with the CD.

Such questions are clearly within the scope of the deposition permitted.

*Statements Epstein Received about Locating the CD*

Q: Do you see paragraph four in that document?
A: You have asked me that question before. Yes.
Q: And in that paragraph four, it indicates that Scott Link informed you that he had
located a CD.
MR. LINK: Yes, sir, that's what it says.
BY MR. CASSELL:
Q: Did he tell you anything about L.M. when he informed you he had located the
disc?
MR. LINK: I am going to instruct him not to answer based on both attorney-client
privilege, work product, and it exceeds the scope of Judge Ray's order.

2nd Epstein Depo. Tr. at 32.   Epstein made a disclosure about what Mr. Link informed him of, and this question simply asks what was disclosed – specifically with reference to L.M.  Again, such issues are at the heart of this contempt proceeding, particularly since they relate to Mr. Epstein's declaration filed in this proceeding.

## CONCLUSION

The Court should direct Mr. Epstein to answer the questions described above and questions of a similar character and should permit counsel to ask follow up questions associated without the answers that were improperly withheld.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically to all registered users on the CM/ECF system, which includes counsel identified on the service list below, on this 22nd day of October, 2018.

I HEREBY CERTIFY that the undersigned attorney is appearing pro hac vice in this matter pursuant to court order dated May 4, 2018.

> Paul G. Cassell, Esq.
> S.J. Quinney College of Law at the
> University of Utah
> 332 S. University St.
> Salt Lake City, UT 84112
> Telephone: (801) 585-5202
> (above for address/contact purposes only, not to
> imply institutional endorsement)
>
> By: /s/ *Paul G. Cassell*
> Paul G. Cassell (Utah Bar No. 6078)
> cassellp@law.utah.edu
> *Pro Hac Vice*
>
> -AND –

I HEREBY CERTIFY that I am admitted to the Bar of the United State District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

> SHAPIRO LAW
> 8551 West Sunrise Boulevard
> Suite 300
> Plantation, Florida 33322
> Telephone: (954) 315-1157
>
> By: /s/ *Peter E. Shapiro*
> Peter E. Shapiro (FBN 615551)
> pshapiro@shapirolawpa.com
>
> *Attorneys for Intervenors L.M., E.W., and Jane Doe*

## SERVICE LIST

Bradley J. Edwards FLBN 542075
Brittany N. Henderson FLBN 118247 Edwards Pottinger LLC
425 N Andrews Avenue, Suite 2
Fort Lauderdale, FL  33301 Phone: (954)-524-2820
Fax: (954)-524-2822
brad@epllc.com
brittany@epll.com

*Attorneys for Farmer, Jaffe, Weissing,  Edwards, Fistos & Lehrman, P.L.*

Jack Scarola, Esq.
Florida Bar No.: 169440
David P. Vitale, Jr., Esq.
Florida Bar No.: 115179
Attorney E-Mails:  jsx@searcylaw.com;  and mmccann@searcylaw.com
Primary E-Mail: _scarolateam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax:    561-383-9451

*Attorneys for Bradley J. Edwards*

Scott J. Link, Esq.
Link &Rockenbach, P.A.
Scott@linkrocklaw.com
Kara@linkrocklaw.com
1555 Palm Beach Lakes Boulevard
Suite 301
West Palm Beach, FL 33401
Phone:  561-727-3600
Fax: 561-727-3601

Chad P. Pugatch, Esq.
Rice Pugatch Robinson Storfer & Cohen, PLLC
101 N.E. Third Avenue, Suite 1800
Ft. Lauderdale, FL 33301
(954) 462-8000

*Attorneys for Jeffrey Epstein*

Niall T. McLachlan
Carlton Fields Jorden Burt, P.A.
100 S.E. Second Street, Suite 4200
Miami, FL 33131
mnmclachlan@cfjblaw.com
*Counsel for Fowler White Burnett, P.A.*

# EXHIBIT A

# FIRST EPSTEIN DEPOSITION

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 502009CA040800XXXXMB


JEFFREY EPSTEIN,

Plaintiff/Counter-Defendant,

vs.

SCOTT ROTHSTEIN, individually;
BRADLEY EDWARDS, individually,

Defendants/Counter-Plaintiffs.
_____/




VIDEOTAPED DEPOSITION

OF

JEFFREY EPSTEIN




Saturday, October 13th, 2018
9:07 a.m. - 11:00 a.m.
1555 Palm Beach Lakes Boulevard, #930
West Palm Beach, Florida 33401




Examination of the witness taken before

Sonja D. Hall
Palm Beach Reporting Service, Inc.
1665 Palm Beach Lakes Boulevard, Suite 1001
West Palm Beach, FL 33401
(561) 471-2995

2

```
 1    APPEARANCES:

 2       For Plaintiff/Counter-Defendant:

 3           LINK & ROCKENBACH, P.A.
             1555 Palm Beach Lakes Boulevard, Suite 301
 4           West Palm Beach, FL 33401
             By SCOTT J. LINK, ESQUIRE
 5           By KARA BERARD ROCKENBACH, ESQUIRE

 6       For Plaintiff/Counter-Defendant:

 7           ATTERBURY, GOLDBERGER & WEISS, P.A.
             250 Australian Ave. South, Suite 1400
 8           West Palm Beach, FL  33401
             By JACK A. GOLDBERGER, ESQUIRE

 9

10       For Defendants/Counter-Plaintiffs:

11           SEARCY, DENNEY, SCAROLA, BARNHART &
             SHIPLEY, P.A.
12           2139 Palm Beach Lakes Boulevard
             West Palm Beach, FL 33409
13           By JACK SCAROLA, ESQUIRE

14        For Fowler White:

15           CARLTON FIELDS, PA
             525 Okeechobee Boulevard, Suite 1200
16           West Palm Beach, FL 33401
             By JOSEPH IANNO, JR, ESQUIRE

17

18        For L.M., E.W. and Jane Doe:

19           S.J. QUINNEY COLLEGE OF LAW
             at the UNIVERSITY OF UTAH
20           332 S. University Street
             Salt Lake City, UT 84112
21           By PAUL G. CASSELL, ESQUIRE (Telephonically)

22                        ALSO PRESENT

23           Above & Beyond Reprographics
             2161 Palm Beach Lakes Boulevard, Suite 412
24           West Palm Beach, FL 33409
             By Manuel Santiago, Videographer

25
```

1                       I N D E X

2

3    Videotaped Deposition of JEFFREY EPSTEIN        Page No.

4

5    Direct Examination by Mr. Scarola                     5

6    Certificate of Oath                                  83

7    Certificate of Reporter                              84

8    Read & Sign Letter to Witness                        85

9

10

11

12                  PLAINTIFF'S EXHIBIT INDEX

13                 (No exhibits were marked.)

14

15

16          DEFENDANTS/COUNTER-PLAINTIFFS' EXHIBIT INDEX

17

18   No.        Description                         Page No.

19   1          Sworn Declaration of Jeffrey Epstein        6

20   2          Affidavit of Jeffrey Epstein               40

21   3          Re-Notice of Taking Deposition             58

22   4          Re-Notice of Taking Deposition             62

23

24

25

1          THE VIDEOGRAPHER:  We are on the video
2      record.  This is the 13th day of
3      October 2018.  The time is approximately
4      9:07 a.m.
5          This is the videotaped deposition of
6      Jeffrey Epstein in the matter of Jeffrey
7      Epstein versus Scott Rothstein,
8      individually; Bradley Edwards, individually;
9      L.M. individually.
10         This deposition is being held at 1555
11     Palm Beach Lakes Boulevard, West Palm Beach,
12     Florida 33401.
13         My name is Manuel Santiago.  I am the
14     videographer representing Above & Beyond
15     Reprographics.
16         Will the attorneys please announce
17     their appearances for the record?
18         MR. SCAROLA:  My name is Jack Scarola.
19     I am counsel on behalf of Bradley Edwards.
20         MR. LINK:  Scott Link and Kara
21     Rockenbach on behalf of Mr. Epstein.
22         MR. GOLDBERGER:  And Jack Goldberger on
23     behalf of Jeffrey Epstein.
24         MR. SCAROLA:  On the phone we have
25     Professor Paul Cassell.

```
 1            MR. CASSELL:  Can I just chime in here?
 2       Paul Cassell for L.M., E.W. and Jane Doe,
 3       intervenors in the Florida State court
 4       action.
 5  THEREUPON,
 6                    JEFFREY EPSTEIN,
 7            being a witness in the notice heretofore
 8  filed, and being first duly sworn in the above cause,
 9  testified on his oath as follows:
10            THE WITNESS:  Yes.
11                  DIRECT EXAMINATION
12  BY MR. SCAROLA:
13       Q    Would you please state your full name?
14       A    Jeffrey E. Epstein.
15       Q    Would you list for us, please, each of your
16  residence addresses?
17            MR. GOLDBERGER:  I think it's beyond
18       the scope.  I'm going to object to Fifth
19       Amendment.
20            You want him to invoke or you okay with
21       me doing it?
22            MR. SCAROLA:  We want Mr. Epstein to
23       invoke any privilege that Mr. Epstein
24       considers appropriate to invoke.
25            THE WITNESS:  The Fifth.
```

1   BY MR. SCAROLA:

2        **Q**    I'm sorry?

3        **A**    The Fifth.

4        **Q**    You are the same Jeffrey Epstein that is a

5   party in the current state court proceedings in which

6   Bradley Edwards has brought suit against you for

7   malicious prosecution, correct?

8        **A**    Correct.

9        **Q**    Mr. Epstein, I'm going to hand you what I

10  have marked as Exhibit Number 1 to this deposition.

11            Ask you to take a look at that document.

12            MR. SCAROLA:  Paul, this is

13       Mr. Epstein's sworn declaration of fact that

14       was filed in the bankruptcy court

15       proceeding.

16            MR. CASSELL:  I am familiar with that.

17       Thank you, Jack.

18            (Defendants/Counter-Plaintiffs' Exhibit

19            Number 1 was marked for identification.)

20  BY MR. SCAROLA:

21       **Q**    Do you recognize the document, Mr. Epstein?

22       **A**    Yes.

23       **Q**    Is that, in fact, your signature above the

24  line that says Jeffrey Epstein?

25       **A**    Yes.

7

1    **Q**    There is a signature to the left of yours at

2    the bottom of the document.  Whose signature is that?

3    **A**    I don't know.

4    **Q**    Who were the attorneys who were representing

5    you at the time that this declaration was prepared on

6    August 14, 2018?

7            MR. LINK:  Object to the form.

8            THE WITNESS:  Could you ask the

9       question again?

10   BY MR. SCAROLA:

11   **Q**    Yes, sir.

12           Who were the lawyers who were representing

13   you in this matter on August 14, 2018?

14           THE WITNESS:  Scott Link.

15   BY MR. SCAROLA:

16   **Q**    Anyone else?

17   **A**    Jack Goldberg.

18   **Q**    Anyone else?

19   **A**    Darren Indyke.

20   **Q**    Anyone else?

21   **A**    Not that I recall.

22   **Q**    Who prepared this declaration?

23   **A**    I believe the Link firm.

24   **Q**    Was it sent to you initially in the form in

25   which it presently appears?

8

1      **A**    I don't recall.

2      **Q**    Do you have any recollection whatsoever of

3   having any input into the content of this declaration?

4            MR. LINK:  So, Mr. Epstein, I just want

5        to caution you.  I don't want you to share

6        any of our communications or conversations.

7            Okay.  You can answer the question

8        without disclosing anything we have talked

9        about.

10            THE WITNESS:  No.

11   BY MR. SCAROLA:

12      **Q**    You had no input?

13      **A**    I don't have anything separate from my

14   attorneys.  Any input I have is with conversations with

15   my attorneys.

16      **Q**    That's not my question.  I have not asked you

17   whether you received any information from your

18   attorneys.

19            I asked you whether you had any input into

20   the content of this declaration.

21            MR. LINK:  Again, I am going to

22        instruct you not to disclose any of our

23        conversations and communications.

24            You can simply answer yes or no to the

25        question.  If you remember it, then you can.

1          THE WITNESS:  Sorry.  So I'm clear, the
2      conversations I had with you about this --
3          MR. LINK:  We are not going to talk
4      about.
5          THE WITNESS:  So is that an answer of
6      yes or no?
7          MR. LINK:  If the question is, do you
8      recall whether you made any changes to what
9      was sent to you, I think you can answer yes
10     or no.
11         MR. SCAROLA:  That's not the question.
12 BY MR. SCAROLA:
13   **Q**    I want to know whether you had any input
14 whatsoever into the drafting of this declaration.
15         Was any of the information contained in
16 this declaration -- included in the declaration as a
17 consequence of input that you personally had?  Or
18 was it simply all drafted by somebody else for your
19 signature?
20         MR. LINK:  So, if you can answer that
21     question without disclosing our
22     communications, you can answer the question.
23     If you can't answer it without disclosing
24     our communication, Mr. Epstein, then you are
25     instructed not to answer it.

1   BY MR. SCAROLA:

2       **Q**    Your answer to the question, sir?

3       **A**    I can't disclose anything -- I have only had

4   a conversation with my attorney regarding this.

5       **Q**    Yes, sir.

6            But my question does not ask you about any

7   communication you had with your lawyers.  I am

8   asking you whether you had any input into the

9   language that is included within this declaration.

10           Is anything here your -- the consequence

11  of your input?

12           MR. LINK:  So, let me just -- I have

13       two questions for you, Mr. Scarola.  One, I

14       thought we were starting with the state

15       court matter.

16           MR. SCAROLA:  We are.

17           MR. LINK:  I may have misunderstood,

18       because this is a bankruptcy declaration.

19       And there isn't anything in Judge Hafele's

20       order that talks about bankruptcy testimony

21       or spoke that you can inquire about.

22           Obviously, by signing this, he has

23       adopted every statement in there as his own.

24       So I'm not sure what we are doing at the

25       moment.

```
1    BY MR. SCAROLA:

2        Q    Can you answer the question, sir?

3        A    I cannot answer the question.

4        Q    Why?

5        A    Anything I talked about with respect to this

6    document is a conversation with my attorneys.

7        Q    And I'm not asking about any communication

8    you had with your lawyer.  I want to know whether

9    anything in this affidavit is as a consequence of your

10   personal input.

11           MR. LINK:  So, if there was anything

12       you did separate and apart from our

13       conversations, then you can tell him.  If

14       not --

15           THE WITNESS:  No.

16   BY MR. SCAROLA:

17       Q    No what?

18       A    No.

19       Q    Nothing in this affidavit was as a result of

20   your personal input; is that correct?

21           MR. LINK:  What he said was separate

22       and apart.

23           My instruction is, you may not disclose

24       any of our communications.  If you can

25       answer the question about something you did
```

1       separate and apart from my directions to you

2       or our communications, you can answer the

3       question.  Other than that, you cannot.

4            MR. SCAROLA:  Mr. Link, communications

5       with counsel are privileged if they are

6       intended to remain confidential.

7            If Mr. Epstein communicated something

8       to you to include within this affidavit,

9       that, obviously, was not intended to remain

10      confidential.  It was intended to be

11      communicated in this particular filing.

12           MR. LINK:  Mr. Scarola, I disagree with

13      you.  I'm instructing him not to answer if

14      it's based on our communications period.

15  BY MR. SCAROLA:

16      Q    The second paragraph of this affidavit says,

17  "The law firm of Fowler White Burnett, PA, represented

18  me" -- meaning you -- "in the state court proceeding

19  from June 2010 through May 2012."

20           What were the terms on which you retained

21  the Fowler White Burnett law firm?

22           MR. LINK:  Mr. Scarola, you are

23      exceeding the scope of the deposition in the

24      state court matter.

25           There are four very specific limited

13

```
1        topics, none of which have you asked a
2        single question about.  I'm really trying to
3        understand what --
4             Do you want to do the bankruptcy first?
5             MR. SCAROLA:  No.  No, sir.  I want to
6        do the state court proceeding first.  I'm
7        asking questions that relate directly to the
8        topics that are defined within the state
9        court order and I would like an answer to
10       that question.
11            MR. LINK:  Would you please tell me
12       which topic you are focused on?  There are
13       only four.
14            MR. SCAROLA:  This relates to all of
15       them.
16            MR. LINK:  It does not, Mr. Scarola.
17            MR. SCAROLA:  We have a disagreement
18       about that.  If you are instructing him not
19       to answer, then the court will make a
20       determination as to whether that is or is
21       not an appropriate instruction and whether
22       we will or will not be back here to redepose
23       Mr. Epstein once again.
24            Are you instructing him to the answer?
25            MR. LINK:  Your question is what were
```

14

```
 1        the terms of his engagement of Fowler White?
 2             MR. SCAROLA:  Yes, that's correct.
 3             MR. LINK:  Then I'm instructing him not
 4        to answer.
 5   BY MR. SCAROLA:
 6        Q    Did you engage Fowler White on an hourly
 7   basis?
 8             MR. LINK:  I am instructing him not to
 9        answer.
10   BY MR. SCAROLA:
11        Q    Did Fowler White present invoices to you for
12   services that were rendered on an hourly basis?
13             MR. LINK:  I am instructing him not to
14        answer.
15   BY MR. SCAROLA:
16        Q    Were you ever billed by Fowler White with
17   invoices that included a description of the services
18   that Fowler White rendered on your behalf?
19             MR. LINK:  I am instructing him not to
20        answer.
21   BY MR. SCAROLA:
22        Q    Were you kept informed as to what Fowler
23   White did on your behalf in connection with their
24   representation of you?
25             MR. LINK:  I'm instructing him not to
```

15

```
1          answer.  It exceeds the scope of the court's

2          order.

3     BY MR. SCAROLA:

4          Q     Your affidavit -- excuse me.  Your

5     declaration states that as part of Fowler White's

6     representation of you, that they represented you in

7     proceedings in the bankruptcy case concerning a

8     subpoena that your original counsel issued to the

9     bankruptcy trustee.  Is that statement true?

10         A     Yes.

11         Q     Who was your original counsel that issued the

12    subpoena to the bankruptcy trustee?

13         A     I don't recall.

14         Q     What was subpoenaed?

15         A     The question again.

16         Q     What was subpoenaed?

17         A     I don't recall.

18         Q     Were emails subpoenaed?

19         A     I'm not sure what subpoena you are talking

20    about.  Sorry.

21         Q     The one that you declared under penalty of

22    perjury was issued by your original counsel to the

23    bankruptcy trustee.

24         A     I don't recall.

25         Q     Did you ever come to learn that the trustee
```

1    in the bankruptcy for the law firm Rothstein,

2    Rosenfeldt & Adler had been subpoenaed to produce

3    emails contained on the server of that law firm?

4        **A**    I don't recall.

5        **Q**    Did it ever come to your attention that

6    emails contained on the server of the law firm

7    Rothstein, Rosenfeldt & Adler had been produced in

8    connection with the state court civil proceedings by

9    the bankruptcy trustee to a special master that had

10   been appointed for purposes of determining what, if

11   any, emails from that production would be turned over

12   in response to the subpoena that was issued?

13       **A**    Separate from any conversations with my

14   attorney, I don't recall.

15       **Q**    Did you ever learn that privilege was being

16   asserted with respect to the production of any emails

17   that were contained on a Rothstein, Rosenfeldt, Adler

18   server?

19       **A**    Separate from a conversation with my

20   attorneys, I don't recall.

21       **Q**    Are you aware, as you sit here today, that

22   federal bankruptcy Judge Ray issued an order with

23   respect to procedures to be followed in connection with

24   responding to an email subpoena?

25              MR. LINK:  Object to the form.

```
 1          MR. SCAROLA:  What's the problem with
 2     the form?
 3          MR. LINK:  You didn't give us any time.
 4     Is there more than one?
 5          MR. SCAROLA:  No, I did.  I said as you
 6     sit here today.
 7          MR. LINK:  No, as to the order.  But --
 8          If you can answer the question, you can
 9     answer question.
10          THE WITNESS:  I'm sorry.  You have to
11     repeat it.
12 BY MR. SCAROLA:
13     Q    Yes.  As you sit here today, are you aware
14 that federal bankruptcy Judge Ray issued an order
15 concerning matters relating to the production of
16 Rothstein, Rosenfeldt, Adler emails?
17          MR. LINK:  Object to the form.
18          THE WITNESS:  Outside conversations
19     with my attorney, no.
20 BY MR. SCAROLA:
21     Q    Have you ever seen an order issued by federal
22 bankruptcy Judge Ray that impose restrictions on the
23 possession of electronic data produced in response to a
24 subpoena for emails from the Rothstein, Rosenfeldt,
25 Adler law firm?
```

1          MR. LINK:  Object to the form.

2          THE WITNESS:  Outside of conversations

3     with my attorney, no.

4  BY MR. SCAROLA:

5     **Q**    Tell me about the conversations that you had

6  with your lawyers relating to the terms of Judge Ray's

7  order.

8          MR. LINK:  I am going to instruct you

9     not to answer that question.

10 BY MR. SCAROLA:

11    **Q**    Have you ever personally seen any of the

12 language that was included within Judge Ray's order?

13    **A**    Outside of the conversations with my

14 attorney, no.

15    **Q**    Well, a conversation with your lawyer does

16 not tell me anything in response to a question that

17 asks what you have seen.

18          Have you ever seen any of the language

19 included within Judge Ray's order that impose

20 restrictions on the possession of electronic data

21 relating to emails of the Rothstein, Rosenfeldt,

22 Adler firm?

23          MR. LINK:  So let me object to the

24     form.

25          If you can answer the question

1          independent of communications with your
2          lawyer -- so if you looked at the order on
3          your own, then you can answer.
4              THE WITNESS:  I don't recall.
5    BY MR. SCAROLA:
6      Q    Are you aware that contempt proceedings are
7    pending in the federal bankruptcy court?
8      A    Yes.
9      Q    What is your understanding of what those
10   proceedings are about?
11     A    It's in regards to the discovery of a disc
12   that was in possession of Fowler White.
13     Q    What is it in regard to that disc?
14     A    That's not a very good question.  Sorry.
15     Q    I'm sorry?
16     A    Can you ask a question?
17     Q    The question is, what is it about this disc
18   that is the subject matter of contempt proceedings in
19   the bankruptcy court?
20             MR. LINK:  So, again, if you can answer
21         the question based on your own personal
22         review of information rather than our
23         communications, you can share that with
24         Mr. Scarola.
25             THE WITNESS:  Nothing outside my

1          conversations with the attorney.

2     BY MR. SCAROLA:

3          **Q**     Did you ever become aware that a subpoena was

4     issued to the bankruptcy trustee to produce emails?

5          **A**     I don't recall.

6          **Q**     Did you ever become aware that a claim of

7     privilege was asserted with regard to any of the emails

8     on the Rothstein, Rosenfeldt, Adler server?

9          **A**     Outside of conversations with my attorney,

10    no.

11         **Q**     Did your lawyer tell you that a claim of

12    privilege had been made with regard to any of the

13    emails on the RRA server?

14              MR. LINK:  Mr. Scarola, you know better

15         than to ask that question.

16              Mr. Epstein, do not answer that

17         question.

18              MR. SCAROLA:  Mr. Link, those happen to

19         be matters as to which privilege is waived

20         as a consequence of your own disclosures in

21         your own affidavits and your own statements

22         with respect to this case.

23              MR. LINK:  I disagree with you.

24              MR. SCAROLA:  That's fine.

25              MR. LINK:  I'm going to instruct you

1       not to answer.

2               MR. SCAROLA:  Just as long as you know

3           that it is our position that there has been

4           a waiver.  You can instruct the witness not

5           to answer and the court will make a

6           determination with regard to that legal

7           issue.

8               MR. LINK:  There's no question.

9               And I will say this, for the record.

10          You haven't asked a single question about

11          the four topics that Judge Hafele

12          specifically delineated for this limited

13          deposition you could take.

14              But I am instructing you not to answer

15          the question, Mr. Epstein.

16   BY MR. SCAROLA:

17       Q   Paragraph four of your declaration, Exhibit

18   Number 1, states, "In February 2018, Scott J. Link of

19   Link & Rockenbach, PA, informed me that he had located

20   a disc in Fowler White's files labeled," quote, Epstein

21   Bate Stamp, unquote.

22              Did I read that accurately?

23       A   Correct.

24       Q   That was a communication from Mr. Link, your

25   lawyer, to you, correct?

1      **A**    Yes.

2      **Q**    What else did Mr. Link tell you?

3             MR. LINK:  So, I'm going to instruct

4      you not to disclose any of your

5      conversations that involved legal advice or

6      strategy or protected communication.

7             If you recall that I said anything

8      other than I located a disc specific to that

9      topic, you can answer.

10            THE WITNESS:  I remember that.

11     Everything else I talked with my attorneys.

12     BY MR. SCAROLA:

13     **Q**    Yes, I know you were talking to your lawyer.

14     I want to know everything that your lawyer told you in

15     this conversation that you have partially disclosed.

16            MR. LINK:  So --

17     BY MR. SCAROLA:

18     **Q**    What else did he tell you?

19            MR. LINK:  So, I'm going to instruct

20     you not to answer based both on

21     attorney-client privilege and exceeds the

22     scope of Judge Hafele's order.

23     BY MR. SCAROLA:

24     **Q**    Your response?

25            MR. LINK:  I have instructed him not to

1      answer.

2  BY MR. SCAROLA:

3      **Q**     When in February of 2018 did you have this

4  communication with Mr. Link?

5      **A**     I don't recall specifically.

6      **Q**     What was the form of the communication?

7      **A**     I don't recall specifically.

8      **Q**     When you tell me you don't recall

9  specifically, that suggest that you may recall

10  generally.  What is your recollection with regard to

11  the form that the communication took?

12      **A**     It's not specifically -- I believe it was a

13  phone call.  But that's my best recollection.

14      **Q**     Where were you when you received that phone

15  call?

16      **A**     No idea.

17      **Q**     Did Mr. Link tell you why he was calling to

18  tell you that he had located a disc?

19           MR. LINK:  Mr. Epstein, I am going to

20      instruct you not to answer the question.

21  BY MR. SCAROLA:

22      **Q**     Did Mr. Link tell you what was on the disc?

23           MR. LINK:  I'm going to instruct you

24      not to answer.

25

 1   BY MR. SCAROLA:

 2        **Q**    Did Mr. Link communicate to you at any time

 3   anything regarding the content of a disc that had been

 4   located in Fowler White's files?

 5             MR. LINK:  I am going to instruct you

 6        not to answer.

 7             MR. SCAROLA:  The basis of that

 8        instruction?

 9             MR. LINK:  Attorney-client privilege

10        and exceeds scope of Judge Hafele's order.

11   BY MR. SCAROLA:

12        **Q**    Had you known prior to Mr. Link's

13   communication with you in February of 2018 that Fowler

14   White had come into possession of a disc relating to

15   anything having to do with the litigation in which you

16   were involved?

17             MR. LINK:  Can you read the first part?

18        Did he say if or did you?  I'm sorry, I

19        missed the first words.

20             (Thereupon, the requested portion of the

21             record was read back by the reporter as

22             above duly recorded.)

23             MR. LINK:  I'm going to object to form.

24             THE WITNESS:  No.

25

25

1    BY MR. SCAROLA:

2        **Q**    How was it that you remember that?

3        **A**    I'm sorry.  The question again.

4        **Q**    How is it that you can tell us under oath

5    today that you had no prior knowledge of Fowler White

6    having come into possession of a disc relating to your

7    litigation?

8        **A**    So, to be clear, to the best of my

9    recollection today, the answer is no.  I have no

10   recollection whatsoever.

11       **Q**    So the answer is not no.  The answer is I

12   don't remember.  Is that correct?

13           MR. LINK:  No.  That's not what he

14       said.

15   BY MR. SCAROLA:

16       **Q**    Well, I want to know.  Are you telling us,

17   no, you didn't know; or are you telling us, I don't

18   remember whether I knew or not?

19       **A**    My best recollection is no.  I can't be

20   certain of anything, frankly.  So the answer is -- with

21   respect to most questions, my answer is no.  But I

22   can't be certain that someone hadn't told me something

23   years ago.  I have no recollection.  I would say no.

24       **Q**    Paragraph five of this declaration says, "I

25   have no personnel knowledge of how the CD came to be in

```
1    Fowler White's possession."

2            Do you have any knowledge that, in fact,

3    it did come to be in Fowler White's possession?

4            MR. LINK:  So, you can -- other than

5        our communications, you can answer the

6        question.

7            THE WITNESS:  It's only through

8        communications with my attorney.

9    BY MR. SCAROLA:

10       Q    So Mr. Link told you that he got the disc

11   from Fowler White; is that correct?

12           MR. LINK:  You can answer that

13       question.

14           THE WITNESS:  Correct.

15   BY MR. SCAROLA:

16       Q    Did he tell you when he got it from Fowler

17   White?

18           MR. LINK:  If you remember, you can

19       answer that question.

20           THE WITNESS:  Sometime in February.

21   BY MR. SCAROLA:

22       Q    Are you aware that William Berger was deposed

23   in the state court civil proceeding?

24       A    I don't recall.

25       Q    Do you know who William Berger is?
```

1    **A**    No, sir.

2    **Q**    Do you recall a former Palm Beach County

3    circuit court judge having been involved as co-counsel

4    in the prosecution of molestation claims against you by

5    the Rothstein, Rosenfeldt, Adler firm?

6              THE WITNESS:  Is this part of

7         today's --

8              MR. LINK:  If you remember that there

9         was a --

10             THE WITNESS:  I do not remember.

11   BY MR. SCAROLA:

12   **Q**    At the time that you had the communication

13   with Mr. Link sometime in February of 2018, did

14   Mr. Link discuss any of the data that was included on

15   the disc that he was informing you about?

16             MR. LINK:  Mr. Epstein, I am going to

17        instruct you not to answer.

18   BY MR. SCAROLA:

19   **Q**    Have you ever received any documents that

20   were represented to have been included on that disc?

21             MR. LINK:  Object to the form.

22        If you can answer that question without

23        disclosing our communications you can answer

24        it.

25             THE WITNESS:  Anything I received, I

28

1          received from my attorneys.

2     BY MR. SCAROLA:

3          **Q**     Yes.  And I want to know whether you ever

4     received any of -- any documents that were represented

5     to you to have been printed from data on the disc that

6     Mr. Link told you about in February of 2018.

7                    MR. LINK:  So, again, without

8              disclosing our communications, you can

9              simply tell him whether you were provided

10             generally any documents, without disclosing

11             any specific documents or our

12             communications.

13                   THE WITNESS:  I don't believe so.

14    BY MR. SCAROLA:

15         **Q**     What specific documents that originated on

16    the disc did you receive?

17                   MR. LINK:  So, I'm going to instruct

18             you not to answer that question based on

19             attorney-client and work product.

20    BY MR. SCAROLA:

21         **Q**     How many documents did you receive?

22                   MR. LINK:  That question you can

23             answer, if you remember.

24                   THE WITNESS:  I don't remember.

25

29

1    BY MR. SCAROLA:

2        **Q**    Can you characterize in any way the volume of

3    documents that you received that you understood

4    originated on the disc?

5        **A**    I don't recall.

6        **Q**    Was it more than one?

7        **A**    Probably.

8        **Q**    Was it more than two?

9        **A**    Probably.

10       **Q**    Was it more than three?

11       **A**    I don't know what you mean by documents.  Are

12   you talking about pages?

13       **Q**    Yes.  Let's be very specific.

14           Did you receive more than three pages that

15   you understood to have been printed out from the

16   disc?

17           MR. LINK:  Let me think about the

18       question for a minute.

19           You can answer that question.

20           THE WITNESS:  Yes.

21   BY MR. SCAROLA:

22       **Q**    Was it more than 10?

23       **A**    I would say less than 100, so we don't have

24   to go through numbers.

25       **Q**    That does indeed save us some time.

| | | |
|---|---|---|
| 1 | | Was it more than 50? |
| 2 | **A** | I don't recall. |
| 3 | **Q** | Was it probably more than 50? |
| 4 | **A** | I don't recall. |

5    **Q**    So the best you are able to tell us is that

6    it was, more likely than not, more than three and less

7    than 100 pages, and you can't narrow it down any

8    further than that; is that correct?

9    **A**    Correct.

10    **Q**    How did you receive those pages?

11    **A**    I don't recall.

12    **Q**    Were they electronically transmitted to you?

13    **A**    I don't recall.

14    **Q**    Do you have any recollection of ever having

15    received hard copies of documents generated from the

16    disc?

17    MR. LINK:  Object to the form.

18    You are talking about from me?

19    MR. SCAROLA:  No, I didn't ask that.

20    THE WITNESS:  Anything separate my

21    attorneys, nothing.

22    BY MR. SCAROLA:

23    **Q**    Pardon me?

24    **A**    Anything separate from the attorneys,

25    nothing.

31

```
 1      Q    Okay.  Well, that's not my question.

 2      A    Okay.

 3      Q    Did you ever receive from anyone any hard

 4  copies of pages that you understood to be generated

 5  from the disc?

 6           MR. LINK:  Okay.  So, I am going to

 7      object to the form.

 8           There are thousands of pages that have

 9      been produced in this case from the disc.

10      So that general generic --

11           MR. SCAROLA:  Mr. Link, that's not a

12      legal objection.  If you have a legal

13      objection, please state it.  Anything other

14      than that is nothing more than an attempt to

15      coach the witness.

16           MR. LINK:  It's not.  It's an objection

17      to the form.

18           MR. SCAROLA:  That's fine.  I

19      understand.

20  BY MR. SCAROLA:

21      Q    Could you answer the question, please?

22      A    Could you repeat it?

23      Q    Yes, sir.

24           Did you ever receive any hard copies of

25  documents -- pages that you understood to have been
```

1    generated from the disc?

2        **A**    Yes.

3        **Q**    On how many separate occasions did you

4    receive pages in hard copy form that you understood to

5    have been generated from the disc?

6        **A**    I would say less than 20.

7        **Q**    Twenty occasions?

8        **A**    Less than 20.

9        **Q**    Let's go through each of those that you can

10   remember and tell me about those occasions on which you

11   recall having received hard copies of pages, which you

12   understood to have been generated from the disc.

13       **A**    Have you asked a question?

14       **Q**    Pardon me?

15       **A**    Have you asked a question?

16       **Q**    Yes.

17       **A**    What's the question?

18       **Q**    I want you to tell me about each of the

19   occasions -- we will start with the first one,

20   chronologically, when you received hard copies of pages

21   that you understood to have been generated from the

22   Fowler White disc that Mr. Link told you about in

23   February of 2018.

24           MR. LINK:  Okay, you can answer that

25       specific question.  It's a different

1       question.

2            THE WITNESS:  Sometime in February I

3       was handed, from my attorneys, some

4       documents.  Is what I recall.  Some

5       documents from my attorneys.  I was handed

6       some documents.

7  BY MR. SCAROLA:

8       Q    Who specifically handed you those documents?

9       A    Darren Indyke.

10      Q    Where were you?

11      A    I believe in New York.  I can't be certain.

12      Q    How many pages did Mr. Indyke hand you on

13  that occasion?

14      A    Less than 100.

15      Q    Were those pages accompanied by any cover

16  letter?

17      A    Not that I recall.

18      Q    Were they accompanied by any summary of the

19  contents?

20      A    Not that I recall.

21      Q    Were they accompanied by any index?

22      A    Not that I recall.

23      Q    What did Mr. Indyke tell you about the

24  documents when he gave him to you?

25            MR. LINK:  I'm going to instruct you

1          not to answer that question based on

2          attorney-client privilege.

3     BY MR. SCAROLA:

4          Q    What did you do with the documents when you

5     received them?

6          A    I read them, to the best of my recollection.

7          Q    Did you read them in their entirety?

8          A    I don't recall.

9          Q    What did the documents say?

10              Let me withdrew that question.

11              If you were asked to recount the content

12    of the documents, as you sit here today, would you

13    be able to describe the contents of the documents?

14         A    Some of them, I think.

15         Q    Approximately, how many documents are there

16    as to which you have the ability, as you sit here

17    today, to describe the contents?

18         A    When you say documents, you mean pages?  I'm

19    sorry?

20         Q    Yes, sir.  Pages.

21         A    Well, I can remember the emails with respect

22    to Brad Edwards --

23         Q    Excuse me.  Pardon me.  I'm stopping you,

24    sir.  That's no responsive to my question.  And I don't

25    want you on this record to be disclosing the content of

35

```
 1    any privileged documents.

 2            My question is not to ask you to describe

 3    the content of those privileged documents, but to

 4    tell us how many pages of privileged material you

 5    have retained a recollection of that would enable

 6    you to describe that content as you sit here today.

 7            So how many pages?

 8            MR. LINK:  You can answer that

 9        question.

10            I want to note for the record that you

11        have made an assertion of privilege.  We

12        have challenged that privilege.  And no

13        court has ever made a determination that

14        they are, in fact, privileged.

15            With that statement, you can answer the

16        question, if you can.

17            THE WITNESS:  I'm sorry.  Can you

18        repeat the question?

19    BY MR. SCAROLA:

20        Q    Yes, sir.

21            As you sit here today, how many pages of

22    the documents that you received from Mr. Indyke --

23    something less than 100 documents --

24        A    Yes.

25        Q    -- would you be able to describe the contents
```

1    of?

2        **A**    Again, I could describe the contents in

3    detail on some that I remember.  I have generalizations

4    on others.

5        **Q**    Let's break it down into two categories.  How

6    many pages could you describe the contents of in

7    detail?

8        **A**    Less than 10.

9        **Q**    And how many pages could you describe the

10    contents of generally?

11        **A**    Probably at least another 20.

12        **Q**    Are you aware that a claim of privilege has

13    been asserted with regard to any of the documents that

14    you received from Darren Indyke?

15            MR. LINK:  So, again, if you have

16        independent knowledge, separate and apart

17        from communications with your lawyers, you

18        can answer the question.

19            THE WITNESS:  I have no independent

20        knowledge.

21    BY MR. SCAROLA:

22        **Q**    Are you aware that a claim of privilege has

23    been asserted with regard to any of the documents or

24    pages that you received from Darren Indyke?

25            MR. LINK:  Same instruction,

```
 1        Mr. Epstein.
 2             THE WITNESS:  Outside of conversations
 3        with my attorney, no.
 4   BY MR. SCAROLA:
 5        Q    Regardless of where you received the
 6   information from, are you aware that a claim of
 7   privilege has been asserted with regard to any of those
 8   documents?
 9             MR. LINK:  So, Mr. Epstein, the source
10        of information is important.  If the sources
11        of information are our communications or
12        communications with your lawyers, I do not
13        want you to disclose that.
14             If you have independent information --
15        you have read something, you have seen
16        something outside of our communications --
17        you answer the question.
18             THE WITNESS:  I have no independent
19        knowledge.
20   BY MR. SCAROLA:
21        Q    Do you have knowledge that you derived from
22   your lawyers?
23             MR. LINK:  Generally or about the
24        topic?
25             MR. SCAROLA:  About that specific
```

```
 1        topic, the assertion of privilege with

 2        regard to any documents.

 3             MR. LINK:  We are not going to disclose

 4        any topics or anything that we talked about.

 5        I am instructing you not to answer.

 6   BY MR. SCAROLA:

 7        Q    Have you ever seen a privilege log that

 8   listed any of the documents that you received from

 9   Mr. Indyke on that log?

10        A    I don't recall.

11        Q    Where did Mr. Indyke get the documents that

12   he delivered to you?

13        A    I don't know.

14        Q    How do you know that the documents Darren

15   Indyke delivered to you were documents that originated

16   on the disc?

17        A    Outside of -- I have no independent

18   knowledge.

19        Q    So that's information you received from your

20   lawyers?

21        A    I have no independent knowledge.

22        Q    That's not my question.

23             Is that information you received from your

24   lawyers?  So they told you that the documents that

25   you received from Darren Indyke came from the Fowler
```

1    White disc, correct?

2         MR. LINK:  I do not want you to

3    disclose your communications with your

4    lawyers.  I am going to instruct you not to

5    disclose any information.

6         If you can answer any of his questions

7    based on your independent knowledge or

8    reviewed independently from discussion with

9    your lawyers you can answer the question.

10        THE WITNESS:  I have no independent

11   knowledge.

12   BY MR. SCAROLA:

13   **Q**    Have you ever reviewed the transcripts of any

14   hearings that were held either in the circuit court, in

15   the bankruptcy proceeding, or before Special Master

16   Carney with regard the production of emails?

17   **A**    I don't recall.

18   **Q**    I am going to hand you what I will mark as

19   Exhibit Number 2 to your deposition.  It is an

20   affidavit that purports to have been signed by you and

21   filed in the circuit court proceedings in Palm Beach

22   County.

23        I would like you to take a look at that,

24   please.  Tell me if you recognize that document.

25             (Defendants/Counter-Plaintiffs's Exhibit

40

```
1              Number 2 was marked for identification.)
2              MR. LINK:  Mr. Scarola, do you have a
3         copy for me?
4              MR. SCAROLA:  That's the only one I
5         have.
6              THE WITNESS:  Okay.
7    BY MR. SCAROLA:
8         Q    Is that your signature on that affidavit?
9         A    Yes.
10        Q    Did you, in fact, swear to the contents of
11   that document?
12        A    Yes, sir.
13        Q    You had told us there were something less
14   than 20 occasions in which you received documents that
15   had been originally contained on the Fowler White disc.
16   You told us about one of those occasions when
17   Mr. Indyke handed you documents.
18             What others do you remember?
19             MR. LINK:  Object to the form.  That
20        was not his testimony.  That was the second
21        question that you asked.
22             The first question, I believe, was
23        general, as I made a statement thousands of
24        documents were produced.
25             MR. SCAROLA:  Is this the legal
```

```
 1          objection that you are making, Mr. Link?

 2               MR. LINK:  It is, Mr. Scarola.

 3               MR. SCAROLA:  Then please state the

 4          legal basis of your objection, and don't

 5          attempt to coach the witness.

 6               MR. LINK:  I'm not coaching the

 7          witness.  I'm correcting your misstatement.

 8               MR. SCAROLA:  That's fine.  Your

 9          objection is there is no proper predicate

10          for the question.

11     BY MR. SCAROLA:

12          Q    Can you answer the question please?

13               MR. LINK:  Mr. Scarola, I am going to

14          finish, please, my objection, although, you

15          did a good job of disrupting my thought,

16          because I was on a roll there.

17               But in any event, your question --

18          object to the form.  It mistakes your prior

19          question and the witness's prior testimony.

20               THE WITNESS:  Sorry.  Could you ask it

21          again?

22     BY MR. SCAROLA:

23          Q    How many other times -- or tell us about the

24     other times that you received information generated

25     from the Fowler White disc.
```

42

1     **A**    I don't have any specific recollection today.

2     **Q**    Can you give us any better estimate as to the

3  number of times you received information from the

4  Fowler White disc other than that it was less than 20?

5     **A**    No.

6     **Q**    What did you do with the documents that you

7  received that you understood to have been generated

8  from the Fowler White disc?

9          MR. LINK:  Object to the form.

10          THE WITNESS:  I'm sorry.  I don't fully

11      understand the question.

12  BY MR. SCAROLA:

13     **Q**    What did you do with the documents that

14  Mr. Indyke gave you, which you understood to have been

15  generated from the Fowler White disc?

16     **A**    I read them.

17     **Q**    And what did you do with them after you read

18  them?

19     **A**    I left them on my desk.

20     **Q**    Which desk?

21     **A**    I don't remember exactly.  I believe New

22  York, as I said before.

23     **Q**    What happened to those documents after you

24  left them on your desk?

25     **A**    After being informed by my counsel, I

1    destroyed them.

2          **Q**    How?

3          **A**    In a shredder.

4          **Q**    When?

5          **A**    The same day.

6          **Q**    The same day that you received them from

7    Mr. Indyke?

8          **A**    The same day I was informed by Counsel to

9    destroy them.

10         **Q**    And when was that?

11         **A**    Some time after February.

12         **Q**    When in relation to having received them from

13    Mr. Indyke?

14         **A**    Sometime -- right after the court -- Indyke

15    was in February.  As soon as the court ordered me to

16    destroy them, I destroyed them.

17         **Q**    Did you ever communicate with anyone

18    regarding the contents of those documents?

19         **A**    Separate from my attorneys, I don't remember

20    anybody else.

21         **Q**    Which lawyers did you communicate with about

22    the content of the documents?

23         **A**    Scott Link, Darren, Jack.

24         **Q**    Anyone else?

25         **A**    Not that I recall.

1    **Q**    Was there anyone else at all at any time

2    under any circumstance that you discussed the contents

3    of the documents with?

4    **A**    I don't recall anybody except my attorneys.

5    **Q**    Did you have any communication with Bradley

6    Edwards regarding the content of those documents?

7    **A**    I don't recall.

8    **Q**    Since receiving those documents, did you have

9    any communication with Bradley Edwards at all about

10   anything?

11   **A**    I don't recall.

12   **Q**    When you read the documents that you received

13   from Mr. Indyke, did you learn anything that you had

14   not previously known?

15   **A**    Yes.

16   **Q**    As you sit here today, would you be able to

17   identify those things that you learned for the first

18   time from among the documents that Mr. Indyke delivered

19   to you?

20   **A**    I'm sure I can remember some of them.

21   **Q**    Was there anything in those documents that

22   you already knew that was not being disclosed to you

23   for the first time upon delivery of those documents to

24   you?

25   **A**    I don't recall.

1      **Q**     We have marked as Exhibit Number 2 an

2    affidavit, which you acknowledged to have been signed

3    by you.  Have you had a chance to read through that?

4      **A**     Yes, sir.

5      **Q**     You agree that there is nothing in this

6    affidavit that relates to the content of any emails,

7    correct?

8      **A**     I'm sorry.  Which emails?

9      **Q**     The emails that you received from Darren

10   Indyke.

11           Let's establish that.  The pages that you

12   received from Darren Indyke were printouts of

13   emails, were they not?

14     **A**     I believe some of them were.

15     **Q**     What else was in there besides email

16   printouts?

17           MR. LINK:  You can say generally, if

18       you remember, without describing what was

19       provided to you.

20           THE WITNESS:  My best recollection is

21       emails.

22   BY MR. SCAROLA:

23     **Q**     So you have no recollection of there being

24   anything other than emails in the documents that you

25   received from Mr. Indyke, correct?

1       **A**     I believe so.

2               Could you ask that question again?  You

3       asked me a question.  Sorry.

4               MR. LINK:  I don't think there's any

5           pending --

6               MR. SCAROLA:  I don't think there's a

7           pending question.  There's about to be.

8       BY MR. SCAROLA:

9       **Q**     You understood that the purpose of Exhibit

10      Number 2, your affidavit, was to describe all of the

11      information that you relied upon in deciding to sue

12      Bradley Edwards, correct?

13      **A**     No, sir.

14      **Q**     What was the purpose of this affidavit?

15      **A**     It was a general -- it did not fully

16      encompass everything I might have seen prior to signing

17      it.  It was a general affidavit.

18      **Q**     I'm sorry.

19      **A**     It was a general discussion.  It didn't list

20      anything I had actually seen before signing this

21      affidavit.

22      **Q**     So the affidavit does not include anything

23      that you actually saw before signing the affidavit; is

24      that correct?

25      **A**     I don't believe with any specificity, sir.

1      **Q**    What does that answer mean?  I don't

2   understand that.

3      **A**    I might have seen things that are not in this

4   affidavit.

5      **Q**    All right.  So what is it that you saw before

6   signing this affidavit that related to your having had

7   a good faith basis for filing the action against

8   Bradley Edwards and Scott Rothstein in December of

9   2009?

10           MR. LINK:  Mr. Epstein, I am going to

11        instruct you not to answer the question.  It

12        far exceeds the scope of the deposition that

13        was authorized by Judge Hafele.

14            This is not a discovery deposition

15        related to the case.  Please do not answer

16        the question.

17   BY MR. SCAROLA:

18      **Q**    Was there any information contained within

19   the emails that form part of your alleged good faith

20   basis for suing Bradley Edwards?

21           MR. LINK:  Object to the form.

22           You can answer the question.

23           THE WITNESS:  Reading the emails in the

24        Darren Indyke documents confirmed everything

25        that was in this affidavit.  Yes, sir.

1  BY MR. SCAROLA:

2     **Q**    Was there any information contained within

3  the emails that formed part of your good faith basis

4  for suing Bradley Edwards?

5          MR. LINK:  Again, I am going to

6       instruct you not answer that question.  It

7       exceeds the scope of the court's order.

8  BY MR. SCAROLA:

9     **Q**    Are you aware of the specific scope of the

10  inquiry that Judge Hafele permitted during the course

11  of this deposition?

12          Did you ever see his order that outlined

13  what you were allowed to be asked about?

14     **A**    Yes.

15     **Q**    You are aware that topic number one was

16  whether and to what extent Epstein reviewed any of the

17  alleged privileged materials prior to March of 2018,

18  correct?

19          THE WITNESS:  Is that what it says?

20          MR. LINK:  That's what it says.

21          THE WITNESS:  Yes.

22  BY MR. SCAROLA:

23     **Q**    Did you review any of the allegedly

24  privileged materials prior to March 2018?

25     **A**    That's a very general category.  Which

1   privilege materials?  It's 27,000 emails, so you are

2   going to have to be specific.

3       **Q**   Well, when you were preparing for this

4   deposition, did you find out which of those 27,000

5   emails were alleged to be privileged?

6       **A**   No.

7       **Q**   So as you sit here today, you are incapable

8   of telling us whether you reviewed any of the alleged

9   privileged materials prior to March 2018, because you

10  have no idea what materials are alleged to be

11  privileged.  Is that what you're telling us?

12          MR. LINK:  Object to the form.  That it

13      is not what he said.

14          THE WITNESS:  I have recollection of

15      reading some of the emails.

16  BY MR. SCAROLA:

17      **Q**   So did you review any of the allegedly

18  privileged materials prior to March 2018?

19      **A**   Again, I understand alleged privileged

20  materials encompass 27,000 emails, so I don't

21  understand your question.

22      **Q**   I want to know whether you reviewed any of --

23  any email, which is alleged to have been privileged at

24  any time before March of 2018.

25          MR. LINK:  Object to the form.

```
 1              THE WITNESS:  Yes.
 2    BY MR. SCAROLA:
 3        Q    How many emails alleged to have been
 4    privileged did you review prior to March of 2018?
 5        A    Again, your question.
 6              MR. SCAROLA:  Read it back, please.
 7              (Thereupon, the requested portion of the
 8              record was read back by the reporter as
 9              above duly recorded.)
10              THE WITNESS:  Can you tell me how many
11          emails have been alleged to be privileged,
12          so we are talking about something --
13    BY MR. SCAROLA:
14        Q    I want to know which emails you reviewed,
15    which you believed to have been alleged to be
16    privileged, prior to March of 2018.
17              MR. LINK:  That's a different question.
18          You can -- if you understand, the question
19          you can answer that.
20              THE WITNESS:  I'm sorry.  I didn't --
21          ask it again, please.
22              MR. SCAROLA:  Please read it back.
23              MR. LINK:  Jack, do you mind if we try
24          to clarify this so that we can move forward,
25          because I think I understand what the
```

1      difficulty is?

2          MR. SCAROLA:  I would like the question

3      read back to see whether or not Mr. Epstein

4      understands the question.

5          MR. LINK:  Okay.

6          (Thereupon, the requested portion of the

7           record was read back by the reporter as

8           above duly recorded.)

9          THE WITNESS:  I still don't understand

10     the question.

11   BY MR. SCAROLA:

12     **Q**    Pardon me?

13     **A**    I don't understand the question.  Sorry.

14     **Q**    You are aware that there are emails which

15   Bradley Edwards alleges to be privileged emails,

16   correct?

17     **A**    I am aware that there -- I was told 27,000

18   emails alleged -- in some form to be privileged.

19     **Q**    Who told you that Bradley Edwards alleged

20   27,000 emails were privileged?

21         MR. LINK:  So, I don't want you to

22     share our conversations or conversations

23     with your lawyers.

24         If you can answer that question from

25     whatever documents -- independent review

```
 1          that the order or affidavit -- whatever you

 2          have seen related to the bankruptcy

 3          proceeding --

 4               THE WITNESS:  I don't believe I have

 5          any independent knowledge.

 6     BY MR. SCAROLA:

 7          Q    You just said you were told that 27,000

 8     emails were alleged to have been privileged.

 9          A    Sorry.  That's not that I said.  I said --

10               MR. SCAROLA:  Would you read back

11          Mr. Epstein's answer, please?

12               MR. LINK:  Do you really not want to

13          have a conversation to see if we can fix

14          this confusion?

15               MR. SCAROLA:  I really don't want to.

16               (Thereupon, the requested portion of the

17               record was read back by the reporter as

18               above duly recorded.)

19     BY MR. SCAROLA:

20          Q    Who told you?

21          A    My attorneys.

22          Q    Which one?

23          A    I don't recall.

24          Q    When?

25          A    I don't recall.
```

53

1    **Q**    Was it before or after March of 2018?

2    **A**    Before.

3    **Q**    Was it before or after February of 2018?

4    **A**    I don't recall.

5    **Q**    What do you remember about that conversation?

6         MR. LINK:  Again, I don't want you to

7    share the details of the conversation.

8         MR. SCAROLA:  He has already done that.

9    He has already made an assertion of what he

10   was told.  That's a waiver of the privilege.

11        I want to know about the conversation

12   in it's entirety.

13        MR. LINK:  And I don't believe that it

14   was a waiver of the privilege.  He gave you

15   non-privileged communication, and he's not

16   going to share with you privileged

17   communications.

18        As you said earlier, every

19   communication isn't privileged.  But the

20   discussion would have been.

21        I have let you ask questions about

22   dates and things of that nature that are not

23   privileged, but I am going to instruct him

24   not to answer your question.

25        And again, I offered on the record to

54

```
 1          discuss with you what I think the impediment
 2          is to these general questions, because there
 3          were alleged privileged emails that were
 4          produced in the litigation -- before my law
 5          firm was retained -- voluntarily by
 6          Mr. Edwards and his law firm, so that there
 7          had been in the record alleged privileged
 8          emails for years in this case.  And you have
 9          not asked specific questions about the
10          emails that were located by my law firm in
11          February as to your questions.
12               So I think your general questions about
13          alleged privileged emails is not encompassed
14          in what the court has asked or what we are
15          here to talk about.  And it's creating
16          confusion, because there were many alleged
17          privileged emails produced years ago.
18   BY MR. SCAROLA:
19        Q    Did Mr. Link tell you the things that he just
20   stated on the record at some time prior to today?
21          MR. LINK:  You are not going to answer
22          that question, Mr. Epstein.
23   BY MR. SCAROLA:
24        Q    Were you told at the time that Mr. Indyke
25   gave you the less than 100 pages that he said were
```

55

```
1    contained on the disc, that an allegation was made that
2    any of those pages were privileged?
3              THE WITNESS:  Can you repeat the
4         question for me, please?
5              (Thereupon, the requested portion of the
6              record was read back by the reporter as
7              above duly recorded.)
8              MR. LINK:  So if you can answer that
9         general question because the source of
10        information was from somebody other than
11        Mr. Indyke and or your lawyers, then you can
12        answer it.
13             THE WITNESS:  I cannot answer it
14        separate from that.
15   BY MR. SCAROLA:
16        Q    Did your lawyers, including Mr. Indyke, tell
17   you when they handed over those pages to you that
18   there's an allegation that these pages contain
19   privileged material?
20             MR. LINK:  I am going to instruct you
21        not to answer it.
22             Do you mind if we take a break?
23             THE VIDEOGRAPHER:  Going off the record
24        at 10:15 a.m.
25             (A recess was had.)
```

56

1          THE VIDEOGRAPHER:  Going back on the

2     record.  The time is 10:26 a.m.

3   BY MR. SCAROLA:

4     **Q**    Have you ever communicated with any agent of

5   Fowler White about the disc that was turned over by

6   them to Link & Rockenbach?

7     **A**    No.  Not to the best of my knowledge.

8     **Q**    Have you ever communicated with Tonja or Fred

9   Haddad about the Fowler White disc?

10    **A**    Not to the best of my knowledge.

11    **Q**    Did you ever receive a copy of the disc

12  itself?

13    **A**    No.

14    **Q**    Do I understand correctly that you don't

15  recall whether any information contained on disc was

16  transmitted to you electronically?  Is that correct?

17         MR. LINK:  Object to the form.

18         THE WITNESS:  We are only talking about

19     recently, I take it, right?

20         I don't know what information was

21     contained entirely on the disc.  I have

22     never seen the disc.  I can't give you an

23     answer in terms of what came off the disc in

24     the past 10 years.

25         Can you ask a better question?  I'm

57

1      sorry.

2  BY MR. SCAROLA:

3      **Q**    The information you received from Mr. Indyke,

4  you were told, was information that originated on the

5  Fowler White disc, correct?

6          MR. LINK:  I don't want you to disclose

7      any communications with your lawyers, but --

8          THE WITNESS:  That is my belief.

9  BY MR. SCAROLA:

10     **Q**    Do you have a specific recollection that that

11 information was conveyed to you in hard copy as opposed

12 to having been sent to you electronically?

13     **A**    Correct.

14     **Q**    Were there any electronic communications that

15 took place at any time that included any information

16 derived from the disc?

17         MR. LINK:  Object to the form.

18         THE WITNESS:  It's a bad question.  I

19     don't have a time frame.  I don't know what

20     was -- came off the discs over the past

21     eight years.

22 BY MR. SCAROLA:

23     **Q**    At any time since the beginning of

24 February 2017 -- 2018, was any information conveyed to

25 you electronically, which, as you sit here today, you

58

1    believe to have originated on the Fowler White disc?

2        **A**    I don't believe so.

3        **Q**    Have you had any electronic communications

4    about the content of the Fowler White disc at any time

5    since 2018?

6        **A**    With who?

7        **Q**    With anyone.

8        **A**    Outside of my attorneys, no.

9        **Q**    Have you had communications with your

10   attorneys about information contained on the Fowler

11   White discs since February of 2018?

12           MR. LINK:  I am going to instruct you

13       not to answer that question.

14   BY MR. SCAROLA:

15       **Q**    This deposition was noticed duces tecum.  You

16   know what that means, correct?

17       **A**    No.  Sorry.

18       **Q**    You don't know.

19           I'm going to hand you what we will mark as

20   Exhibit Number 3.

21           (Defendants/Counter-Plaintiffs' Exhibit

22           Number 3 was marked for identification.)

23   BY MR. SCAROLA:

24       **Q**    Can you take a look at it and tell me whether

25   you have ever seen it before?

```
 1              MR. SCAROLA:  Paul, this is a copy of
 2         the Re-Notice of Taking Video Deposition
 3         Duces Tecum.
 4              MR. CASSELL:  Thank you, Jack.
 5              MR. LINK:  Let me know when you are
 6         finished.
 7              THE WITNESS:  I'm finished.
 8              MR. LINK:  So, Mr. Epstein, you can
 9         answer the question -- I don't want you to
10         disclose our communication.  But if the
11         question that's asked have you seen
12         physically that document, then you can
13         answer that.  But I don't want you to
14         disclose our communications about it and
15         anything we discussed.
16              THE WITNESS:  I have not seen it
17         before.
18    BY MR. SCAROLA:
19         Q    Were you informed that you had an obligation
20    to bring with you at the time of this deposition those
21    items that are described on the second page of Exhibit
22    Number 3, quote, All communications and all records
23    relating to all communications concerning or containing
24    information derived from documents or data over which a
25    claim of privilege was asserted by or on behalf of
```

```
 1   Rothstein, Rosenfeldt, Adler PA; Farmer, Jaffe,

 2   Weissing, Edwards, Fistos & Lehrman, P.L.; or Bradley

 3   J. Edwards?

 4          MR. LINK:  I think -- which subpoena

 5       duces tecum are you looking at, Jack?  Which

 6       case?

 7          MR. SCAROLA:  This is the subpoena

 8       duces tecum issued in the bankruptcy court

 9       proceedings.

10          MR. LINK:  So in the bankruptcy court

11       proceeding, we filed an objection to the

12       subpoena duces tecum, and you and your law

13       firm never responded, so there are no

14       documents being produced in the bankruptcy

15       matter.

16   BY MR. SCAROLA:

17       Q   Do you have any documents that fit within the

18   description that I just read?

19          MR. LINK:  You are not going to answer

20       that question.

21          MR. SCAROLA:  And the basis for that?

22          MR. LINK:  I filed my objection and it

23       has sat there for months and you didn't

24       respond to it or move to compel it.  I am

25       not going to let him answer any questions
```

1        about it.

2   BY MR. SCAROLA:

3        **Q**     Have you conducted any search of

4   electronically retained data on any communication

5   device or computer that you have used since March of --

6   excuse me -- since February of 2018 to determine

7   whether there is stored on that device any

8   communication or records relating to communications

9   concerning or containing information derived from

10  documents or data over which a claim of privilege has

11  been asserted in these proceedings?

12            MR. LINK:  So, Mr. Epstein, I do not --

13        I am instructing you not to answer the

14        question on the basis of both our assertion

15        of an objection to the duces tecum that went

16        unanswered in the federal court --

17        bankruptcy court.

18            And secondly, it exceeds the scope of

19        the deposition in the bankruptcy court,

20        which was limited to asking you whether you

21        had the disc or were aware of the disc that

22        is subject to the bankruptcy proceeding

23        before it was delivered -- before I located

24        it.  So I'm going to instruct you not to

25        answer.

1    BY MR. SCAROLA:

2        **Q**    I am going to mark as Exhibit Number 4 the

3    Re-Notice of Taking Video Deposition Duces Tecum in the

4    circuit court proceedings.

5                (Defendants/Counter-Plaintiffs' Exhibit

6                Number 4 was marked for identification.)

7    BY MR. SCAROLA:

8        **Q**    Hand that to you, sir, and ask you whether

9    you have seen that before.

10               MR. LINK:  Again, you can answer that

11          specific question.  I don't want you to

12          testify or disclose about our communications

13          that relate to that exhibit, but you can

14          answer his very specific question.

15               THE WITNESS:  No.

16   BY MR. SCAROLA:

17       **Q**    Were you aware that you had an obligation to

18   bring with you at the time of this deposition all

19   documents tending to establish whether and to what

20   extent Epstein reviewed any of the alleged privileged

21   materials prior to March 2018; whether and to what

22   extent Epstein reviewed any of the alleged privileged

23   materials after March 2018; whether Epstein has any

24   knowledge regarding compliance with the court's verbal

25   rulings on the record at the March 8th, 2018 hearing

63

1    regarding destruction of those documents Edwards has

2    claimed are privileged; whether and to what extent

3    Epstein has shared any of the alleged privileged

4    materials with anyone other than his attorneys,

5    understanding that the documents are described as

6    including, but not limited to all non-identical copies

7    of writings, drawing, drafts, charts, photographs,

8    phono-records, recordings, and/or any other data,

9    compilations from which information can be obtained,

10   translated, if necessary, by the party to whom the

11   request is directed through detection devices into

12   reasonably useable form?

13          Documents also include all electronic data

14   as well as application metadata and system metadata.

15   All inventories and rosters of information

16   technology systems, for example, hardware, software

17   and data, including but not limited to network

18   drawings, lists of computing devices, servers, PCs,

19   laptops, PDAs, cell phones with data storage and/or

20   transmission features, programs, data maps and

21   security tools and protocols.

22          MR. LINK:  So, we filed a written

23       response and objection to the request.  We

24       have asserted attorney-client privilege

25       where appropriate.  We identified where no

64

1          documents existed.  We, in fact, produced

2          the only responsive non-privileged

3          documents.

4               I will note for the record,

5          Mr. Scarola, that we did all of that in

6          advance of this deposition, even though we

7          weren't required to do so by the Florida

8          Rules of Civil Procedure that gave us 35

9          days, I believe, to do that with mailing,

10         and that information and objections and

11         documents have been produced.

12  BY MR. SCAROLA:

13         **Q**    Did you search the data storage of any cell

14  phone that you used in order to make a determination as

15  to whether any of those items described in this duces

16  tecum exist?

17              MR. LINK:  I am going to instruct you

18         not to answer.  We have filed our written

19         response to the subpoena duces tecum.

20              As I just said, we did it in advance of

21         deposition, even though we weren't required

22         to under the Florida Rules of Civil

23         Procedure, and we have produced all

24         non-privileged documents.

25

65

```
 1   BY MR. SCAROLA:

 2        Q    And I am entitled to know whether any search

 3   was conducted in connection with this duces tecum.

 4   Would you answer that question, please?

 5             MR. LINK:  I am going instruct you not

 6        to answer it.

 7   BY MR. SCAROLA:

 8        Q    Did you search any home computer or other

 9   device capable of electronically storing data to

10   determine whether any documents exist within the scope

11   of the request that I have just read?

12             MR. LINK:  I'm going to instruct you

13        not to answer.

14             Let the record reflect Mr. Epstein

15        testified that he shredded the hard copies

16        that he had.  That's what he remembers

17        receiving.  We will stand by our written

18        objections and production.

19   BY MR. SCAROLA:

20        Q    As you sit here today, do you know whether

21   there is any data on any electronic storage device that

22   relates in any way to the content of the Fowler White

23   disc?

24             MR. LINK:  Mr. Epstein, you can answer

25        that specific question, but you may not
```

1          disclose any communications between you and

2          your attorneys.

3                MR. SCAROLA:  That doesn't ask for any

4          communications between Mr. Epstein and his

5          lawyer.

6     BY MR. SCAROLA:

7          Q    I would like to know whether, as you sit here

8     today, you know whether there is any electronic data

9     stored on any device to which you have access that

10    contains any information derived from the Fowler White

11    disc.

12         A    Since I'm not really sure what total

13    information contained from the Fowler White disc of at

14    least 27,000 emails -- and you referenced something as

15    being derived from it -- I would not be able to have

16    any recollection -- any way possible to search in any

17    way to see if there's anything that's been derived from

18    27,000 emails.

19         Q    Do you have files on any electronic storage

20    device that relate to this litigation?

21                MR. LINK:  Over the last 10 years?

22    BY MR. SCAROLA:

23         Q    As you sit here today, do you know whether

24    there is any electronic data on any electronic data

25    storage device that relates to this litigation?

```
1              MR. LINK:  I am going to object to the

2         form.  It is not limited -- I am going to

3         instruct you not the answer.  It is

4         unrelated to the bankruptcy proceeding and

5         Judge Hafele's topics.

6              If you want to try to narrow it,

7         Mr. Scarola.  I obviously communicated with

8         Mr. Epstein, to this day, sometimes

9         electronically.

10             If you want to tie it in to the court's

11        order, then we will see if he can answer it.

12             MR. SCAROLA:  My question stands.  And

13        he is instructed not to answer that

14        question?

15             MR. LINK:  Yes, sir.

16   BY MR. SCAROLA:

17        Q    Thank you.

18             Mr. Epstein, have you made any effort to

19   determine whether there is anything on any

20   electronic storage device to which you have access,

21   which information was generated since February of

22   2018 relating to the contents of the Fowler White

23   disc?

24             MR. LINK:  I am going to instruct you

25        not to answer.
```

1          MR. SCAROLA:  And the basis of that

2      instruction?

3          MR. LINK:  It exceeds the scope of the

4      deposition of bankruptcy proceeding and

5      Judge Hafele's specific order and our

6      objections that we filed in the circuit

7      court and the bankruptcy court.

8  BY MR. SCAROLA:

9      Q    Are you aware of the entry of an order

10 requiring that all information derived from the Fowler

11 White discs be destroyed or purged?

12     A    You said derived from.  I'm sorry.  That's

13 the problem I am having with your question.

14         MR. LINK:  Object to the form.  Thank

15     you.

16 BY MR. SCAROLA:

17     Q    Would you answer the question please?

18     A    I don't know what derived from means.  I'm

19 sorry.

20         MR. LINK:  As we have discussed, when

21     you say the Fowler White disc, that a -- I'm

22     assuming you mean the one that my law firm

23     discovered.  The disc generated thousands --

24     tens of thousands of pages that were

25     produced in this litigation.

```
1              These depositions -- this deposition we
2         are here for today is limited by court order
3         to the disc that I -- that my law firm
4         located and received in February.
5              MR. SCAROLA:  That's the Fowler White
6         disc, isn't it.
7              MR. LINK:  No.  I don't know that it
8         is.
9              MR. SCAROLA:  That's the question that
10        I'm asking.  The question I'm asking relates
11        specifically to the Fowler White disc and
12        whether Mr. Epstein is aware of the entry of
13        an order that required the destruction or
14        purging of all information alleged to be
15        privileged derived from the Fowler White
16        disc.
17             MR. LINK:  By definition we are now
18        limiting that to the disc, which my office
19        started reviewing on February 25th, 2018.
20        If that's your clarification for all the
21        questions, then let me hear the question
22        again.
23             THE WITNESS:  I don't know what derived
24        from a disc with untold amount of
25        information on it means.  Sorry.
```

```
 1    BY MR. SCAROLA:

 2        Q    I mean came from.

 3        A    No.

 4        Q    Data that came from the disc, printouts that

 5    came from the disc, information that came from the disc

 6    that was obtained from Fowler White and acquired,

 7    allegedly, sometime in February 2018 from Fowler White

 8    to Link & Rockenbach.

 9             Do you now understand the question, sir?

10        A    No.  I don't not.

11             MR. LINK:  I don't either.

12             Jack, are you asking him whether he as

13        retained any of the allegedly privilege

14        emails --

15             MR. SCAROLA:  No.  I was asking him

16        whether he's aware of an order --

17             MR. LINK:  Can I please finish, please?

18             Are you asking him -- because the

19        question has changed -- are you asking him

20        has he retained any of the copies or

21        electronic copies of the documents that are

22        the subject of the bankruptcy proceeding

23        that were located by my law firm from a disc

24        that we started reviewing on February 25th,

25        2018?
```

1          I think that's a legitimate question,

2     pursuant to both -- well, pursuant to Judge

3     Hafele's order, not pursuant to the

4     bankruptcy order.

5          But your question hasn't been tailored

6     that way.

7          MR. SCAROLA:  And that's because that's

8     not the question I'm asking.

9  BY MR. SCAROLA:

10    **Q**    I want to know whether you are aware of the

11 entry of an order that restricted your possession of

12 any information that was derived from the disc that

13 Link & Rockenbach obtained from Fowler White in

14 February of 2018.

15    **A**    The word derived -- any conversation that

16 anybody had in any way attached to that information, I

17 cannot answer that question.

18          If you are asking me the question

19 specifically -- you have to be more specific.

20 Derived from -- I don't know what derive means.

21          MR. LINK:  It can encompass our

22     conversations.

23          THE WITNESS:  It can encompass many

24     conversations, and subjects not related to

25     this hearing (sic).

BY MR. SCAROLA:

    **Q**   Are you aware of the entry of a court order that prohibited you from obtaining possession of any documents or electronic data that originated on the specific copy of the disc that had been in Fowler White's files and was turned over in copy form to Link & Rockenbach in February of 2018?

          MR. LINK:  I object to the form.  I don't think there's an order that says that.

          Do you have a court order you are referring to?

          THE WITNESS:  May I see a court order?

BY MR. SCAROLA:

    **Q**   Are you aware of any court order restricting your possession of that information?

    **A**   May I see the court order?

    **Q**   No, sir.  I want to know whether you are aware of any court order that restricted your possession of that information.

    **A**   I don't know what that information you are referring to is.

    **Q**   The information that was contained --

    **A**   Are you going to let me finish?

          MR. LINK:  Let me -- let's take a pause.  I think the problem we're having is

1          that the court order -- there's no court

2          order that says he has to flush his memory.

3                    THE WITNESS:  Excuse me.  Is there a

4          court order?

5                    MR. LINK:  There is no court order that

6          says what Mr. Scarola says.

7                    Mr. Epstein has already answered your

8          question that he received documents and he

9          shredded them when I instructed him of Judge

10         Hafele's oral ruling on March 8th, 2018.

11    BY MR. SCAROLA:

12         Q    What do you know about that March 8th, 2018

13    order?

14                   MR. LINK:  Mr. Scarola -- Mr. Scarola,

15         this is -- no reason to get aggressive and

16         be upset.  If there's an order that you

17         have -- because what you have recited is not

18         accurate.  If you have an order, please show

19         us.

20    BY MR. SCAROLA:

21         Q    Are you aware of an order entered by Judge

22    Hafele in March of 2018 that related to the contents of

23    the disc obtained from Fowler White's files?

24                   MR. LINK:  Mr. Scarola, that is a

25         misrepresentation.  There was no order

```
1          entered.  There was a verbal ruling, which
2          we complied with and filed, I believe, at
3          least two notices of compliance.  So you are
4          misstating what transpired in March of 2018
5          to this witness.
6    BY MR. SCAROLA:
7          Q    Are you aware of any verbal ruling -- whether
8    Mr. Link chooses to characterize as an order or
9    something other than an order -- relating to the
10   retention of documents or data derived from the Fowler
11   White disc that Link & Rockenbach obtained from the
12   files of Fowler White?
13         A    I am going to take -- you will have -- again,
14   if you choose your words more carefully, I would
15   appreciate it.  I don't know what derived from means.
16         Q    Is it derived that you don't understand the
17   meaning of, or from that you don't understand the
18   meaning of?
19         A    Derived from.
20              MR. LINK:  It includes our
21         conversations, Mr. Scarola.  That's the
22         issue.
23              MR. SCAROLA:  Except that the question
24         relates to documents or data.
25
```

1    BY MR. SCAROLA:

2        **Q**    Are you aware of the entry of an order or the

3    issuance of a ruling or the pronouncement of any court

4    that restricted retention of documents or electronic

5    data that was obtained from --

6        **A**    Thank you.

7        **Q**    -- the disc that Link & Rockenbach got from

8    Fowler White's files?

9        **A**    Yes.

10        **Q**    What do you understand that ruling, order or

11    direction to be?

12        **A**    I was to have destroyed my copies I had of

13    those emails.

14        **Q**    Did you have any understanding as to whether

15    that order, direction or ruling related to anything

16    other than hard copies that you had?

17        **A**    Anything -- I believe anything I had.

18        **Q**    And that would include any electronic data

19    that you had, correct?

20        **A**    I believe so.

21        **Q**    Did you make any effort whatsoever to

22    determine whether you had any electronic data that fell

23    within the scope of that ruling?

24        **A**    Yes.

25        **Q**    What did you do?

 1      **A**    I don't remember.

 2      **Q**    Is whatever you did an action that you took

 3   personally or did it involve anyone else's efforts?

 4      **A**    Separate from my attorneys, I don't believe

 5   so.

 6      **Q**    Did you engage your attorneys to attempt to

 7   determine whether there was any electronic data that

 8   you had that fell within the scope of the court's

 9   ruling, direction or order?

10           MR. LINK:  I'm going to instruct you

11       not -- A, I am going to object to the form.

12       And I don't understand the question.  But I

13       am going to object to you discussing --

14       answering any question about what we

15       discussed.

16           MR. SCAROLA:  I haven't asked what you

17       discussed.  I am trying find out whether

18       anything was done to comply with the court's

19       order, which Mr. Epstein has said he

20       understood to include purging electronic

21       data.

22           MR. LINK:  Then ask him --

23           MR. SCAROLA:  If he said --

24           MR. LINK:  Ask him, Did you have any

25       data and you looked and you delete it, and

1          he will answer that question.  Just like he

2          said he shredded the hard copies.

3    BY MR. SCAROLA:

4        **Q**    Did you look for any electronic data?

5        **A**    I don't believe I had any.

6        **Q**    Did you look for any electronic data?

7        **A**    I don't believe I had any.

8        **Q**    Let me try a third time.

9        **A**    Okay.

10       **Q**    Did you look for any electronic data or did

11   you assume, because you didn't think you had any, that

12   there was no need to look?

13       **A**    I don't recall.

14       **Q**    Did you engage the services of anyone else to

15   attempt to determine whether you had any electronic

16   data that you understood you were not supposed to have?

17       **A**    Not to the best of my recollection.

18       **Q**    What devices do you have upon which

19   electronic data could be stored?

20          MR. LINK:  I am going to object to the

21       form and instruct you not to answer the

22       question as framed.

23          MR. SCAROLA:  I have no further

24       questions of Mr. Epstein subject to our

25       ability to re-examine him with regard to all

1       improper objections that have been raised,

2       and with regard to items not produced that

3       fall within the scope of the duces tecum of

4       both notices.

5            MR. LINK:  So you have completed both

6       the circuit court and the bankruptcy

7       deposition?

8            MR. SCAROLA:  That is correct.

9            MR. LINK:  Mr. Cassell, do you have --

10           MR. SCAROLA:  Actually, it is not

11      correct.  I'm telling you they are not

12      completed --

13           MR. LINK:  Subject to your

14      reservations.

15           MR. SCAROLA:  Right.

16           MR. LINK:  I got that.

17           Mr. Cassell, do you have questions for

18      L.M. in the bankruptcy proceeding?

19           MR. CASSELL:  I do.

20           MR. LINK:  Okay.  So I want the record

21      to be clear, Mr. Cassell, that you do not

22      have permission by the circuit court to ask

23      any questions in the circuit court.

24           The bankruptcy court has allowed you to

25      ask questions on behalf of L.M., directed

```
 1        only in the bankruptcy proceeding, and
 2        the -- my question is do you have questions
 3        about the bankruptcy proceeding that have
 4        not been asked by Mr. Scarola?
 5             MR. CASSELL:  I do.
 6             MR. LINK:  Okay.
 7             MR. CASSELL:  And for the record, I
 8        would like to disagree with your assertion
 9        that we have been denied the opportunity to
10        ask questions by the circuit court.
11             It is our position that, by virtue of
12        having intervened in that matter, and in
13        particular with matters connected to those
14        that are being discussed today, we have the
15        right to ask questions.
16             MR. LINK:  There's actually a court
17        order, Mr. Cassell, that gives Bradley
18        Edwards permission to ask questions.  There
19        is no court order giving the intervenors the
20        right to ask questions.
21             So I want to be clear we have closed
22        the circuit court proceeding, because the
23        only party that had permission, pursuant to
24        Judge Hafele's order to ask questions, was
25        Mr. Edwards, and Mr. Scarola -- subject to
```

1    your reservations, Jack -- has finished his

2    deposition of the circuit court.

3        So we are now closing that matter and

4    moving forward on the bankruptcy matter for

5    additional questions by Mr. Cassell on

6    behalf of L.M. and by Mr. Ianno on behalf of

7    Fowler White.

8        MR. SCAROLA:  And it is our position on

9    behalf of Brad Edwards that once an

10   intervention has been granted and permission

11   is given to take discovery in the proceeding

12   to any party, every other party, including

13   intervenors to that proceeding, have a right

14   to participate in the discovery process.

15       MR. LINK:  We will see what Judge

16   Hafele says.

17       Mr. Ianno --

18       MR. IANNO:  Well, I think what we need

19   to do is do the read or waive and then just

20   splice it and start -- not to continue it.

21   We will just close it off entirely and have

22   the videographer start a whole new file and

23   the court reporter start a whole new file.

24       MR. LINK:  So, yes --

25       MR. CASSELL:  Before we do that, I just

1    need to ask two small things for the record.

2    It will take about 30 seconds.

3        First, I join in the statement that

4    Mr. Scarola just made.  And second, I would

5    amplify that it was my understanding that

6    Mr. Epstein understood he could have

7    questions asked of him today through his

8    attorneys -- and, of course, there's no

9    court order permitting that -- just as a

10   defendant in an action is allowed to ask

11   questions during a deposition, such as this

12   one, intervenors are allowed to ask

13   questions, particularly where the subject

14   matter at issues goes directly to the

15   interest of the intervenors, which is the

16   privacy of their own confidential

17   information, which was the subject that I

18   intended to ask questions about.

19       MR. LINK:  I understand.  So we are

20   going to not waive.  We will read, please.

21       And this closes the circuit court

22   proceeding.  We understand your objections,

23   Mr. Cassell, and Mr. Scarola's reservations

24   to go back before Judge Hafele.  And if we

25   are instructed to come back, we will come

1       back.

2            THE VIDEOGRAPHER:  Going off the

3       record.  The time is 11 a.m.  This marks the

4       end of the deposition.

5                           - - -

6            (The deposition was concluded

7            at 11:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OATH

2
    STATE OF FLORIDA      )
3                         : SS
    COUNTY OF PALM BEACH )

4

5          I, the undersigned authority, certify that

6    JEFFREY EPSTEIN personally appeared before me and was

7    duly sworn.

8              WITNESS my hand and official seal this 19th

9    day of October, 2018.

10

11                    _____

12                    Sonja D. Hall

13                    Commission No.: GG 168652

14                    Notary Public - State of Florida

15                    My Commission Expires: 2-01-22

16

17

18

19

20

21

22

23

24

25
```

1              REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE  OF  FLORIDA   )
                         : SS
4   COUNTY OF PALM BEACH )

5          I, SONJA D. HALL, certify that I was

6   authorized to and did stenographically report the

7   deposition of JEFFREY EPSTEIN; that a review of the

8   transcript was requested; and that the transcript is a

9   true and complete record of my stenographic notes.

10         I further certify that on the 19th day of

11  October, 2018, I notified SCOTT J. LINK, ESQUIRE that

12  the deposition of JEFFREY EPSTEIN was ready for

13  reading and signing by the witness.

14         I further certify that I am not a relative,

15  employee, attorney, or counsel of any of the parties,

16  nor am I a relative or employee of any of the parties'

17  attorney or counsel connected with the action, nor am

18  I financially interested in the action.

19         Dated this 19th day of October, 2018.

20

21                    _____

22                    SONJA D. HALL

23

24

25

```
 1   TO:     JEFFREY EPSTEIN
             c/o SCOTT J. LINK, ESQUIRE
 2           LINK & ROCKENBACH, P.A.
             1555 Palm Beach Lakes Boulevard, Suite 301
 3           West Palm Beach, FL 33401


 4
                 RE:  JEFFREY EPSTEIN vs. SCOTT ROTHSTEIN,
 5   INDIVIDUALLY; BRADLEY EDWARDS, INDIVIDUALLY


 6


 7               At the conclusion of your deposition given
     in the above-styled cause you indicated you wished to
 8   read and sign the transcript.

 9               This letter is to advise you that your
     deposition is ready, and we ask that you call our
10   office at (561) 471-2995 at your earliest convenience
     for an appointment to come in.
11
                 If you are a party in this action and your
12   attorney has ordered a copy of this transcript, you
     may wish to read his copy and forward to us a
13   photostatic copy of your signed correction sheet.

14               It is necessary that you do this as soon as
     possible, since the transcript cannot be held beyond
15   two weeks from the date of this letter.

16               If you have any reason which you would like
     for me to place on your deposition as to your failure
17   to sign the same, please advise.

18               Thank you for your prompt attention.

19                       Very truly yours,
                         PALM BEACH REPORTING SERVICE, INC.
20                       1665 Palm Beach Lakes Blvd.,
                         Suite 1001
21                       West Palm Beach, Florida  33401

22
                         BY:  SONJA D. HALL
23


24   Date:  October 19th, 2018

25
```

86

1

CORRECTION SHEET:

2

NAME:  JEFFREY EPSTEIN

3          RE:  JEFFREY EPSTEIN vs. SCOTT ROTHSTEIN,
INDIVIDUALLY; BRADLEY EDWARDS, INDIVIDUALLY

4

5          The following corrections, additions or
deletions were noted on the transcript of the

6   testimony which I gave in the above-captioned matter
held on October 13th, 2018:

7

PAGE(S)     LINE(S)    SHOULD READ

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                   SIGNATURE: _____

24                        DATE: _____

25

# EXHIBIT B

# SECOND EPSTEIN DEPOSITION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE

Case No. 09-34791-RBR

Chapter 11


IN RE:

ROTHSTEIN ROSENFELDT ADLER, P.A.,


Debtor
_____/




VIDEOTAPED DEPOSITION

OF

JEFFREY EPSTEIN






Saturday, October 13th, 2018
11:05 a.m. - 12:10 p.m.
1555 Palm Beach Lakes Boulevard, #930
West Palm Beach, Florida 33401

```
1            Examination of the witness taken before

2                     Sonja D. Hall
              Palm Beach Reporting Service, Inc.
3       1665 Palm Beach Lakes Boulevard, Suite 1001
                 West Palm Beach, FL 33401
4                     (561) 471-2995

5   APPEARANCES:

6      For Jeffrey Epstein:

7          LINK & ROCKENBACH, P.A.
           1555 Palm Beach Lakes Boulevard, Suite 301
8          West Palm Beach, FL 33401
           By SCOTT J. LINK, ESQUIRE
9          By KARA BERARD ROCKENBACH, ESQUIRE

10     For Jeffrey Epstein:

11         ATTERBURY, GOLDBERGER & WEISS, P.A.
           250 Australian Ave. South, Suite 1400
12         West Palm Beach, FL 33401
           By JACK A. GOLDBERGER, ESQUIRE

13

14     For Bradley Edwards:

15         SEARCY, DENNEY, SCAROLA, BARNHART &
           SHIPLEY, P.A.
16         2139 Palm Beach Lakes Boulevard
           West Palm Beach, FL 33409
17         By JACK SCAROLA, ESQUIRE

18
           EDWARDS POTTINGER LLC
19         425 N Andrews Avenue, Suite 2
           Fort Lauderdale, FL 33301
20         By Bradley Edwards, Esquire (Telephonically)

21      For Fowler White:

22         CARLTON FIELDS, PA
           525 Okeechobee Boulevard, Suite 1200
23         West Palm Beach, FL 33401
           By JOSEPH IANNO, JR, ESQUIRE
24

25
```

```
 1        For L.M., E.W. and Jane Doe:

 2            S.J. QUINNEY COLLEGE OF LAW
             at the UNIVERSITY OF UTAH
 3            332 S. University Street
             Salt Lake City, UT 84112
 4            By PAUL G. CASSELL, ESQUIRE (Telephonically)

 5                        ALSO PRESENT

 6            Above & Beyond Reprographics
             2161 Palm Beach Lakes Boulevard, Suite 412
 7            West Palm Beach, FL 33409
             By Manuel Santiago, Videographer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              I N D E X

2

3    Videotaped Deposition of JEFFREY EPSTEIN        Page No.

4

5    Direct Examination by Mr. Cassell                   7

6    Cross-Examination by Mr. Ianno                     34

7    Redirect Examination Mr. Cassell                   39

8    Cross-Examination by Mr. Scarola                   57

9    Certificate of Oath                                62

10   Certificate of Reporter                            63

11   Read & Sign Letter to Witness                      64

12

13                   EXHIBIT INDEX

14

15   No.      Description                        Page No

16   1        Jeffrey Epstein's Sworn Declaration       13

17   5        Bankruptcy Court Order                    34

18

19           (Exhibits 2-4 are incorporated in the

20           prior deposition, as agreed by Counsel.)

21

22

23

24

25

```
 1              THE VIDEOGRAPHER:  We are on the video
 2      record.  This is the 13th day of October 2018.
 3      The time is approximately 11:05 a.m.
 4              This is the videotaped deposition of
 5      Jeffrey Epstein, In Re: Rothstein Rosenfeldt
 6      Adler, P.A.
 7              This deposition is being held at 1555
 8      Palm Beach Lakes Boulevard, West Palm Beach,
 9      Florida 33401.
10              My name is Manuel Santiago.  I am the
11      videographer representing Above & Beyond
12      Reprographics.
13              Will the attorneys please announce
14      their appearances for the record?
15              MR. SCAROLA:  Jack Scarola appearing on
16      behalf of Bradley Edwards.
17              MR. LINK:  Scott Link and Kara Rockenbach
18      on behalf of Jeffrey Epstein.
19              MR. IANNO:  Joseph Ianno, Carlton Fields
20      on behalf of Fowler White.
21              MR. GOLDBERGER:  And Jack Goldberger on
22      behalf of Mr. Epstein.
23              MR. CASSELL:  Paul Cassell, an attorney in
24      Utah on behalf of L.M., E.W. and Jane Doe.
25
```

```
 1    THEREUPON,

 2                        JEFFREY EPSTEIN,

 3           being a witness in the notice heretofore

 4    filed, and being first duly sworn in the above cause,

 5    testified on his oath as follows:

 6           THE WITNESS:  Yes.

 7           MR. SCAROLA:  For the record, we have

 8       agreed by stipulation to incorporate the just

 9       concluded -- subject to rulings on

10       objections -- deposition of Mr. Epstein in the

11       circuit court case as part of the record in

12       this deposition being take in the bankruptcy

13       proceeding.  And I have no further questions in

14       light of that incorporation.

15           MR. IANNO:  I guess I should have asked,

16       because I'm not a party -- Fowler White is not

17       a party in the state court proceedings.  Does

18       everybody agree that Fowler White can obtain a

19       copy of the state court deposition, which

20       typically doesn't always happen?

21           Is that acceptable to everyone?

22           MR. SCAROLA:  Yes.

23           MR. LINK:  Yes.  Since it relates to both

24       proceedings, yes, sir.  No objection.

25           MR. SCAROLA:  So with that, I believe
```

1          Mr. Cassell has questions for Mr. Epstein.

2               MR. LINK:  Mr. Cassell, before you start,

3          I noticed you notice your appearance on behalf

4          of three intervenors.  The bankruptcy court's

5          last ruling is that only intervenor L.M. has

6          standing to ask questions at this deposition.

7               So to the extent you seek to ask

8          separate questions for the other two

9          intervenors, the court order does not

10         provide that.

11              MR. CASSELL:  We can address that issue,

12         should it arise.  I'm not anticipating that

13         that problem will arise.

14              MR. LINK:  Very good.  Thank you, sir.

15                    DIRECT EXAMINATION

16    BY MR. CASSELL:

17         **Q**   Good morning, Mr. Epstein.  I represent a

18    victim of sexual assault that I will refer to as L.M.

19              Do you know L.M.?

20              MR. GOLDBERGER:  On behalf of Mr. Epstein,

21         Mr. Cassell, he's going to invoke his Fifth

22         Amendment privileges.

23              Do you want him to recite that or would

24         you accept my representation?

25              MR. CASSELL:  I would prefer that he

8

1          recites that.

2               THE WITNESS:  On the advice of Counsel, I

3          will assert the Fifth.

4     BY MR. CASSELL:

5          **Q**   It will speed things up if you would just say

6     the Fifth or something like that.  I think we can all

7     understand what you're doing, if that's acceptable to

8     everyone.

9               MR. GOLDBERGER:  That's fine.  Thank you.

10    BY MR. CASSELL:

11         **Q**   Do you have any bias against L.M., sir?

12              MR. LINK:  I'm going to instruct you not

13         to answer that question.  It exceeds the scope

14         of the permitted deposition by Judge Ray.

15              MR. CASSELL:  Can I have some

16         clarification, Mr. Link?  I understood I was

17         entitled to ask questions going to L.M.'s

18         interest in this case.  And as I pursue that, I

19         was trying to see if Mr. Epstein would have any

20         reason to provide slanted testimony in

21         connection with those subjects.

22              MR. LINK:  Yes, sir.  The court said, I am

23         going to allow the deposition of Epstein as to

24         knowledge about the disc or possession about

25         the disc, very limited.

1        So those are the questions in the
2    bankruptcy proceeding that I am going to
3    allow him to answer pursuant to Judge Ray's
4    order.
5        MR. SCAROLA:  And it is Brad Edwards'
6    position that issues concerning bias and
7    prejudice are always appropriate with respect
8    to any deponent under any circumstances, absent
9    some specific prohibition by the court with
10   regard to those subject matters.
11       MR. LINK:  Well, you have finished on
12   behalf Mr. Edwards.  Are you now assisting
13   Mr. Cassell and L.M. as their counsel?
14       MR. SCAROLA:  Oh, no.
15       MR. LINK:  You have already said you were
16   done, Mr. Scarola.
17       MR. SCAROLA:  Yes, I have asked all the
18   questions that I had, but I have every right to
19   state the position of Bradley Edwards with
20   regard to any issue that arises during the
21   course of this deposition.  And bias and
22   prejudice of the witness is clearly an
23   appropriate area of inquiry.
24       MR. LINK:  I'm going to, again, instruct
25   him not to answer based on Judge Ray's very

1     specific limited order of what he will allow

2     Mr. Epstein to answer.

3  BY MR. CASSELL:

4     **Q**   Mr. Epstein, do you have any prejudice

5  against L.M.?

6          MR. LINK:  Mr. Cassell, again, I am

7     instructing Mr. Epstein not to answer that

8     question.

9          None of these questions have anything

10     to do with whether he had knowledge of the

11     existence of the specific disc that we are

12     talking about, and I am instructing

13     Mr. Epstein not to answer.

14  BY MR. CASSELL:

15     **Q**   Mr. Epstein, would you have any reason to

16  deny having knowledge about a disc that contains

17  information about L.M.?

18          MR. LINK:  Give me a minute.  My head is

19     twisted over the question.

20          Would you rephrase it for me,

21     Mr. Cassell, please?

22          MR. CASSELL:  Why don't we just have the

23     court reporter read it back.

24          (Thereupon, the requested portion of the

25          record was read back by the reporter as

```
 1              above duly recorded.)
 2              MR. LINK:  I am going to instruct you not
 3         to answer the question.  I don't understand it.
 4         I believe it exceeds the scope of this
 5         deposition as set by Judge Ray.
 6              MR. CASSELL:  What part of the question
 7         don't you understand, Mr. Link?
 8              MR. LINK:  Because I don't understand it
 9         at all.  It's as though you're asking him does
10         he have a reason to lie about not knowing that
11         Fowler White had a disc in a box -- whatever
12         that disc is -- for a period of eight years.
13         That just doesn't make any sense to me.  I
14         don't understand it.
15    BY MR. CASSELL:
16         Q    Mr. Epstein, you can answer if you understand
17    it.
18              MR. LINK:  He can't, because I have
19         instructed him not to.
20    BY MR. CASSELL:
21         Q    Mr. Epstein, do you have any knowledge --
22    actually, let's go in this direction.
23              MR. CASSELL:  And perhaps Mr. Scarola
24         could assist me and place in front of the
25         witness the declaration of Mr. Epstein filed in
```

1    the bankruptcy action.

2         MR. LINK:  It's Exhibit 1 to this

3    deposition transcript.

4         So that the record is clear, it was

5    Exhibit 1 to the combined deposition.  It is

6    now going to be marked separately as

7    Exhibit 1 to the bankruptcy deposition so

8    that it is part of the bankruptcy

9    proceeding.

10        MR. SCAROLA:  The circuit court deposition

11   has been incorporated in the bankruptcy

12   deposition.  Do we really need to mark the

13   document twice?

14        MR. LINK:  I think it's safer to do it.

15        MR. GOLDBERGER:  If we have another copy,

16   why don't we just do it.  Do we have another

17   copy?

18        MR. LINK:  No, no.  I don't think we need

19   another copy.  I just wanted the record to

20   reflect -- since we have a new transcript -- it

21   was marked, but it will be an exhibit to this

22   transcript.

23        MR. SCAROLA:  The old transcript is part

24   of the new transcript.

25        MR. IANNO:  But I don't know if it's going

13

```
 1          to be incorporated in toto.
 2               It's one page.  Let's -- we all agree
 3          that the court reporter can attach Exhibit 1
 4          to both transcripts.  That's simple.
 5               MR. SCAROLA:  Fine.  So it will be
 6          attached twice?
 7               MR. IANNO:  Yes.  If it was 100 pages,
 8          yes, it may be a problem.  Butt it's one page.
 9               MR. GOLDBERGER:  Mr. Epstein has the
10          document, Mr. Cassell.
11               (Exhibit Number 1 was marked for
12                identification.)
13     BY MR. CASSELL:
14          Q    Do you see paragraph four of that sworn
15     declaration of facts?
16          A    Yes.
17          Q    And do you see a reference there to a disc,
18     quote, CD, in that paragraph?
19          A    Yes.
20          Q    Would you have any reason to deny knowledge
21     about that CD?
22               MR. LINK:  Object to the form.  And I'm
23          going to instruct him not to answer.
24               MR. CASSELL:  On what basis?
25               MR. LINK:  The question is not consistent
```

1    with what Judge Ray, in his ruling, where he

2    says very limited to asking him about his

3    knowledge.

4         You want to ask him if he knew about

5    it, you can ask him that.

6  BY MR. CASSELL:

7    **Q**    Do you have any knowledge of the CD

8  referenced in paragraph four?

9    **A**    Yes.

10   **Q**    Do you have any knowledge about information

11 related to L.M. on that CD?

12        MR. GOLDBERGER:  I'm going to instruct

13   Mr. Epstein to invoke his Fifth Amendment

14   privileges as to that question, Mr. Cassell.

15        Jeffrey, just say Fifth.

16        THE WITNESS:  Fifth.

17 BY MR. CASSELL:

18   **Q**    When did you first learn about information

19 regarding L.M. on that CD?

20   **A**    Sorry.  The question again.

21   **Q**    When did you first learn about information

22 about L.M. on that CD?

23   **A**    In February.

24   **Q**    What information did you learn about L.M. in

25 February?

1          MR. SCAROLA:  Excuse me.  Hold on just one

2      second.

3          THE WITNESS:  I'm answering the question.

4          MR. SCAROLA:  No, you're not answering the

5      question until I state my position on the

6      record.

7          It is our position that any disclosure

8      on this record of privileged information is

9      improper.  And on behalf of Bradley Edwards,

10     we object to any such disclosure on the

11     record.

12         MR. CASSELL:  I'm going to withdraw the

13     question, which will obviate Mr. Scarola's

14     concern.

15         MR. LINK:  Okay.  Do you have any other

16     questions, Mr. Cassell.

17         MR. CASSELL:  Yes, I do.

18 BY MR. CASSELL:

19     **Q**   Do you see paragraph six in the affidavit

20 before you?

21     **A**   Yes.

22     **Q**   And it says, quote, I have never seen the CD

23 nor received a copy of it, close quote.  Is that

24 correct?

25     **A**   That's correct.

1      **Q**    Does that sentence contain all of the

2   information relevant to the CD?

3              MR. LINK:  Object to the form.

4              THE WITNESS:  I don't understand the

5        question.

6   BY MR. CASSELL:

7      **Q**    Well, it says, "I have never seen the CD."

8              Had you seen information that was

9   contained on the CD when you wrote this affidavit?

10     **A**    I said I have never seen the CD.

11     **Q**    Have you seen information from the CD?

12     **A**    Yes.

13     **Q**    And that was not disclosed in your affidavit,

14  was it?

15     **A**    No.

16     **Q**    Why didn't you inform Judge Ray that you had

17  the information from the CD in other ways?

18             MR. LINK:  So, I'm going to -- maybe I

19        want you to answer that question.

20             Judge Ray's order --

21             Do you want to talk to Mr. Cassell

22        privately?

23             MR. SCAROLA:  No.

24             MR. LINK:  Judge Ray's order -- Judge

25        Ray's order is limited to whether Mr. Epstein

1    had or was aware of the CD, which is a defined

2    term in paragraph four of the submission

3    before -- at any time before receiving it from

4    my law firm.

5        So this submission is specific to Judge

6    Ray's inquiry.

7        Now, if you want to ask him questions

8    about what he saw on that CD -- is that what

9    you intend to do, Mr. Cassell?

10       MR. CASSELL:  I intend to ask the question

11   I just asked.

12       MR. LINK:  Well, then I am going to

13   instruct him not to answer the question,

14   because, A, it's nonsensical.  And, B, it is

15   beyond the scope of Judge Ray's order.

16       MR. CASSELL:  You're saying that the only

17   thing we're permitted to ask about is the CD

18   and not information on the CD?

19       MR. LINK:  If you want to ask him if he

20   saw the information that's contained on the CD

21   that is the subject of the bankruptcy

22   proceeding before receiving it from me, I won't

23   object to that.

24       Judge Ray used the word disc.  And when

25   Counsel said we want to talk about the

1    information, Judge Ray said no.  But if you

2    have a specific question about -- for

3    example, the documents that Mr. Epstein said

4    he received from Mr. Indyke, whether he

5    received those before February 2018, I won't

6    object to that question.

7         MR. CASSELL:  And just for the record, the

8    previously propounded question, which I think

9    was proper, you're instructing him not to

10   answer that question?

11        MR. LINK:  Yes, sir.

12        MR. CASSELL:  Right?

13        MR. LINK:  Yes, sir.  Hopefully I have

14   given you guidance on a question I don't think

15   is permissible, but I would let you answer it

16   based on what you said -- I would let

17   Mr. Epstein, rather.

18        MR. CASSELL:  And so the record is clear,

19   we disagree with your limited instruction.  We

20   think, obviously, information related to this

21   CD is within the scope of Judge Ray's order.

22        MR. LINK:  I understand that.

23        Mr. Cassell, so you know, the

24   information that's contained on that CD,

25   27,000 pages, tens of thousands of pages

1     have been produced over the last 10 years,

2     including material that at one time and

3     still remains on the defective privileged

4     log.

5          But Judge Ray has made it clear that

6     the issue in front of him is -- from

7     Mr. Epstein's standpoint is really simple.

8     It's on page 36.  And it says, "I am going

9     to allow the deposition of Epstein as to

10    knowledge about the disc or possession about

11    the disc.  Very limited."

12         Then I will draw your attention to page

13    45 where Mr. Scarola said, "We want to be

14    able to litigate before Your Honor a

15    violation of this court's order and

16    retention of documents obtained from the

17    disc."  And the court said, "I disagree with

18    you."

19         So the court has made it abundantly

20    clear that its focus is on whether

21    Mr. Epstein knew Fowler White had a disc,

22    whatever that disc may be, before

23    communications with me.

24         MR. SCAROLA:  And I will state for the

25    record that you are reading from a transcript

1          that does not conform with the subsequently

2          entered order by Judge Ray.

3                  MR. LINK:  You may argue that to him.

4                  MR. CASSELL:  That was going to be my

5          point as well.

6                  MR. LINK:  Go ahead with your question,

7          Mr. Cassell.

8     BY MR. LINK:

9          **Q**    When did you see information on the CD that

10    is the subject of the bankruptcy proceeding?

11         **A**    After February.

12         **Q**    Would you have any reason to lie about

13    stating that you only saw the information after

14    February?

15                 MR. LINK:  Again, I am going to instruct

16         him not to answer that question.

17    BY MR. CASSELL:

18         **Q**    When did you first become aware of your

19    attorneys' possession of a disc containing information

20    about L.M.?

21                 MR. LINK:  So, when you say your attorney,

22         are you referring to Link & Rockenbach?

23                 MR. CASSELL:  I said attorneys plural.

24         Any attorney.

25                 THE WITNESS:  After February.

1   BY MR. CASSELL:

2       **Q**    Would you have any reason to lie in stating

3   that you first learned about this after February?

4           MR. LINK:  I'm going to instruct you,

5       Mr. Epstein, not to answer the question.

6   BY MR. CASSELL:

7       **Q**    Have you distributed any information about

8   L.M. after February?

9           MR. LINK:  Object to the form.

10          Mr. Cassell, are you limiting your

11      question to the information provided by my

12      law firm and Mr. Indyke that came from the

13      CD as defined in Exhibit 1?

14          MR. CASSELL:  Yes.

15          THE WITNESS:  Sorry.  Could you repeat the

16      question?

17          MR. LINK:  He's going to repeat it, but --

18      go ahead, then I will make my objection.

19  BY MR. CASSELL:

20      **Q**    Have you distributed any information about

21  L.M. after February?

22      **A**    I don't know what you mean by distributed any

23  information.  Sorry.

24      **Q**    Have you distributed any information as just

25  described by Mr. Link after February regarding L.M.?

```
 1            MR. LINK:  So, I am going to object that
 2        it's redundant of Mr. Scarola's questions.  And
 3        if you are now asking specific as to L.M., did
 4        you -- Mr. Epstein, did you disclose or share
 5        emails about L.M. with anyone other than your
 6        attorneys, you can answer that question.
 7            THE WITNESS:  No.
 8    BY MR. CASSELL:
 9        Q    In answering no a moment ago, do you have any
10    reason to lie?
11            MR. LINK:  I am going to instruct him not
12        to answer.
13    BY MR. CASSELL:
14        Q    Do you have any reason to answer no that
15    would be relevant to the court in evaluating the
16    truthfulness of your testimony?
17            MR. LINK:  I am going to instruct him not
18        to answer.
19    BY MR. CASSELL:
20        Q    Do you have any reason to be biased in
21    answering with the word no?
22            MR. LINK:  I am going to instruct him not
23        to answer.
24    BY MR. CASSELL:
25        Q    Do you have any prejudice against my client
```

23

1  that would lead you to say no when in fact the answer

2  is yes?

3        MR. LINK:  I am going to instruct you not

4      to answer.

5  BY MR. CASSELL:

6      **Q**   Isn't it true, sir, that the answer to the

7  previous question should have been yes?

8      **A**   I don't understand the question.

9      **Q**   Isn't it true, sir, that after February, you

10  distributed information about L.M. that you got from

11  the CD?

12      **A**   Could you specifically tell me what

13  information you are referring to?

14      **Q**   Any information.

15        MR. LINK:  Unrelated to the emails from

16      the CD that we are talking about, Mr. Cassell?

17        MR. CASSELL:  No.  Related to any

18      information on the CD.

19        MR. LINK:  To someone other than his

20      attorneys?

21        MR. CASSELL:  Correct.

22        MR. LINK:  He's been asked that question

23      twice and he has answered it.

24        THE WITNESS:  No.

25        MR. LINK:  The answer is no.

24

```
1              MR. CASSELL:  And it's -- your position,
2         Mr. Link, is I cannot explore reasons why that
3         might be a false answer?
4              MR. LINK:  Well, that's different than
5         saying, Are you a liar, which is the only
6         question you have asked.
7    BY MR. CASSELL:
8         Q    Is there any reason why that might be a false
9    answer, Mr. Epstein?
10             MR. LINK:  Again, I am going to instruct
11        him not to answer.
12             MR. CASSELL:  On what basis?
13             MR. LINK:  I just told you.  All you're
14        doing is calling him a liar.  You're not asking
15        questions that would show that what he has said
16        is untrue.
17             So I would allow you to test the
18        veracity of what he said.  I'm not going to
19        let you say, Are you a liar.
20   BY MR. CASSELL:
21        Q    Is there any reason why your veracity might
22   be called into question with the previous answer,
23   Mr. Epstein?
24             MR. LINK:  I'm going to instruct him not
25        to answer.  By the word veracity, I meant
```

```
 1         asking real questions, rather than just
 2         accusing him of being a liar.
 3    BY MR. CASSELL:
 4         Q    Would you have any reason to slant your
 5    testimony that you've just given, Mr. Epstein?
 6              MR. LINK:  I'm going to instruct him not
 7         to answer.
 8              Slant.  Another word for liar.
 9              Mr. Cassell, if all of your questions
10         are going to be are you a liar, then you can
11         just say that, and I will instruct him not
12         to answer and you don't have to go through
13         every one of them.
14              MR. CASSELL:  I don't think you've
15         accurately characterized any of my questions.
16         Why don't you just make your record to each
17         question and we will move forward from there.
18              MR. LINK:  Okay.
19    BY MR. CASSELL:
20         Q    Mr. Epstein, do you have any documents
21    connected with this CD?
22         A    I don't know what you mean by connected with.
23         Q    Do you have any documents that refer to the
24    CD?
25              MR. LINK:  So, Mr. Cassell, I apologize.
```

1      I hate to interrupt.  It's definitional.

2          As I have explained, this CD --

3      whatever this CD is -- is the source of

4      27,000 pages, tens of thousands of which

5      have been produced in the course of the last

6      10 years.  Many of them have been marked at

7      depositions, including some that are on a

8      privilege log.  Some have been included in

9      affidavits.  Some have been filed with the

10     court.

11         So the scope of the deposition

12     permitted by Judge Ray relates to

13     Mr. Epstein's knowledge that a CD, as

14     defined in our submission, was held by

15     Fowler White.  That's what he has allowed

16     you to ask Mr. Epstein about.  Period.

17         MR. IANNO:  And on behalf of Fowler White

18     I join.

19         MR. CASSELL:  My question was a simple

20     one.  I asked him -- Mr. Epstein -- whether he

21     had any documents related to the CD.  I don't

22     know that I got an answer to that question.

23         MR. IANNO:  Mr. Cassell, this is Joe

24     Ianno.  You don't have a time period.  The

25     documents, as Mr. Link has said, could have

```
 1          come from 10 years and other sources.
 2               If you're going to ask him if he has
 3          any documents as a result of Link &
 4          Rockenbach's CD -- the CD from February of
 5          2018, ask him that.  But don't be generic
 6          and ask him if he just has documents
 7          whatsoever without any reference to a
 8          specific time period.
 9               MR. CASSELL:  Why not?
10               MR. LINK:  Because it's not within the
11          scope of the permitted bankruptcy deposition.
12          This is not a discovery deposition.
13               MR. IANNO:  This is not a generic
14          deposition where we're going into the merits of
15          the case or anything.
16               This is a deposition that's limited to
17          the contempt proceedings that relate to the
18          discovery of this alleged disc.
19               Ask him those questions.  But not
20          something from 10 years ago.
21     BY MR. CASSELL:
22          Q    On or after February 1st, 2018, do you have
23     any documents connected to the CD?
24          A    I don't know what you mean by connected to.
25               Are asking me if I kept any copies of the
```

1   emails that reference your client?

2        **Q**    No.  I am asking you whether you have any

3   documents connected to the CD.

4             MR. LINK:  Mr. Cassell, I am just going to

5        object and instruct him not to answer the

6        question.

7   BY MR. CASSELL:

8        **Q**    Mr. Epstein, on or after February 1st, 2018,

9   do you have any documents related to the CD?

10            MR. LINK:  Again, I'm going to object to

11       the form.  I don't know how he can answer that

12       question.  I believe it exceeds what the

13       bankruptcy court has permitted.

14            The bankruptcy court was very clear

15       that what has happened post my receipt of

16       the CD is not an issue for the bankruptcy

17       court, so I am going to instruct you not to

18       answer, Mr. Epstein.

19   BY MR. CASSELL:

20       **Q**    Mr. Epstein, on or after February 1st, 2018,

21   do you have any documents connected to L.M. that came

22   from the CD?

23            MR. LINK:  I have got the same objection

24       and the same instruction.

25

1    BY MR. LINK:

2        **Q**    Mr. Epstein, on or after February 1st, 2018,

3    do you have any documents related to L.M. and related

4    to the CD?

5            MR. LINK:  Same objection and same

6        instruction.

7            Mr. Cassell, I promise you, I'm not

8        trying to be an obstructionist here.  If you

9        would tailor the question to the bankruptcy

10        proceeding, I will let him answer.

11    BY MR. CASSELL:

12        **Q**    Mr. Epstein, on or after February 1st, 2018,

13    do you have any documents related to the bankruptcy

14    proceeding that are connected to L.M.?

15            MR. LINK:  Mr. Cassell, can I ask you a

16        question?  Why are you picking February 1st

17        just for an example?  Because the disc was

18        first reviewed by my office on February 25th.

19        I didn't know if it was intentional.

20            MR. CASSELL:  It is intentional.

21            MR. LINK:  Okay.  Then I'm going to

22        instruct him not to answer pursuant to Judge

23        Ray's bankruptcy ruling.

24    BY MR. CASSELL:

25        **Q**    Mr. Epstein, on or after February 23rd, 2018,

1    do you have any document connected to L.M. from the CD?

2        MR. LINK:  Same objection and instruction,

3        Mr. Epstein.

4    BY MR. CASSELL:

5        **Q**    Mr. Epstein, on or after February 23rd, 2018,

6    do you have any documents related to L.M. that are

7    related to the CD?

8        MR. LINK:  Same objection.  Same

9        instruction.

10   BY MR. CASSELL:

11       **Q**    Mr. Epstein, on or after February 23rd, 2018,

12   do you have any documents related to the bankruptcy

13   proceeding that relate to L.M.?

14       MR. LINK:  Same objection.  Same

15       instruction.

16   BY MR. CASSELL:

17       **Q**    Mr. Epstein, have you ever had a conversation

18   with Lilly Ann Sanchez related to the CD?

19       MR. IANNO:  What time frame?

20       MR. CASSELL:  Anytime.

21       MR. IANNO:  Then I'm going to instruct him

22       not to answer because Ms. Sanchez was his

23       counsel and based on attorney-client privilege.

24   BY MR. CASSELL:

25       **Q**    Mr. Epstein, without going into the substance

1   of any conversation you may have had with Lilly Ann

2   Sanchez, did you have a conversation with Lilly Ann

3   Sanchez about the CD?

4           MR. IANNO:  Same instruction.  You can ask

5       him if he had a conversation, but you can't ask

6       him if he had a conversation with his attorney

7       about a specific subject matter, because that

8       reveals the subject matter of the privilege.

9           So you can ask him if he ever talked to

10      Lilly Ann Sanchez, but not about what.

11          MR. CASSELL:  So you are instructing him

12      not to answer that question?

13          MR. IANNO:  It's attorney-client

14      privilege.  Ms. Sanchez was an attorney with

15      Fowler White.

16  BY MR. CASSELL:

17      **Q**   Mr. Epstein, have you looked for any

18  electronic data related to L.M. on or after

19  February 1st, 2018?

20          MR. LINK:  I am going to object to the

21      form and instruct you not to answer.

22  BY MR. CASSELL:

23      **Q**   Mr. Epstein, do you have the document I think

24  that's been marked as Exhibit 1 in front of you?

25      **A**   Yes.

1      **Q**    Do you see paragraph four in that document?

2      **A**    You have asked me that question before.  Yes.

3      **Q**    And in that paragraph four, it indicates that

4  Scott Link informed you that he had located a CD.

5             MR. LINK:  Yes, sir, that's what it says.

6  BY MR. CASSELL:

7      **Q**    Did he tell you anything about L.M. when he

8  informed you he had located the disc?

9             MR. LINK:  I am going to instruct him not

10        to answer based on both attorney-client

11        privilege, work product, and it exceeds the

12        scope of Judge Ray's order.

13  BY MR. CASSELL:

14     **Q**    In February 2018, what did Mr. Link inform

15  you of?

16             MR. LINK:  You know Mr. Scarola asked

17        these and I made the same objection.  And the

18        objection is both attorney-client, work product

19        and exceeds the scope of Judge Ray's order.

20  BY MR. CASSELL:

21     **Q**    What does paragraph four mean, Mr. Epstein?

22     **A**    It says Scott Link informed me that he had

23  located a disc in Fowler White's files labeled "Epstein

24  Bate Stamp" -- quote, Epstein Bate Stamp.

25     **Q**    Please tell me all that he informed you of.

```
 1            MR. LINK:  Mr. Cassell, I'm going to
 2        instruct him not to answer based on
 3        attorney-client privilege, work product,
 4        exceeds the scope of Judge Ray's rulings.
 5    BY MR. CASSELL:
 6        Q    It is true, sir, that Mr. Link told you
 7    information about L.M. at that time, correct?
 8            MR. LINK:  Again, I am going to instruct
 9        him not to answer for all the reasons I have
10        articulated a dozen times or more.
11            MR. CASSELL:  And I take it we agree that
12        today's deposition is limited to liability, not
13        to damage issues; is that correct?
14            MR. LINK:  Yes, sir.
15            MR. CASSELL:  Because I would have
16        additional questions on damage issue.  But
17        since that's not covered, I didn't want there
18        to be some argument that I have waived the
19        opportunity to ask damage questions.
20            MR. LINK:  I will not assert that.  We are
21        in agreement.
22            MR. CASSELL:  I believe -- unless
23        Mr. Scarola has any follow-up that my questions
24        may have caused him to want to ask -- I believe
25        I am done with my questions.
```

34

1        MR. LINK:  Okay.  Maybe it's now

2    Mr. Ianno's turn.

3        MR. IANNO:  What number exhibit are we

4    going to go with?  We are going to go with

5    five?

6        May I have this marked as Exhibit 5,

7    then.

8        (Exhibit Number 5 was marked for

9        identification.)

10              CROSS-EXAMINATION

11   BY MR. IANNO:

12   **Q**   Mr. Epstein, after you finish reviewing that

13   document marked Exhibit 5, just let me know.

14       MR. IANNO:  Mr. Cassell, just so you

15   know -- I apologize -- Exhibit 5 is the

16   November 30, 2010 bankruptcy court order.

17       MR. CASSELL:  Thank you.

18   BY MR. IANNO:

19   **Q**   I want to refer you back to number one and

20   this infamous paragraph four that was discussed now for

21   a little bit.

22       Do you know where the CD originated that's

23   referenced in paragraph four of Exhibit 1?

24   **A**   No, I do not.

25   **Q**   Do you know how it came into Fowler White's

35

1    possession?

2        **A**    No, I do not.

3        **Q**    When you stated in paragraph four that the

4    Fowler White's file labeled quote, Epstein Bate Stamp,

5    close quote, what is labeled Epstein Bate Stamp?  The

6    file or the CD?

7        **A**    I believe the CD, but I'm not sure.

8        **Q**    Now, let me turn to Exhibit 5, which is a

9    bankruptcy court order from November of 2010.

10       **A**    Yes, sir.

11       **Q**    Are you aware of this order?

12       **A**    I have just read it.

13       **Q**    Have you seen it before today's deposition?

14       **A**    I don't recall.

15       **Q**    Did you know of the existence of this order?

16       **A**    I don't recall.

17       **Q**    Let me turn your attention to page two, the

18   third line that begins with Fowler White.

19       **A**    Okay.

20       **Q**    Let's take this phrase by phrase.  It states,

21   "Fowler White will not retain any copies of the

22   documents contained on the discs provided to it."

23            And that was discs, plural, correct?

24       **A**    Correct.

25       **Q**    Do you know what discs are referred to there?

1      **A**    No.

2      **Q**    Do you know if the discs referred to in

3  Exhibit 5 are the same discs or disc in Exhibit 1?

4      **A**    No, sir.

5      **Q**    Do you know if the disc referred to in

6  Exhibit 5 is a disc that Link found in Fowler White's

7  files -- Link & Rockenbach found -- I'm sorry -- in the

8  Fowler White's files?

9      **A**    Could you repeat the question?

10      **Q**    Sure.

11          Do you know if the discs referred to in

12  Exhibit 5 is the same discs or disc that Link &

13  Rockenbach found in Fowler White's files in

14  February 2018?

15      **A**    I do not.

16      **Q**    The order on Exhibit 5 goes on to state --

17  the next phrase -- Nor shall any images or copies of

18  said documents be retained in the memory of Fowler

19  White's computers (sic).

20      **A**    Copiers.

21      **Q**    Copiers.  Sorry.  You're correct.  Thank you

22  for correcting me.

23          Do you know if there were any images or

24  copies of documents retained in the memory of Fowler

25  White's copiers?

1     **A**    I do not.

2     **Q**    Do you know if the documents contained on the

3  disc that is the subject of Exhibit 1 in your

4  declaration are the same documents from discs referred

5  to in Exhibit 5?

6     **A**    I do not.

7     **Q**    The next sentence goes on to state, "Should

8  it be determined that Fowler White or Epstein retained

9  images or copies of the subject documents on its

10  computer or otherwise --"

11        Do you have any knowledge of whether or

12  not Fowler White retained images of copies of the

13  subject documents on a computer or otherwise?

14     **A**    I do not.

15     **Q**    Between November 2010 and February of 2018,

16  did you have any knowledge as to whether or not a disc

17  that was the subject of Exhibit 5 was retained by

18  Fowler White?

19     **A**    I did not.

20     **Q**    Do you know if, in fact, a disc that is the

21  subject of Exhibit 5 was retained by Fowler White?

22     **A**    I do not.

23     **Q**    I just want to clarifying something.  I know

24  we incorporated the previous deposition.  I believe

25  Mr. Scarola asked you if you talked to any agent of

1    Fowler White about the discs.  Do you recall that?

2        **A**    Yes, sir.

3        **Q**    I had a problem with when he used the word

4    agent.

5        **A**    So did I.

6        **Q**    Did you talk to any attorney with Fowler

7    White -- without disclosing the contents of the

8    communications -- between February 2018 and today about

9    the disc?

10       **A**    I don't remember.

11       **Q**    Do you have any general recollection of

12    calling somebody from Fowler White -- or at Fowler

13    White between February 2018 and today?

14       **A**    I don't remember.  Sorry.

15           MR. LINK:  Paul, you still there?

16           MR. CASSELL:  I am.  I will have follow-up

17       questions on these questions.

18           MR. LINK:  That's okay.  There was just a

19       beep.  I thought you got lost there.

20           MR. CASSELL:  Thank you for checking.

21    BY MR. IANNO:

22       **Q**    And just to clarify, Mr. Epstein, you have no

23    idea as to whether or not the disc that's referred to

24    in Exhibit 1 is the same disc that's referenced in

25    Exhibit 5, correct?

1      **A**    I do not.  Correct.

2             MR. IANNO:  I have no further questions.

3             MR. LINK:  Mr. Cassell.

4                    REDIRECT EXAMINATION

5    BY MR. CASSELL:

6      **Q**    I believe just a moment ago you were asked

7    about a document identified as Exhibit 5.

8      **A**    Yes.

9      **Q**    And that's dated November 30th, 2009,

10   correct?

11            MR. IANNO:  2010.

12            THE WITNESS:  2010.

13   BY MR. CASSELL:

14     **Q**    I'm sorry.  2010.  Thank you.

15            Is that right, Mr. Epstein?

16     **A**    Yes.

17     **Q**    And I believe you answered you had no

18   knowledge of where the disc came from from 2010

19   onwards; is that right?

20            MR. LINK:  I'm not sure that was the

21        question.

22            THE WITNESS:  Sorry.  Can you rephrase the

23        question?

24            MR. LINK:  Can you reask the question?

25

```
 1    BY MR. LINK:

 2         Q    I believe you were asked and answered that

 3    you had no knowledge as to how Fowler White came to

 4    come into possession of a disc in or about 2009; is

 5    that right?

 6              MR. LINK:  That's not what he asked.

 7              MR. IANNO:  I object.  That wasn't the

 8         question or the answer.

 9              MR. CASSELL:  Well, perhaps the court

10         reporter could assist us by reading back the

11         question regarding how Fowler White came into

12         possession of the disc and Mr. Epstein's

13         answer.

14              MR. IANNO:  I can assist you there,

15         Mr. Cassell, and Mr. Scarola can correct me if

16         I'm wrong.  That question was related to

17         Exhibit 1 and the disc referenced in paragraph

18         four in Exhibit 1.

19              MR. CASSELL:  And my recollection is

20         Mr. Epstein denied having any knowledge

21         regarding the disc, correct?

22              MR. IANNO:  He can answer, but the record

23         will reflect what his testimony was.

24    BY MR. CASSELL:

25         Q    What was your answer to the question that's
```

1    just been referred to, Mr. Epstein?

2            MR. LINK:  I'm not going to let him answer

3        a question like that.  You have to ask him a

4        specific question, Mr. Cassell.

5            MR. CASSELL:  I would like the court

6        reporter, then, to read back the question that

7        was asked at the beginning of the set of

8        questions that were just asked regarding a disc

9        coming into the possession of Fowler White.

10            MR. GOLDBERGER:  You have to be a little

11        more specific than that.  She will be searching

12        for 45 minutes.

13            MR. CASSELL:  How about the second

14        substantive question that was asked?

15            MR. IANNO:  He's asking for the second

16        question I asked him during my questioning.

17            MR. CASSELL:  Second substantive question.

18            MR. GOLDBERGER:  Mr. Cassell, the court

19        reporter is asking for direction.  The second

20        question that was asked?  Is that what you're

21        asking?

22            MR. CASSELL:  The second question.

23            (A discussion was held off the record.)

24            MR. LINK:  Why don't we go off the record.

25            Mr. Cassell, we are going off the

1    record for a minute.

2         THE VIDEOGRAPHER:  Going off the record.

3    The time is 11:47 a.m.

4         (A discussion was held off the record.)

5         (Whereupon, Bradley Edwards joins the

6         proceedings.)

7         THE VIDEOGRAPHER:  Going back on the

8    record.  The time is 11:49 a.m.

9  BY MR. CASSELL:

10     **Q**    And if the court reporter could read back the

11  question and the answer, I think that would speed up my

12  subsequent questions here.

13         (Thereupon, the requested portion of the

14         record was read back by the reporter as

15         above duly recorded.)

16  BY MR. CASSELL:

17     **Q**    Do you recall the answer, "I did not,"

18  Mr. Epstein?

19     **A**    Yes.

20     **Q**    Did you have any reason, when you made that

21  statement, to give inaccurate testimony?

22         MR. LINK:  I am going to object based on

23     all the objections I made in the past and

24     instruct you not to answer.

25

```
1    BY MR. CASSELL:

2        Q    Did you have any reason to lie when you gave

3    that testimony, sir?

4              MR. LINK:  Same instruction and objection.

5    BY MR. CASSELL:

6        Q    Did you have any reason to be biased when you

7    gave that answer to that question, sir?

8              MR. LINK:  Same instruction.

9    BY MR. CASSELL:

10       Q    Did you have any reason to be prejudiced when

11   you gave that answer, sir?

12             MR. LINK:  Same.

13   BY MR. CASSELL:

14       Q    Did you have any reason to slant your

15   testimony so that it would be harmful to L.M. when you

16   gave the answer to that question, sir?

17             MR. LINK:  Same.

18   BY MR. CASSELL:

19       Q    Did you have any reason to slant your

20   testimony so it would be biased against any other part

21   in this matter, including Bradley J. Edwards?

22             MR. LINK:  Same.

23   BY MR. LINK:

24       Q    Isn't it true, sir, that you have substantial

25   reasons to give inaccurate information to the answer to
```

1    that question?

2            MR. LINK:  Same.

3    BY MR. CASSELL:

4        **Q**    And, sir, if I was allowed to explore why you

5    gave inaccurate information to that question, we would

6    discover substantial reasons for slanting your

7    testimony; isn't that true?

8            MR. LINK:  So I'm going object to form,

9         the characterization, and I'm going to instruct

10        him not to answer.

11           MR. GOLDBERGER:  Not just because of form,

12        but it's beyond the scope.

13           MR. LINK:  It is beyond the scope and it's

14        a very inappropriate statement for a lawyer to

15        make in Florida -- anywhere.

16   BY MR. CASSELL:

17       **Q**    Was the statement I just made accurate,

18   Mr. Epstein?

19           MR. LINK:  I'm going to instruct him not

20        to answer for all the reasons I've already

21        articulated.

22   BY MR. CASSELL:

23       **Q**    Isn't it true, sir, that the statement I just

24   made is accurate?

25           MR. LINK:  Same instruction.

45

BY MR. CASSELL:

    **Q**   Sir, with regard to all the answers that you gave to the attorney for Fowler White a moment ago, isn't it true that you had reason to slant your testimony against L.M.?

        MR. LINK:  Same instruction, Mr. Epstein.

BY MR. CASSELL:

    **Q**   In general, sir, isn't it true that you have substantial bias against L.M.?

        MR. LINK:  Same instruction, Mr. Epstein.

BY MR. CASSELL:

    **Q**   With regard to the question and answer that we have been talking about -- that is, the November 2010 to February 2018 Fowler White disc possession -- do you have any documents associated with that answer?

        MR. LINK:  Does he have any documents associated with his not having knowledge?

        MR. CASSELL:  Correct.

        THE WITNESS:  I don't understand the question.

        MR. LINK:  How can you have documents about something you don't have knowledge about, Mr. Cassell?

1            MR. CASSELL:  That's what I wanted to

2       know, whether the answer to my question is yes

3       or no.

4            THE WITNESS:  I don't understand the

5       question.

6            Can you rephrase the question, sir?

7   BY MR. CASSELL:

8       **Q**    Previously we discussed a question which was

9   to the effect that, between November 2010 and

10  February 2018, whether you had any knowledge of a disc

11  being retained by Fowler White.  And you answered, I

12  did not have any knowledge.

13           I am wondering if you have any documents

14  associated with your answer?

15           MR. LINK:  So, I am going to let him

16      answer the question, but I'm going to note that

17      we had an objection to the production of any

18      documents that were on the duces tecum.

19           But, Mr. Epstein, if you can answer his

20      question about whether you have any

21      documents that confirm that you had no

22      knowledge, then you can answer the question.

23           THE WITNESS:  I don't --

24           MR. LINK:  He doesn't understand the

25      question.

```
 1    BY MR. CASSELL:
 2         Q    Would you have any documents associated with
 3    possession of a disc by Fowler White between
 4    November 2010 and February 2018?
 5         A    Again.  I'm sorry.  Do I have any what?
 6         Q    Do you have -- I'm sorry.
 7              MR. LINK:  I think he's asking you if you
 8         have any --
 9              THE WITNESS:  Let him tell me.
10              MR. LINK:  Mr. Cassell, what's the
11         question?
12    BY MR. CASSELL:
13         Q    Do you have any documents associated with
14    Fowler White's possession of a disc between November
15    2010 and February 2018?
16              MR. IANNO:  Mr. Cassell, on behalf of
17         Fowler White, I have to object, because that
18         question is very overbroad.
19              If you want to ask him about
20         specific -- Exhibit 5 is a document that he
21         may have had in his possession that relates
22         to a disc.
23              I mean, you have to be more specific
24         than just saying do you have any documents
25         that relate to it.
```

```
1          MR. CASSELL:  From what I understood from
2     Mr. Link, the answer to this question was going
3     to be no because he had no knowledge of
4     anything -- or seems to be a document which
5     shows knowledge.
6          MR. LINK:  I think Mr. Ianno's point is
7     your question is broader than what I was
8     saying.
9          MR. IANNO:  Right.
10         MR. CASSELL:  Well, I'm going to ask the
11    question again, then.
12  BY MR. CASSELL:
13    Q    The question is, Mr. Epstein, do you have any
14  documents associated -- I'm sorry.  Let me start over.
15         Mr. Epstein, do you have any documents
16  associated with the disc being retained by Fowler
17  White between November 2010 and February 2018?
18    A    Are you referring to documents that talk
19  about the disc, or documents from the disc that has
20  27,000 piece of paper?  I don't understand the
21  question.  I'm sorry.
22         MR. IANNO:  Mr. Cassell, I think if -- I
23    direct the focus of your question on the word
24    retain.  Is that correct?
25         MR. CASSELL:  That's part of the question
```

```
 1          yes.
 2                MR. IANNO:  Okay.
 3                MR. LINK:  The way the question is framed,
 4          Mr. Cassell, the witness can't answer it.
 5                MR. CASSELL:  Well, the witness can
 6          explain to me why he can't answer it and I
 7          will --
 8                THE WITNESS:  Because it's 27,000 --
 9                MR. CASSELL:  I'm going to object to the
10          attorneys coaching.
11                The attorneys are entitled to object to
12          my question, and should feel free to do so.
13          But I don't want the attorneys telling me
14          what Mr. Epstein can and cannot do.  He's
15          perfectly capable of speaking for himself.
16                MR. LINK:  Fair enough.  We were trying to
17          be helpful and move it along.  Why don't you
18          ask the question and we will decide whether he
19          can answer it or not.
20     BY MR. CASSELL:
21          Q    Mr. Epstein, do you have any documents
22     associated with a disc retained by Fowler White in
23     November 2010 and February 2018?
24          A    What does associated mean?
25          Q    Associated would be the standard definition
```

50

1   of associated, connected to or related to.

2         MR. LINK:  Mr. Cassell, I'm sorry to jump

3      in here.  Are you talking about as defined --

4      the CD in paragraph four of Mr. Epstein's

5      declaration?

6         MR. CASSELL:  I was talking, what I

7      thought was well established at this point,

8      about a question that the Fowler White attorney

9      asked and an answer that Mr. Epstein gave about

10     10 minutes ago.

11        MR. LINK:  I think there's a disconnect.

12        MR. IANNO:  You're confusing the

13     transcript.

14        MR. LINK:  I'm going to do this.  Make it

15     easy.  I am going to instruct him not to answer

16     the pending question.

17         If you have a different question that

18     ties into whether Mr. Epstein had knowledge

19     before February 2018 of the existence, or

20     whether he had possession of the CD as

21     defined in paragraph four of his submission,

22     I will let him answer that.

23        MR. CASSELL:  Why are objecting to him

24     answering this question?

25        MR. LINK:  Because it's an overly broad

1    question that is unrelated to the bankruptcy

2    proceeding.

3        And as we have talked about extensively

4    here, there are multiple discs.  There are

5    27,000 pages, tens of thousands of which

6    have been produced at various times.

7        And -- so to ask the general question

8    about the contents of the disc is different

9    than asking about the specific disc that's

10   referenced in the affidavit and the

11   submission, and that's the scope of the

12   bankruptcy proceeding.

13       MR. CASSELL:  I have to say that I'm

14   perplexed, because 10 minutes ago the attorney

15   for Fowler White asked Mr. Epstein as part of

16   the bankruptcy proceeding whether he had any

17   knowledge of a disc being retained by Fowler

18   White.  And I'm now simply following up on that

19   question.  So it's not clear to me how this

20   could somehow be unconnected with the

21   bankruptcy proceeding when my question directly

22   relates to a question that was asked just 10

23   minutes ago.

24       MR. IANNO:  No, it doesn't, Mr. Cassell.

25   Your question goes far beyond what I asked, and

```
 1        I will leave it at that.
 2   BY MR. CASSELL:
 3        Q    Mr. Epstein, are you familiar with the
 4   question that was asked to you about 10 minutes ago
 5   that I had the court reporter read back to you?
 6        A    Yes, sir.
 7        Q    Are you familiar with your answer?
 8        A    Yes, sir.
 9        Q    Do you have any documents connected with your
10   answer?
11        A    The question asked was did I have any
12   knowledge of the disc being retained.  I have no -- to
13   the best of my recollection, any documents that reflect
14   whether I knew that the disc was retained.
15             Is that an answer to your question?
16        Q    Yes.
17             MR. LINK:  Thank you, Mr. Epstein.
18   BY MR. CASSELL:
19        Q    When you say to the best of your knowledge,
20   do you have any reason to be forgetful on this topic?
21        A    It's been -- you described it's been 10
22   years -- eight years since this disc, so I don't know
23   with specificity over eight years and what documents
24   have been derived from or touched this -- related to,
25   in your words.  So your question is just too broad for
```

53

1   me to answer.  I'm sorry.

2       **Q**   So let's focus, then, on or about

3   November 30th, 2010.  Do you have any reason to forget

4   what knowledge you would have had about Fowler White

5   retaining a disc at that time?

6           MR. LINK:  I'm going -- the way you

7       phrased the question, I'm going to object to

8       the form and instruct him not to answer it.

9           MR. CASSELL:  What's the basis for the

10      instruction not to answer?

11          MR. LINK:  Do you have any reason to

12      forget?

13          MR. CASSELL:  Yes.

14          MR. LINK:  I'm going to instruct him not

15      to answer the question.

16          MR. CASSELL:  On what basis?

17          MR. LINK:  Because essentially it's the

18      same thing as, Are you lying?  Do you have a

19      specific reason to forget?  It's argumentive

20      and it exceeds the scope of the bankruptcy

21      order.

22          MR. CASSELL:  Let's go through this.  I

23      didn't know that an argumentive question was

24      the basis for an objection in this proceeding.

25      Is that your position?

```
 1           MR. LINK:  No.  I'm just articulating all
 2      the reasons I thought the question didn't make
 3      sense.
 4           In essence, what I'm not going to allow
 5      you to do is to ask questions about are you
 6      lying? are you slanting? are you
 7      intentionally forgetting? are you biased?
 8      are you skewed? which has been 90 percent of
 9      what you have tried to do.
10           So you can frame them different ways,
11      but it's the same result, and so I'm
12      instructing him not to answer.
13 BY MR. CASSELL:
14    Q    Mr. Epstein, about one minute ago you said
15 that something that happened eight years ago would be
16 difficult for you to remember.
17           MR. LINK:  That is not what he said.
18           THE WITNESS:  That is not what I said.
19           MR. CASSELL:  Would the court reporter
20      read back the answer that Mr. Epstein gave
21      approximately two minutes ago.
22           (Thereupon, the requested portion of the
23           record was read back by the reporter as
24           above duly recorded.) cast
25
```

55

```
1   BY MR. CASSELL:
2       Q    Sir, do you recall the answer that you just
3   gave two minutes ago?
4       A    Yes.
5       Q    And you indicated that it dealt with
6   something that was not indicated with specificity, I
7   think was the word you used.
8       A    That's correct.
9       Q    If we focus in on information related to my
10  client L.M., do you remember anything from eight years
11  ago regarding documents associated with L.M. that
12  Fowler White might have been retaining?
13           MR. IANNO:  Object to the form.  Outside
14       the scope of the contempt proceedings, and
15       overbroad.
16           MR. CASSELL:  I don't understand how
17       something could be outside of the contempt
18       proceedings if I'm following up on a question
19       that -- the answer gave two minutes ago.
20           MR. IANNO:  That's not your question,
21       Mr. Cassell.
22           I'm kind of offended that there's five
23       lawyers in this room on a Saturday morning,
24       a court reporter, a videographer, and we're
25       wasting time about -- talking about issues
```

```
 1          that have nothing to do with the bankruptcy
 2          proceeding.  But go forward.
 3               MR. LINK:  Will you ask the question
 4          again, please?
 5     BY MR. CASSELL:
 6          Q    Do you have any reason to recall
 7     information -- sorry.
 8               Do you have any reason to recall
 9     information about my client L.M.?
10               MR. LINK:  Generally?
11               THE WITNESS:  Yes, I do.  I have
12          tremendous information about your client.
13               MR. IANNO:  What does that have to do --
14               MR. LINK:  Ask your next question.  He
15          says he has tremendous information about your
16          client.
17               MR. CASSELL:  I'm sorry.  Could you --
18               MR. LINK:  He has tremendous information
19          about your client.
20     BY MR. CASSELL:
21          Q    What information do you have that you learned
22     from the -- actually, let me rephrase that.
23               Any information that might cause her
24     emotional distress?
25               MR. LINK:  Can you say that question
```

1       again?

2   BY MR. CASSELL:

3       **Q**    Do you have any information about my client

4   that might cause her emotional distress, without

5   revealing the nature -- without indicating what that

6   information is?

7            MR. SCAROLA:  Excuse me.  Paul, aren't

8        those questions better reserved for the damage

9        portion?

10           MR. IANNO:  Which is what I was going to

11       state, but okay.

12           MR. CASSELL:  Without going into details,

13       I just wanted to ask that one question.

14           MR. SCAROLA:  Isn't that one better

15       reserved for the damage portion?

16           MR. CASSELL:  I will withdraw that

17       question.

18           I think those -- unless Mr. Scarola has

19       any follow-ups to my questions, I believe

20       those are all the questions I have.

21                   CROSS-EXAMINATION

22   BY MR. SCAROLA:

23       **Q**    With regard to Exhibit Number 5, the order

24   entered in the bankruptcy proceeding, when is the first

25   time that you saw that document?

58

1     **A**    Sorry.  Five?

2     **Q**    Yes.

3           MR. LINK:  Mr. Epstein, you heard his

4     question.  When you saw it.  I don't want you

5     to talk about if you discussed it, any

6     communication with lawyers.

7           THE WITNESS:  Just today is my best

8     recollection.

9  BY MR. SCAROLA:

10    **Q**    When is the first time you learned of the

11 existence of this order?

12    **A**    I don't remember.

13    **Q**    Did you learn of the existence of this order

14 at any time prior to February of 2018?

15    **A**    I don't recall.  Sorry.

16    **Q**    When is the most recent time that -- the most

17 recent time prior to today that you learned of the

18 existence of this order?

19    **A**    I think just today is the best of my

20 recollection.

21    **Q**    So you had no knowledge that this order

22 existed at any time before today.  Is that your

23 testimony?

24    **A**    No.  I said I don't remember.  I don't

25 recall.

1      **Q**    So you may or may not have learned of the
2    existence of this order sometime prior to today.  You
3    don't have a recollection of that.  Is that your
4    testimony?
5           MR. LINK:  Hold on one second.  So as I
6        instructed you before, so you know, I don't
7        want you to share communications with your
8        lawyers.  If you have independent information
9        or knowledge, then you can answer it.
10           MR. SCAROLA:  And it is our position that
11        knowledge gained from Mr. Epstein's attorneys
12        about the existence of an order that expressly
13        relates to Mr. Epstein is not a privileged
14        communication in any respect at all in light of
15        the fact that the order requires action on
16        Mr. Epstein's part.
17           So are you instructing --
18           MR. LINK:  The word only requires action
19        on Mr. Epstein's part.  But if he had the
20        disc -- which he has testified he didn't have
21        the disc -- so there's no action required by
22        the order, Mr. Scarola.
23           MR. SCAROLA:  That is not -- that is not
24        accurate, but we don't need to argue about
25        that.

```
1              MR. LINK:  I agree.

2              MR. SCAROLA:  Are you instructing him not

3         to answer the question as phrased?

4              MR. LINK:  No.  I gave him the instruction

5         not to divulge attorney-client privilege

6         communication.

7    BY MR. SCAROLA:

8         Q    Did any lawyer ever tell you that there was

9    an order entered by the court that restricted your

10   ability to retain information regarding emails?

11             MR. LINK:  I am going to object to your

12        statement.  That is not what the order says,

13        and I am going to instruct you not to disclose

14        communications with lawyers.

15   BY MR. SCAROLA:

16        Q    This order reads, "Should it be determined

17   that Fowler White or Epstein retained images or copies

18   of the subject documents" -- referring to documents

19   that were delivered in electronic form to Fowler White

20   -- "on its computer or otherwise, the court retains

21   jurisdiction to award sanctions in favor of Farmer,

22   Brad Edwards or his client."

23             Do you see where that provision is

24   included in the order?

25             MR. LINK:  You may look at the
```

```
 1        provision --
 2             But I object to -- you added words to
 3        the sentence, Mr. Scarola.
 4             But you may look --
 5   BY MR. SCAROLA:
 6        Q    Let me read the sentence exactly as it
 7   appears in the order.  "Should it be determined that
 8   Fowler White or Epstein retained images or copies of
 9   the subject documents on its computer or otherwise, the
10   Court retains jurisdiction to award sanctions in favor
11   of Farmer, Brad Edwards or his client."
12             Did I read that sentence accurately?
13        A    Yes, sir.
14        Q    Have you ever done anything up to today, as
15   you sit here right now, to determine whether you are or
16   are not in compliance with that order?
17             MR. LINK:  So I'm going to instruct you
18        not to answer that question as he phrased it.
19             MR. SCAROLA:  I have no further questions.
20             MR. LINK:  We will read and not waive.
21             THE VIDEOGRAPHER:  Going off the record.
22        The time is 12:10 p.m. this marks the end of
23        the deposition.
24             (The deposition was concluded
25              at 12:10 p.m.)
```

```
 1                    CERTIFICATE OF OATH

 2
     STATE OF FLORIDA      )
 3                         : SS
     COUNTY OF PALM BEACH )

 4

 5          I, the undersigned authority, certify that

 6   JEFFREY EPSTEIN personally appeared before me and was

 7   duly sworn.

 8             WITNESS my hand and official seal this 19th

 9   day of October, 2018.

10

11             _____

12                     Sonja D. Hall

13                     Commission No.: GG 168652

14                     Notary Public - State of Florida

15                     My Commission Expires: 2-01-22

16

17

18

19

20

21

22

23

24

25
```

63

```
 1             REPORTER'S DEPOSITION CERTIFICATE

 2

 3   STATE  OF  FLORIDA   )
                          : SS
 4   COUNTY OF PALM BEACH )

 5             I, SONJA D. HALL, certify that I was

 6   authorized to and did stenographically report the

 7   deposition of JEFFREY EPSTEIN; that a review of the

 8   transcript was requested; and that the transcript is a

 9   true and complete record of my stenographic notes.

10             I further certify that on the 19th day of

11   October, 2018, I notified SCOTT J. LINK, ESQUIRE that

12   the deposition of JEFFREY EPSTEIN was ready for

13   reading and signing by the witness.

14             I further certify that I am not a relative,

15   employee, attorney, or counsel of any of the parties,

16   nor am I a relative or employee of any of the parties'

17   attorney or counsel connected with the action, nor am

18   I financially interested in the action.

19             Dated this 19th day of October, 2018.

20

21                       _____

22                       SONJA D. HALL

23

24

25
```

1    TO:      JEFFREY EPSTEIN
             c/o SCOTT J. LINK, ESQUIRE
2            LINK & ROCKENBACH, P.A.
             1555 Palm Beach Lakes Boulevard, Suite 301
3            West Palm Beach, FL 33401

4
             RE:  JEFFREY EPSTEIN vs. SCOTT ROTHSTEIN,
5    INDIVIDUALLY; BRADLEY EDWARDS, INDIVIDUALLY

6

7            At the conclusion of your deposition given
     in the above-styled cause you indicated you wished to
8    read and sign the transcript.

9            This letter is to advise you that your
     deposition is ready, and we ask that you call our
10   office at (561) 471-2995 at your earliest convenience
     for an appointment to come in.
11
             If you are a party in this action and your
12   attorney has ordered a copy of this transcript, you
     may wish to read his copy and forward to us a
13   photostatic copy of your signed correction sheet.

14           It is necessary that you do this as soon as
     possible, since the transcript cannot be held beyond
15   two weeks from the date of this letter.

16           If you have any reason which you would like
     for me to place on your deposition as to your failure
17   to sign the same, please advise.

18           Thank you for your prompt attention.

19                       Very truly yours,
                         PALM BEACH REPORTING SERVICE, INC.
20                       1665 Palm Beach Lakes Blvd.,
                         Suite 1001
21                       West Palm Beach, Florida  33401

22
                         BY:  SONJA D. HALL
23

24   Date:  October 19th, 2018

25

1

CORRECTION SHEET:

2

NAME:  JEFFREY EPSTEIN

3
          RE:  JEFFREY EPSTEIN vs. SCOTT ROTHSTEIN,
INDIVIDUALLY; BRADLEY EDWARDS, INDIVIDUALLY

4

5
          The following corrections, additions or
deletions were noted on the transcript of the

6
testimony which I gave in the above-captioned matter
held on October 13th, 2018:

7

PAGE(S)     LINE(S)    SHOULD READ

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                    SIGNATURE:  _____

24                       DATE:  _____

25